JUDGE SULLIVAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 07 CV 10329

——————————————— x
CITY OF LIVONIA EMPLOYEES' : Civil Action No.
RETIREMENT SYSTEM, On Behalf of Itself :
and All Others Similarly Situated, : CLASS ACTION
:
Plaintiff, : COMPLAINT FOR VIOLATION OF THE
: FEDERAL SECURITIES LAWS
:
vs. :
:
WYETH and ROBERT ESSNER, :
:
Defendants. :
:
——————————————— x DEMAND FOR JURY TRIAL



NOV 1 4 2007

U.S. CASHIERS

## INTRODUCTION AND OVERVIEW

1.     This is a class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of Wyeth securities between January 31, 2006 and July 24, 2007 (the "Class Period"), who were damaged thereby (the "Class").

2.     Wyeth is a leading pharmaceutical company and maintains a large business in women's health care products. From 2003 to 2006, Wyeth conducted Phase 3 clinical trials on its new drug, desvenlafaxine ("Pristiq") for postmenopausal symptoms of hot flashes and night sweats. In June 2006, Wyeth announced that it had submitted a New Drug Application ("NDA") to the Food and Drug Administration ("FDA") for this indication.

3.     On July 24, 2007, defendants issued a press release entitled "Wyeth Receives Approvable Letter From FDA for PRISTIQ for the Treatment of Vasomotor Symptoms Associated With Menopause," stating:

> Wyeth Pharmaceuticals, a division of Wyeth, announced today that it received an approvable letter from the U.S. Food and Drug Administration (FDA) for PRISTIQ™ (desvenlafaxine), a serotonin-norepinephrine reuptake inhibitor (SNRI), currently under review as a treatment for moderate-to-severe vasomotor symptoms (hot flashes and night sweats) associated with menopause.
>
> In its letter, the FDA said that before the application could be approved, it would be necessary for Wyeth to provide additional data regarding the potential for serious adverse cardiovascular and hepatic effects associated with the use of PRISTIQ in this indication. The Agency requested that these data come from a randomized, placebo-controlled clinical trial of a duration of one year or more conducted in postmenopausal women.

4.     As a result of the FDA committee's decision on July 24, 2007, Wyeth's stock price dropped from $56 to $50.30 the next day. This decrease in Wyeth's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

## JURISDICTION AND VENUE

5.    The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act. Venue is proper pursuant to §27 of the 1934 Act. Wyeth conducts business in this district and its stock trades on the New York Stock Exchange ("NYSE"), which is located in this district.

## THE PARTIES

6.    Plaintiff City of Livonia Employees' Retirement System purchased Wyeth securities during the Class Period as set forth in the attached certification and was damaged thereby.

7.    Defendant Wyeth's headquarters are located in Madison, New Jersey. Wyeth's stock is traded under the symbol WYE on the NYSE, which is an efficient market.

8.    Defendant Robert Essner ("Essner") was the Chief Executive Officer and Chairman of the Board of Wyeth and a member of the Regulatory Review Committee at all relevant times.

## SCIENTER

9.    During the Class Period, the defendants had both the motive and opportunity to conduct fraud. They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. In so doing, the defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Wyeth securities during the Class Period.

## PRE-CLASS PERIOD STATEMENTS

10.    On December 22, 2005, the Company issues a press release entitled "Wyeth Submits New Drug Application for Desvenlafaxine Extended Release (DVS-233) for Depression," which stated in part:

Wyeth Pharmaceuticals, a division of Wyeth, announced today that it has submitted a New Drug Application (NDA) with the U.S. Food and Drug Administration (FDA) for desvenlafaxine extended release (DVS-233) for the treatment of major depressive disorder (MDD). Desvenlafaxine extended release represents Wyeth's ongoing commitment to research and development of new antidepressant therapies. The new compound was discovered and developed by Wyeth Research.

The clinical development program for major depressive disorder supporting the NDA investigated desvenlafaxine extended release, a serotonin/norepinephrine reuptake inhibitor (SNRI), in patients with a broad range of symptoms associated with depression, including both emotional and somatic symptoms.

"We know from clinical studies as well as clinical practice that there remain significant unmet needs in treating depressed patients," says Gary L. Stiles, M.D., Executive Vice President, Chief Medical Officer, Wyeth. "If approved, desvenlafaxine extended release will offer physicians a new clinically proven option for treating depression."

## FALSE AND MISLEADING
## STATEMENTS DURING THE CLASS PERIOD

11.    On May 25, 2006, the Company issued a press release entitled: "Desvenlafaxine

Succinate (DVS-233) Phase 3 Data Show Significant Improvement in Symptoms of Depression in

Adult Patients versus Placebo; Results Presented for the First Time at 2006 American Psychiatric

Association Annual Meeting," which stated in part:

Wyeth Pharmaceuticals, a division of Wyeth, this week presented for the first time phase 3 data and results from other studies concerning its investigational drug for major depressive disorder (MDD), desvenlafaxine succinate (DVS-233), a novel serotonin-norepinephrine reuptake inhibitor (SNRI) at the 2006 American Psychiatric Association Annual Meeting in Toronto.

Overall, the phase 3 data results showed desvenlafaxine succinate significantly improved depressive symptoms in adult patients compared to placebo. In a separate study investigating QTc prolongation involving healthy adult female subjects, desvenlafaxine succinate 200 mg and 600 mg doses did not affect the QT interval at the study's primary endpoint at eight hours post dose. Studying a drug's effect on the QT interval is one of many methods used to help determine a drug's overall safety profile.

Wyeth Research discovered and developed desvenlafaxine succinate. In December 2005, Wyeth submitted a New Drug Application (NDA) to the U.S. Food and Drug Administration (FDA) for desvenlafaxine succinate for the treatment of MDD.

- 3 -

"The phase 3 data showed that desvenlafaxine succinate can help improve symptoms in adult patients suffering with depression," says Nicholas A. DeMartinis, M.D., Assistant Professor and Associate Director of Clinical Operations of the Neuropsychopharmacology Treatment Research and Training Center at the University of Connecticut Health Center and principal investigator of the clinical trial presented in the scientific session. "Because a substantial number of patients with depression do not respond to current antidepressant treatments, it is important that new treatments continue to be developed to provide patients and physicians with additional treatment options," Dr. DeMartinis adds.

"Wyeth is pleased to be able to report these promising findings that have the potential to add value to the management and treatment of major depressive disorder," says Philip Ninan, Vice President, Neuroscience, Global Medical Affairs. "As a leader in neuroscience, Wyeth is committed to its continuing development of medications that help address the unmet needs of people living with mental illness."

Abstract:  Efficacy and Safety of Desvenlafaxine Succinate in the Treatment of Major Depressive Disorder

The results of the first study presented, a phase 3, multicenter, randomized, double-blind clinical trial of desvenlafaxine succinate in 461 adult patients with MDD, showed significant reduction in Hamilton Depression Rating Scale (HAM-D17) scores for the desvenlafaxine succinate 100 mg (p = .0038) and 400 mg (p=0.0023) dose groups versus the placebo group.  For the 200 mg dose group, reduction in the HAM-D17 trended towards significance (p=0.0764).    All desvenlafaxine succinate dose groups showed significant improvement on the Clinical Global Impression-Improvement (CGI-I) scale, a secondary efficacy measure, versus placebo (p<0.05). Additionally, the 100 mg desvenlafaxine succinate group demonstrated significant improvement versus placebo in depression-related pain scores utilizing the Visual Analog Scale-Pain Intensity (VAS-PI) scale (p=0.002).

Abstract: Randomized, Double-Blind, Placebo-Controlled Study of Desvenlafaxine Succinate in Major Depressive Disorder

The results of a second phase 3, randomized, double-blind, placebo-controlled study of desvenlafaxine succinate were also presented at the APA annual meeting.  In this second study, 375 adult patients with major depressive disorder were randomized to receive desvenlafaxine succinate once-daily doses of 200 mg, 400mg, or placebo.  Adjusted mean change from baseline in HAM-D17 total score, the primary efficacy measure, was significantly greater for the desvenlafaxine succinate 200 mg (p=0.002) and 400 mg (p=0.008) dose groups versus placebo.  In addition, overall VAS-PI scores for the desvenlafaxine succinate 200 mg group were significantly better than placebo (p=.002). There was a trend toward significance for the desvenlafaxine succinate 400 mg group (p=0.053).

- 4 -

In the two phase 3 desvenlafaxine succinate clinical trials presented at the APA, adverse events, including nausea and increased blood pressure, were generally consistent with the SNRI class. The incidence of nausea was greatest during week 1 of treatment and decreased dramatically afterwards to rates that remained low for the remainder of the study. The most common treatment emergent adverse events (*i.e.*, those reported by at least 10 percent of desvenlafaxine succinate patients, and twice the rate of patients on placebo) were abdominal pain, asthenia, anorexia, constipation, dry mouth, nausea, vomiting, dizziness, insomnia, nervousness, somnolence, sweating, tremor, vertigo, and abnormal ejaculation. Most of these adverse events in both studies were mild or moderate in severity.

Abstract: Double-blind, Placebo- and Moxifloxacin-controlled Crossover Study of the Effects of Desvenlafaxine Succinate on QT Interval in Healthy Adult Female Subjects

To help determine whether desvenlafaxine succinate had effects on the QT interval, a randomized, double-blind study of 71 healthy adult women (ages 18 to 55) was conducted. In the study, desvenlafaxine succinate 200 mg and 600 mg dose groups did not affect the QT interval at the primary endpoint at eight hours post dose. Because many drugs are known to be associated with a potential to prolong QT interval, the FDA developed guidance recommending that all manufacturers conduct a QT interval study to help determine whether any new agent may potentially prolong the QT/QTc interval, one of many important measures of cardiovascular safety.

Abstract: Desvenlafaxine: Preclinical Evidence for Serotonin and Norepinephrine Reuptake Inhibition, Antidepressant, and Antinociceptive Activity

According to research also presented during the APA, desvenlafaxine succinate exhibited activity in preclinical models of depression and anxiety.

12.    On June 26, 2006, Wyeth issued a press release stating that it had submitted an NDA for Pristiq for the treatment of moderate to severe vasomotor symptoms associated with menopause, such as hot flashes and night sweats. It stated that desvenlafaxine succinate would give physicians additional options to help meet the individualized needs of their menopausal patients. Joseph Camardo, M.D., Senior Vice President, Global Medical Affairs, stated: "The simultaneous submission of these NDAs emphasizes Wyeth's position as a leader and innovator in women's health. Wyeth continues to support clinical research and drug development with the goal of meeting the health care needs of women worldwide."

- 5 -

13.     On October 5, 2006, defendants made a presentation at an investor conference, stating that Pristiq was "[s]imilar to Effexor XR® in terms of efficacy, safety and tolerability." Defendants stated that Pristiq "[c]an become the first and only SNRI proven to effectively address the distinctive symptoms and therapeutic needs of women with . . . vasomotor symptoms." A slide entitled "Pristiq™ Phase 3 Summary" stated:

- Safety
  - Early discontinuation rate below 10% at end of week 1
  - Tolerability profile improved after week 1
    - Predominant systems – nausea, dizziness, insomnia, somnolence
    - Median duration of nausea: 3-4 days

Defendants also stated that Wyeth had asked the FDA for approval for Pristiq in June 2006 and predicted peak sales of ">$2 Billion."

14.     On October 5, 2006, defendants issued a press release entitled "Wyeth Presents R&D Highlights at Investor Conference," stating:

Pristiq (Desvenlafaxine Succinate) (Major Depressive Disorder and Vasomotor Symptoms)

*          *          *

FDA action for the second application for Pristiq for vasomotor symptoms (VMS) associated with menopause is anticipated in April 2007. Pristiq is expected to provide significant relief of hot flushes (decrease in number and severity) associated with menopause.

If approved, Pristiq will be the first non-hormonal treatment indicated for relief of VMS.

15.     On January 24, 2007, defendants issued a press release entitled "Wyeth Receives Approvable Letter From FDA for Pristiq (Desvenlafaxine Succinate) for the Treatment of Major Depressive Disorder," stating:

- 6 -

Wyeth Pharmaceuticals, a division of Wyeth, announced today that the Company has received an approvable letter from the U.S. Food and Drug Administration (FDA) for Pristiq™ (desvenlafaxine succinate), a serotonin-norepinephrine reuptake inhibitor (SNRI) studied as a treatment for adult patients with major depressive disorder (MDD). The letter was received January 22.

"The approvable letter is in line with Wyeth's expectations and we remain on track with our plans for Pristiq" says Joseph Mahady, President, Wyeth Pharmaceuticals – The Americas and Global Businesses. "We are working toward resolution of all outstanding issues at our manufacturing site in Guayama, Puerto Rico and have already made significant progress in meeting previously established commitments."

According to the approvable letter, FDA approval of Pristiq is subject to several conditions, including the following:

A satisfactory FDA inspection of the Company's Guayama, Puerto Rico facility, which is where Pristiq will be manufactured
Several post-marketing commitments, including submission of long-term relapse prevention, low dose and pediatric studies
Additional clarity around the Company's product education plan for physicians and patients
Confirmation by the FDA of the acceptability of the proprietary name, Pristiq

As the Company has already communicated, launch timing for the MDD indication is predicated on three elements – final FDA approval for Pristiq as a treatment for adult patients with MDD, the results of ongoing MDD studies at lower dosage levels, and the progress of FDA review of Wyeth's separate New Drug Application (NDA) for vasomotor symptoms (VMS) associated with menopause. Importantly, while the approvable letter requires some post-marketing commitments, the FDA does not require that any additional clinical studies be submitted prior to the approval of Pristiq.

"Given the importance of Pristiq, we are committed to ensuring the most complete profile and product information is available to physicians and patients at the time of this product's launch," Mahady says.

16.    On May 9, 2007, defendants issued a press release entitled "Wyeth Presents Phase 3 Data for Pristiq, an Investigational Non-Hormonal Therapy for Menopausal Hot Flashes and Night Sweats; First Scientific Presentation for Pristiq Occurs at the 55th Annual Clinical Meeting of the American College of Obstetricians and Gynecologists," stating:

Wyeth Pharmaceuticals, a division of Wyeth, presented results from the first Phase 3 studies evaluating Pristig™ (desvenlafaxine) for the treatment of moderate-to-severe

vasomotor symptoms (hot flashes and night sweats) associated with menopause. These studies showed that women who took Pristiq experienced a reduction in both the number and severity of hot flashes. Additional analyses presented demonstrated that Pristiq reduced the number of nighttime awakenings and mood disturbances in postmenopausal women with hot flashes and night sweats and did not have a negative effect on sexual function.

The data were presented at the 55th Annual Meeting of the American College of Obstetricians and Gynecologists (ACOG) in San Diego. Pristiq is currently under review by the U.S. Food and Drug Administration (FDA) and could be the first non-hormonal treatment for menopausal hot flashes and night sweats.

"Millions of women experience hot flashes and night sweats during menopause, but there are currently no effective non-hormonal treatment options approved by the FDA," says Joseph Camardo, M.D., Senior Vice President, Global Medical Affairs, Wyeth Pharmaceuticals. "The data indicate Pristiq has the potential to expand the range of effective treatment options by providing a non-hormonal choice for menopausal women with moderate-to-severe vasomotor symptoms."

Evaluation of Safety and Efficacy

Three studies presented examine the efficacy of Pristiq at various doses while also evaluating its safety and tolerability profile. The most common side effect in all three studies was nausea, which was generally mild to moderate, was dose-dependent, and resolved quickly, on average within three days.

Efficacy and Safety of Desvenlafaxine Succinate for Treatment of Menopausal Vasomotor Symptoms

This one-year, multicenter, randomized, double-blind, placebo-controlled trial evaluated the safety and efficacy of Pristiq at multiple doses. The study included 689 postmenopausal women with 50 or more moderate-to-severe hot flashes per week. Primary endpoints were assessed at weeks four and 12 and included the daily number and severity of hot flashes and night sweats.

Results from this study showed a reduction in the number and severity of hot flashes and night sweats at weeks four and 12 for several of the doses investigated. There was a rapid onset of action – within one week of starting therapy.

Efficacy of Desvenlafaxine Succinate in the Treatment of Menopausal Vasomotor Symptoms

This six month multicenter, randomized, double-blind, placebo-controlled trial evaluated the efficacy and safety of Pristiq. The study included 541 postmenopausal women with 50 or more moderate-to-severe hot flashes per week. Primary endpoints were assessed at weeks four and 12, and included the daily number and severity of hot flashes and night sweats.

Pristiq demonstrated significant improvements compared with placebo for all primary endpoints. A statistically significant reduction in the number of hot flashes (60 to 66 percent) was maintained throughout the 26-week study period.

A Placebo-Controlled Trial of Desvenlafaxine Succinate and Tibolone for Menopausal Vasomotor Symptoms

This 12-week, multicenter, randomized, double-blind, placebo- and active-controlled trial evaluated the safety and efficacy of Pristiq. The study included 451 postmenopausal women with 50 or more moderate-to-severe hot flashes per week, in multiple countries outside of the United States.

Results showed that at weeks four and 12, all groups experienced a decrease in the number and severity of hot flashes from baseline. There was no statistically significant difference between Pristiq and placebo; whereas, the difference between active comparator and placebo was significant.

17.    On July 23, 2007, *The Associated Press* reported:

A Cowen & Co. analyst said the Food and Drug Administration will probably approve a Wyeth drug that treats menopausal symptoms Monday, but the drug may reach only a niche market.

The FDA is due to rule on Wyeth's application for Pristiq, which treats hot flashes and night sweats without using hormones. The agency delayed approval in April, requesting additional clinical data from Wyeth.

Analyst Steve Scala said the agency will approve the drug because there is an unmet medical need. Pristiq causes fewer mood and sleep disruption problems than hormone replacement therapy, he added.

*        *        *

"Pristiq's modest efficacy could initially niche it to patients where HRT is contra-indicated," he said "However. there is a larger opportunity in the 80 percent of women currently not seeking treatment for their post menopausal symptoms."

The analyst expects $50 million in Pristiq sales this year, $100 million in 2008, and $300 million in 2012.

18.    Defendants' Class Period statements were materially false and misleading when made because defendants concealed negative data regarding Pristiq's hepatic and cardiovascular effects.

## THE TRUTH IS REVEALED

19.    On July 24, 2007, defendants issued a press release entitled "Wyeth Receives

Approvable Letter From FDA for PRISTIQ for the Treatment of Vasomotor Symptoms Associated

With Menopause," stating:

> Wyeth Pharmaceuticals, a division of Wyeth, announced today that it received an
> approvable letter from the U.S. Food and Drug Administration (FDA) for
> PRISTIQ™ (desvenlafaxine), a serotonin-norepinephrine reuptake inhibitor (SNRI),
> currently under review as a treatment for moderate-to-severe vasomotor symptoms
> (hot flashes and night sweats) associated with menopause.
>
>     In its letter, the FDA said that before the application could be approved, it
> would be necessary for Wyeth to provide additional data regarding the potential for
> serious adverse cardiovascular and hepatic effects associated with the use of
> PRISTIQ in this indication. The Agency requested that these data come from a
> randomized, placebo-controlled clinical trial of a duration of one year or more
> conducted in postmenopausal women.

20.    As a result of the FDA committee's decision on July 24, 2007, Wyeth's stock price

dropped from $56 to $50.30 the next day.  This decrease in Wyeth's stock price was a result of the

artificial inflation caused by defendants' misleading statements coming out of the stock price.

21.    On July 24, 2007, *The Associated Press* reported:

> The Food and Drug Administration wants more data from Wyeth on how its
> proposed drug to treat hot flashes and other symptoms of menopause affects the heart
> and liver, the company said Tuesday.
>
>     The FDA is seeking a one-year study of how the drug Pristiq affects those
> organs, said Wyeth's chief medical officer, Dr. Gary Stiles.
>
>     The FDA on Monday stopped short of approving Pristiq for menopause
> symptoms, sending Wyeth a so-called approvable letter, according to agency
> spokeswoman Rita Chappelle.  That indicates the company's application is
> acceptable in many respects, but that staff scientists want more information about the
> treatment before approving it.
>
>     The decision was a blow to Madison-based Wyeth, which hopes to market the
> drag as the first non-hormonal treatment for menopausal symptoms.

22.    On July 24, 2007, *The Wall Street Reported* reported:

The Food and Drug Administration declined to approve an experimental Wyeth drug to treat hot flashes and other symptoms of menopause.

The agency issued an "approvable letter" for the drug. which Wyeth has proposed selling under the brand name Pristiq, an agency spokeswoman said.  The FDA can't comment on the contents of such letters other than to confirm they have been issued.

The issuance of an approvable letter means that the FDA thinks a product could be approved but typically that the agency needs more information before granting final approval.

Pristiq, which is derived from Wyeth's blockbuster antidepressant Effexor XR, has been expected to help compensate for an anticipated decline in sales of that drug, which is set to face generic competition by 2010.

23.     On July 24, 2007, *TheStreet.com* reported:

Wyeth watched its shares drop sharply after U.S. regulators said they want another clinical trial for the menopause-symptoms treatment Pristiq.

*        *        *

The company didn't provide an exact timetable for the new clinical trial. The FDA also asked Wyeth to answer questions about "certain chemistry, manufacturing and controls deficiencies" before it approves the drug.  Wyeth didn't provide details.

*        *        *

Merrill Lynch analyst David Risinger cut his rating to hold from buy, telling clients that Pristiq probably wouldn't be available for treating menopause symptoms until the first quarter of 2010.  He doesn't own shares, but his firm has had a noninvestment banking relationship.

"For all intents and purposes, this indication is dead," says Barbara Ryan, of Deutsche Rank Securities, in a note to clients.

*        *        *

Pristiq has been viewed by Wyeth as a way to expand its women's health care offerings and to shore up sales for its Premarin and Prempro treatment for menopause.  These drugs achieved sales of $1.05 billion last year and are among Wyeth's biggest products.

However, sales have slowed, gaining 3% year over year in the second quarter but declining 3% during the first half of 2007 compared with the same period last year.

- 11 -

&ast; &ast; &ast;

"This blow to Pristiq will intensify the company's exposure to Effexor [XR] generics in 2010," Ryan warns.

24. On July 25, 2007, *AP News* reported:

Leerink Swann analyst Seamus Fernandez downgraded the Madison, N.J., company to 'Market Perform' from 'Out-perform,' questioning sales of Pristiq and Wyeth's ability to get regulators to approve its drugs.

25. On July 25, 2007, *The Star-Ledger* reported:

Wyeth said a new clinical trial for Pristiq, one of the company's most important experimental medicines, could take a year or longer to complete.

Industry analysts said the safety concerns could doom the drug – which is also awaiting approval as a treatment for depression – and its potential to ensure earnings growth when Wyeth's Effexor antidepressant and Protonix ulcer drug face generic competition in coming years.

Credit Suisse analyst Catherine Arnold said she is no longer counting on any sales from Pristiq, given the FDA's cautionary stance.

"The effect is negative in the longer term and we see a $2.6 billion revenue shortfall and a 31 cent (per share) hit" to Wyeth's 2011 results, Arnold said in a research note.

&ast; &ast; &ast;

The Madison-based company has been counting on Pristiq, a derivative of Wyeth's $3.5-billion-a-year Effexor, to ease the sting when Effexor's U.S. patent lapses in 2010 and cheaper generics hit the market.

Revenue from Pristiq, which analysts have said could top $2 billion a year, would also help prevent a sharp earnings decline in 2011, when Protonix loses patent protection.

"It's a big setback for Wyeth," said Bannister. who noted Pristiq was unlikely to be approved until 2009 or 2010 – too late to sufficiently ramp up its sales before Effexor's patent lapses.

26. On August 13, 2007, *The Wall Street Journal* reported:

The Food and Drug Administration's rejection of Wyeth's schizophrenia drug bifeprunox is the latest in a string of disappointments that is sapping the confidence of investors in the big drug company's long-term growth prospects.

- 12 -

\*        \*        \*

The setbacks come after a bigger disappointment in late July, when the FDA issued what is known as an approvable letter – which typically indicates the agency needs more information before it will approve a drug – for Wyeth's experimental drug Pristiq for menopause symptoms.

\*        \*        \*

While Wyeth's profits have been strong lately, the string of bad news raises concerns over how the company will compensate for a future drop in sales of two of its blockbuster drugs, antidepressant Effexor XR and acid-reflux drug Protonix. The pills accounted for combined world-wide sales of $5.5 billion last year, about 27% of the company's revenue, and both are expected to face generic competition for the first time in the U.S. in 2010 or early 2011.

\*        \*        \*

Wyeth's shares were down $2.99, or 6%, to $46.59 at 4 p.m. Friday in trading on the New York Stock Exchange. That is about 21% below the stock's 52-week high of $59 reached in May.

## LOSS CAUSATION/ECONOMIC LOSS

27.     During the Class Period, as detailed herein, defendants made false and misleading statements by means of concealment and obfuscation of critical clinical trial data and engaged in a scheme to deceive the market. This artificially inflated Wyeth's stock price and operated as a fraud or deceit on the Class. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Wyeth's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time. As a result of their purchases of Wyeth securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

28.     Wyeth's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

- 13 -

29.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Wyeth who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made. On the contrary, such statements concealed critical data about the prospects of an important drug candidate.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

30.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Wyeth securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

31.     At all relevant times, the market for Wyeth securities was efficient for the following reasons, among others:

(a)    As a regulated issuer, Wyeth filed periodic public reports with the SEC; and

(b)    Wyeth regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

32.    Plaintiff incorporates ¶¶1-31 by reference.

33.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

34.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Wyeth securities during the Class Period.

35.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Wyeth securities. Plaintiff and the Class would

not have purchased Wyeth securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

36.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Wyeth securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act Against All Defendants

37.    Plaintiff incorporates ¶¶1-36 by reference.

38.    The Individual Defendants acted as controlling persons of Wyeth within the meaning of §20 of the 1934 Act. By virtue of their positions and their power to control public statements about Wyeth, the Individual Defendants had the power and ability to control the actions of Wyeth and its employees. Wyeth controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

39.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Wyeth securities during the Class Period (the "Class"). Excluded from the Class are defendants, directors and officers of Wyeth and their families and affiliates.

40.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Wyeth had more than 1.3 billion shares of stock outstanding, owned by thousands of persons.

- 16 -

41.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the 1934 Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the prices of Wyeth securities were artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

42.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

43.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

44.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiff and the members of the Class damages and interest;

- 17 -

C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 14, 2007              COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
                                       SAMUEL H. RUDMAN
                                       DAVID A. ROSENFELD


                                       SAMUEL H. RUDMAN

                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)

                                       COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
                                       DARREN J. ROBBINS
                                       MATTHEW P. MONTGOMERY
                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)

                                       Attorneys for Plaintiff

- 18 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff")
declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the
direction of plaintiff's counsel or in order to participate in this private action or any
other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the
class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in
the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a
class in the following actions filed under the federal securities laws during the three
years prior to the date of this Certification:

*Charatz v. Avaya, Inc., et al.*, No. 3:05-cv-02319-MLC-TJB (D.N.J.)
*In re Sunterra Corp. Sec. Litig.*, No. 2:06-cv-00844-BES-RJJ (D. Nev.)
*In re GMH Communities Trust Sec. Litig.*, No. 2:06-cv-01444-PBT (E.D. Pa.)

(b)    Plaintiff is seeking to serve as a representative party for a class in
the following actions filed under the federal securities laws:

(c)    Plaintiff initially sought to serve as a representative party for a
class in the following actions filed under the federal securities laws during the three
years prior to the date of this Certification:

*Margaret K. Hill, Trustee of Kelk Irrevocable Trust v. Tribune Company, et al.*, No. 1:05-cv-02602 (N.D. Ill.)

WYETH

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _2nd_ day of _November_ , 2007.

CITY OF LIVONIA EMPLOYEES'
RETIREMENT SYSTEM

By: _Gerald S. Sole_

Its: _ Treasurer _

- 2 -

## SCHEDULE A

### SECURITIES TRANSACTIONS

#### Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 05/01/2006 | 625 | $48.80 |
| 05/01/2006 | 1,325 | $48.74 |
| 05/02/2006 | 900 | $48.71 |
| 05/03/2006 | 950 | $48.89 |
| 05/04/2006 | 550 | $49.48 |
| 05/04/2006 | 600 | $49.45 |
| 05/04/2006 | 925 | $49.30 |
| 05/05/2006 | 1,425 | $49.83 |
| 06/16/2006 | 1,000 | $43.99 |
| 04/13/2007 | 4,928 | $55.95 |
| 04/16/2007 | 2,288 | $56.70 |

#### Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 08/10/2006 | 50 | $47.81 |
| 08/10/2006 | 1,375 | $47.75 |
| 08/10/2006 | 1,400 | $47.87 |
| 08/11/2006 | 500 | $47.59 |
| 08/11/2006 | 950 | $47.55 |
| 08/14/2006 | 425 | $47.63 |
| 08/14/2006 | 650 | $47.61 |
| 08/15/2006 | 900 | $47.62 |
| 08/15/2006 | 950 | $47.66 |
| 08/16/2006 | 275 | $47.56 |
| 08/16/2006 | 825 | $47.42 |
| 07/24/2007 | 594 | $52.62 |
| 07/24/2007 | 947 | $51.23 |
| 07/24/2007 | 5,675 | $51.16 |