UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

――――――――――――――――――――――――――― x

CITY OF LIVONIA EMPLOYEES'
RETIREMENT SYSTEM, On Behalf of Itself
and All Others Similarly Situated,

                      Plaintiff,

      vs.

WYETH, et al.,

                      Defendants.

――――――――――――――――――――――――――― x

:   Civil Action No. 1:07-cv-10329-RJS

:   <u>CLASS ACTION</u>

:   **ECF CASE**

:   DECLARATION OF LAURIE L. LARGENT
:   IN SUPPORT OF PLAINTIFFS'
:   MEMORANDUM OF LAW IN
:   OPPOSITION TO DEFENDANTS' MOTION
:   TO DISMISS THE CONSOLIDATED
:   COMPLAINT FOR VIOLATION OF THE
:   FEDERAL SECURITIES LAWS

I, LAURIE L. LARGENT, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of California and have been admitted *pro hac vice* in the instant action.  I am associated with the law firm of Coughlin Stoia Geller Rudman & Robbins LLP, one of the counsel of record for Plaintiffs in the above-entitled action.  I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.      Attached as Exhibit A is a true and correct copy of Robert Essner's Form 4 filed with the Securities & Exchange Commission ("SEC") identifying that he beneficially owned 75,535 shares of Wyeth common stock (including 17,464 shares jointly held with his spouse) following his final Class Period stock sale.

3.      Attached as Exhibit B is a true and correct copy of Joseph M. Mahady's Form 4 filing with the SEC identifying that he beneficially owned 6,414 shares of Wyeth common stock following his final Class Period stock sale.

4.      Attached as Exhibit C is a true and correct copy of Kenneth J. Martin's Form 4 filing with the SEC identifying that he beneficially owned 4,805 shares of Wyeth common stock following his final Class Period stock sale.

5.      Attached as Exhibit D is a true and correct copy of Bernard J. Poussot's Form 4 filing with the SEC identifying that he beneficially owned 32,264 shares of Wyeth common stock following his final Class Period stock sale.

6.      Attached as Exhibit E is a true and correct copy of Robert R. Ruffolo's Form 4 filing with the SEC identifying that he beneficially owned 30,000 shares of Wyeth common stock following his final Class Period stock sale.

7.     Attached as Exhibit F is a true and correct copy of excerpts from Wyeth's Form 10-K filed with the SEC for the fiscal year ended December 31, 2005, identifying Wyeth's relevant risk disclosures before the Class Period.

8.     Attached as Exhibit G is a true and correct copy of excerpts from Wyeth's Form 10-K filed with the SEC for the fiscal year ended December 31, 2006, identifying Wyeth's relevant risk disclosures during the Class Period.

9.     Attached as Exhibit H is a true and correct copy of excerpts from Wyeth's Form 10-K filed with the SEC for the fiscal year ended December 31, 2007, identifying Wyeth's relevant risk disclosures after the Class Period.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 25th day of July, 2008, at San Diego, California.

s/ LAURIE L. LARGENT
LAURIE L. LARGENT

S:\CasesSD\Wyeth\DEC 00052903.doc

- 2 -

CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2008, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on July 25, 2008.

s/ LAURIE L. LARGENT
LAURIE L. LARGENT

COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:   llargent@csgrr.com

# Mailing Information for a Case 1:07-cv-10329-RJS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Joseph Chepiga**
  mchepiga@stblaw.com,managingclerk@stblaw.com
- **Alexandra Emily Greif**
  agreif@stblaw.com
- **Tor Gronborg**
  torg@lerachlaw.com
- **Laurie L. Largent**
  llargent@csgrr.com
- **Lynn Katherine Neuner**
  lneuner@stblaw.com,managingclerk@stblaw.com
- **David Avi Rosenfeld**
  drosenfeld@csgrr.com,e_file_ny@csgrr.com,amartin@csgrr.com
- **Samuel Howard Rudman**
  srudman@csgrr.com,e_file_ny@csgrr.com
- **Trig Randall Smith**
  trigs@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`

EXHIBIT A

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 4

```
---------------------------
|       OMB APPROVAL        |
|---------------------------|
| OMB Number:               |
| 3235-0287                 |
| Expires:                  |
| January 31, 2005          |
| Estimated average         |
| burden hours per          |
| response 0.5              |
---------------------------
```

STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

() Check this box if
no longer subject to
Section 16. Form 4 or
Form 5 obligations may
continue. See Instruction
1(b).

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

(Print or Type Responses)

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| ESSNER ROBERT | WYETH                          WYE | _X_ Director  _____ 10% Owner |
| | | _X_ Officer   _____ Other |
| (Last)    (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | (give title below)        (specify below) |
| | 10-27-2006 | Chairman and CEO |
| 5 GIRALDA FARMS, (Street) | 4. If Amendment, Date Original Filed(Month/Day/Year) | |
| MADISON   - NJ - 07940 (City)   (State)  (Zip) | | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| | | _X_ Form filed by One Reporting Person |
| | | ___ Form filed by More than One Reporting Person |

Table I -- Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2a. Deemed Execut. Date (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Sec Beneficially Owned Following Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10-27-2006 | | M | | 177,600 | A | $36.2188 | 235,671.1224 | D | |
| Common Stock | 10-27-2006 | | S | | 177,600 | D | $51.9757 | 58,071.1224 | D | |
| Common Stock (Joi ntly w/ Spouse) | | | | | | | | 17,463.9479 | D | |
| Common Stock (Res tricted Stock Tru st) | | | | | | | | 532,679.7631 | D | |

Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/ Day/ Year) | 3a. Deemed Execu. Date (Month/ Day/ Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/ Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned folowing reported tran.(s) (Inst.4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option | $36.2188 | 10-27-2006 | | M | | | 177,601 0 | 05-22-2007 | 05-22-2011 | Common Stock | 177,600 | $0 | 0 | D | |

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| ESSNER ROBERT<br><br>5 GIRALDA FARMS<br>MADISON NJ 07940 | X | . | Chairman and CEO | |

Explanation of Responses:

1 Ten-year option vesting in one-third increments on the first, second and third anniversaries of the grant date.

Remarks:


Signatures

William M. Haskel, Attorney-in-Fact for Robert Essner          / 10-30-2006
----------------------------------------------------------     -----------
 ** Signature of Reporting Person                                 Date


  *  If the form is filed by more than one reporting person, seeInstruction 5(b)(v).
  ** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
  See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).


  Note: File three copies of this Form, one of which must be manually signed.  If space is
insufficient, See Instruction 6 for procedure.

  Potential persons who are to respond to the collection of information contained in this form
are not required to respond unless the form displays a currently valid OMB number.

EXHIBIT B

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 4

```
-----------------------
|     OMB APPROVAL     |
|---------------------|
| OMB Number:         |
| 3235-0287           |
| Expires:            |
| January 31, 2005    |
| Estimated average   |
| burden hours per    |
| response 0.5        |
-----------------------
```

( ) Check this box if
no longer subject to
Section 16. Form 4 or
Form 5 obligations may
continue. See Instruction
1(b).

STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

(Print or Type Responses)

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| MAHADY JOSEPH M | WYETH        WYE | ___ Director       ___ 10% Owner    _X_ Officer       ___ Other |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | (give title below)       (specify below) |
| 5 GIRALDA FARMS, (Street) | 10-24-2006 | Senior VP |
| | 4.If Amendment, Date Original Filed(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| MADISON - NJ - 07940 (City) (State) (Zip) | | _X_ Form filed by One Reporting Person    ___ Form filed by More than One Reporting Person |

Table I -- Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2a. Deemed Execut. Date (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Sec Beneficially Owned Following Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10-24-2006 | | M | | 126,000 | A | $41.05 | 132,414 | D | |
| Common Stock | 10-24-2006 | | S | | 126,000 | D | $51.2106 | 6,414 | D | |
| Common Stock | 10-24-2006 | | M | | 76,000 | A | $40.22 | 82,414 | D | |
| Common Stock | 10-24-2006 | | S | | 76,000 | D | $51.2106 | 6,414 | D | |

Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of | 2. Conver- | 3. Trans- | 3a. Deemed | 4. Trans- | 5. Number of | 6. Date | 7. Title and | 8. Price | 9. Number | 10. Owner- | 11. Nature of |
|---|---|---|---|---|---|---|---|---|---|---|

| Deriv- ative Security (Instr. 3) | Sion or Exercise Price of Deriv- ative Security | action Date (Month/ Day/ Year) | Execu. Date (Month/ Day/ Year) | action (Instr. 8) Code V | Deriv- ative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) (A) (D) | Exercisable and Expira- tion Date (Month/Day/ Year) Date Exer- cisable | Expira- tion Date | Amount of Underlying Securities (Instr. 3 and 4) Title | Amount or Number of Shares | of Deriv- ative Secur- ity (Instr. 5) | of Deriv- ative Secur- ities Bene- ficially Owned folowing reported tran.(s) (Inst.4) | ship Form of Deriv- ative Secur- ity Direct (D) or Indirect (I) (Instr.4) | Indirect Benefici. Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee Stock Option | $41.05 | 10-24-2006 | | M | 126,000 0 | 04-24-2013 #1 | | Common Stock | 126,000 | $0 | 0 | D | |
| Employee Stock Option | $40.22 | 10-24-2006 | | M | 76,000 | 04-22-2014 #1 | | Common Stock | 76,000 | $0 | 38,000 | D | |

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| MAHADY JOSEPH M 15 GIRALDA FARMS MADISON NJ 07940 | | | Senior VP | |

Explanation of Responses:

  1 Ten-year option vesting in one-third increments on the first, second and third anni versaries of the grant date.

Remarks:

Signatures

William M. Haskel, Attorney- in-Fact for Joseph M. Mahady     / 10-26-2006
-----------------------------------------------------------    -----------
    ** Signature of Reporting Person                     Date

    * If the form is filed by more than one reporting person, seeInstruction 5(b)(v).
    ** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
    See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

    Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, See Instruction 6 for procedure.

    Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

EXHIBIT C

FORM 4

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

```
-------------------------
|      OMB APPROVAL      |
|-----------------------|
| OMB Number:           |
| 3235-0287             |
| Expires:              |
| January 31, 2005      |
| Estimated average     |
| burden hours per      |
| response 0.5          |
-------------------------
```

{} Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

(Print or Type Responses)

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| MARTIN KENNETH J | WYETH    WYE | ___ Director    ___ 10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | _X_ Officer    ___ Other |
| 5 GIRALDA FARMS, (Street) | 06-13-2007 | (give title below)     (specify below) |
| | | CFO and Vice Chairman |
| MADISON - NJ - 07940 (City) (State) (Zip) | 4.If Amendment, Date Original Filed(Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| | | _X_ Form filed by One Reporting Person |
| | | ___ Form filed by More than One Reporting Person |

Table I -- Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Trans- action Date (Month/ Day/ Year) | 2a. Deemed Execut. Date (Month/ Day/ Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Sec Beneficially Owned Following Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 06-13-2007 | | S | | 12,541 | D | \$57.1532 | 4,805.8585 #1 | D | |
| Common Stock (Restricted Stock Trust) | | | | | | | | 252,322.71 #1 | I | Restricted Stock Trust |

Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of | 2. Conver- | 3. Trans- | 3a. Deemed | 4. Trans- | 5. Number of | 6. Date | 7. Title and | 8. Price | 9. Number | 10. Owner- | 11. Nature of |
|---|---|---|---|---|---|---|---|---|---|---|

| Deriv- ative Security (Instr. 3) | sion or Price of Deriv- ative Security | action Date (Month/ Day/ Year) | Execu- Date (Month/ Day/ Year) | action Code (Instr. 8) | | Deriv- ative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | Exercisable and Expira- tion Date (Month/Day/ Year) | | Amount of Underlying Securities (Instr. 3 and 4) | | of Deriv- ative Secur- ity (Instr. 5) | of Deriv- ative Secur- ities Bene- ficially Owned folowing reported tran.(s) (Inst.4) | ship Form of Deriv- ative Secur- ity Direct (D) or Indirect (I) (Instr. 4) | Indirect Benefici. Ownership (Instr. 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exer- cisable | Expira- tion Date | Title | Amount or Number of Shares | | | | |

+------------------------------------------------------+
|                                  |      Relationships                          |
| Reporting Owner Name / Address   +----------+----------+----------+--------+
|                                  | Director |10% Owner | Officer  | Other  |
+----------------------------------+----------+----------+----------+--------+
|MARTIN KENNETH J                  |     .    |     .    |CFO and Vi|        |
|                                  |          |          |ce Chairma|        |
|5 GIRALDA FARMS                   |          |          |n         |        |
|MADISON NJ 07940                  |          |          |          |        |
+----------------------------------+----------+----------+----------+--------+

Explanation of Responses:

 1 Includes dividend equivalents exempt pursuant to Rule 16a-11.


Remarks:



Signatures

William M. Haskel, Attorney-in-Fact for Kenneth J. Martin     / 06-14-2007
----------------------------------------------------------    -----------
  ** Signature of Reporting Person                              Date


    *  If the form is filed by more than one reporting person, seeInstruction 5(b)(v).
    ** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
    See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).


    Note: File three copies of this Form, one of which must be manually signed.  If space is
insufficient, See Instruction 6 for procedure.

    Potential persons who are to respond to the collection of information contained in this form
are not required to respond unless the form displays a currently valid OMB number.

# EXHIBIT D

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 4

```
                                                        ----------------------
                                                        |    OMB APPROVAL     |
                                                        |--------------------|
() Check this box if          STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES
   no longer subject to                                 | OMB Number:        |
   Section 16. Form 4 or                                | 3235-0287          |
   Form 5 obligations may                               | Expires:           |
   continue. See Instruction                            | January 31, 2005   |
   1(b).                                                 | Estimated average  |
                                                        | burden hours per   |
                                                        | response 0.5       |
          Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section   ----------------------
          17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
                              Investment Company Act of 1940
(Print or Type Responses)
```

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| POUSSOT BERNARD J | WYETH                                    WYE | ___ Director          ___ 10% Owner<br>_X_ Officer           ___ Other |
| (Last)     (First)  (Middle) | 3. Date of Earliest Transaction (Month/Day/Year)<br>10-27-2006 | (give title below)                    (specify  below)<br>President and Vice Chairman |
| 5 GIRALDA FARMS,<br>(Street) | 4.If Amendment, Date Original Filed(Month/Day/Year) | 6. Individual or Joint/Group Filing<br>(Check Applicable Line) |
| MADISON   - NJ - 07940<br>(City)   (State)  (Zip) | | _X_ Form filed by One Reporting Person<br>___ Form filed by More than One<br>        Reporting Person |

Table I -- Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.<br>Title of<br>Security<br>(Instr. 3) | 2.<br>Trans-<br>action<br>Date<br>(Month/<br>Day/<br>Year) | 2a.<br>Deemed<br>Execut.<br>Date<br>(Month/<br>Day/<br>Year) | 3.<br>Transaction<br>Code<br>(Instr. 8)<br>Code | V | 4.<br>Securities Acquired<br>(A) or Disposed of (D)<br>(Instr. 3, 4 and 5)<br>Amount | (A)<br>or<br>(D) | Price | 5.<br>Amount of Sec<br>Beneficially<br>Owned Following<br>Transaction(s)<br>(Instr. 3 and<br>4) | 6.<br>Ownership<br>Form:<br>Direct<br>(D) or<br>Indirect<br>(I)<br>Instr. 4) | 7.<br>Nature of<br>Indirect<br>Beneficial<br>Ownership<br>(Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| Common Stock | 10-27-2006 | | M | | 2,600 | A | $36.2188 | 34,864.26 | D | |
| Common Stock | 10-27-2006 | | S | | 2,600 | D | $52.0008 | 32,264.26 | D | |
| Common Stock | 10-27-2006 | | M | | 102,666 | A | $40.22 | 134,930.26 | D | |
| Common Stock | 10-27-2006 | | S | | 102,666 | D | $52.0008 | 32,264.26 | D | |
| Common Stock | 10-27-2006 | | M | | 115,493 | A | $41.05 | 147,757.26 | D | |
| Common Stock | 10-27-2006 | | S | | 115,493 | D | $52.0008 | 32,264.26 | D | |
| Common Stock | 10-30-2006 | | M | | 46,507 | A | $41.05 | 78,771.26 | D | |
| Common Stock | 10-30-2006 | | S | | 46,507 | D | $51.7045 | 32,264.26 | D | |

Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3a. Deemed Execution Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned (Inst. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option | $36.2188 | 10-27-2006 | | M | | | 2,600 | 05-22-2007 | #1 | Common Stock | 2,600 | $0 | 0 | D | |
| Employee Stock Option | $41.05 | 10-27-2006 | | M | | | 115,493 | 04-24-2013 | #1 | Common Stock | 115,493 | $0 | 46,507 | D | |
| Employee Stock Option | $41.05 | 10-30-2006 | | M | | | 46,507 | 04-24-2013 | #1 | Common Stock | 46,507 | $0 | 0 | D | |
| Employee Stock Option | $40.22 | 10-27-2006 | | M | | | 102,666 | 04-22-2014 | #1 | Common Stock | 102,666 | $0 | 51,334 | D | |

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| POUSSOT BERNARD J<br><br>5 GIRALDA FARMS<br>MADISON NJ 07940 | | | President and Vice Chairman | |

Explanation of Responses:

1 Ten-year option vesting in one-third increments on the first, second and third anniversaries of the grant date.

Remarks:

Signatures

William M. Haskel, Attorney-in-Fact for Bernard Poussot      / 10-31-2006
------------------------------------------------------------   -----------
 ** Signature of Reporting Person                              Date


    *  If the form is filed by more than one reporting person, seeInstruction 5(b)(v).
    ** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
    See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).


    Note: File three copies of this Form, one of which must be manually signed.  If space is
insufficient, See Instruction 6 for procedure.

    Potential persons who are to respond to the collection of information contained in this form
are not required to respond unless the form displays a currently valid OMB number.

# EXHIBIT E

FORM 4

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

() Check this box if
no longer subject to
Section 16. Form 4 or
Form 5 obligations may
continue. See Instruction
1(b).

STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

```
---------------------
| OMB APPROVAL
|---------------------
| OMB Number:
| 3235-0287
| Expires:
| January 31, 2005
| Estimated average
| burden hours per
| response 0.5
---------------------
```

(Print or Type Responses)

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section
17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| RUFFOLO ROBERT R | WYETH                              WYE | ____ Director          ____ 10% Owner   _X_ Officer            ____ Other |
| (Last)    (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 02-26-2007 | (give title below)              (specify  below) Senior VP |
| 5 GIRALDA FARMS, (Street) | 4. If Amendment, Date Original Filed(Month/Day/Year) | |
| MADISON    - NJ - 07940 (City)    (State)   (Zip) | | 6. Individual or Joint/Group Filing (Check Applicable Line) _X_ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |

Table I -- Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Trans- action Date | 2a. Deemed Execut. Date | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Sec Beneficially Owned Following Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | (Month/ Day/ Year) | (Month/ Day/ Year) | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock (Restricted Stock Trust) | 02-26-2007 | | A #1 | | 96,200 | A | $0 | 212,271.4504 | I | Restricted Stock Trust |
| Common Stock (Restricted Stock Trust) | 02-26-2007 | | F | | 2,431 | D | $50.64 | 209,840.4504 #2 | I | Restricted Stock Trust |
| Common Stock | | | | | | | | 30,000 | D | |
| Common Stock (401(k)) | | | | | | | | 780.87 | I | By 401(k) Plan |

Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3a. Deemed Execution Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) Code / V | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) (A) / (D) | 6. Date Exercisable and Expiration Date (Month/Day/Year) Date Exercisable / Expiration Date | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) Title / Amount or Number of Shares | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned folowing reported tran. (s) (Inst.4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Inst.4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| RUFFOLO ROBERT R<br>5 GIRALDA FARMS<br>MADISON NJ 07940 | | | Senior VP | |

Explanation of Responses:

1 Issuance of common stock upon conversion of a performance share unit award granted in 2004 under Issuer's 2002 Stock Incentive Plan. Receipt of the award is deferred until distribution.
2 Includes dividend equivalents credited under the Restricted Stock Trust exempt pursuant to Rule 16a-11.

Remarks:

Signatures

William M. Haskel, Attorney-in-Fact for Robert R. Ruffolo    / 02-28-2007
-----------------------------------------------------------    -----------
  ** Signature of Reporting Person                             Date

    *  If the form is filed by more than one reporting person, seeInstruction 5(b)(v).
    ** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
    See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

    Note: File three copies of this Form, one of which must be manually signed.  If space is insufficient, See Instruction 6 for procedure.

    Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

EXHIBIT F

Annual Report for the Year Ended December 31, 2005
Case 1:07-cv-10329-RJS   Document 29-7   Filed 07/25/2008   Page 2 of 11
Page 1 of 50

10-K 1 d10k.htm ANNUAL REPORT FOR THE YEAR ENDED DECEMBER 31, 2005

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

(Mark One)

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the fiscal year ended December 31, 2005**

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    For the transition period from _____ to _____

Commission file number 1-1225

# Wyeth
(Exact name of registrant as specified in its charter)

| **Delaware** | **13-2526821** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **Five Giralda Farms, Madison, NJ** | **07940-0874** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code (973) 660-5000

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| $2 Convertible Preferred Stock, $2.50 par value | New York Stock Exchange |
| Common Stock, $0.33 - 1/3 par value | New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Availability of Information

The annual report on Form 10-K and all other Company periodic reports (including quarterly reports on Form 10-Q, current reports on Form 8-K and all amendments thereto) are available promptly after filing with the Securities and Exchange Commission ("SEC") on the Company's Internet website at www.wyeth.com. Copies are also available, without charge, by contacting Wyeth Investor Relations at (877) 552-4744.

## ITEM 1A. RISK FACTORS

Our future operating results may differ materially from the results described in this report due to the risks and uncertainties related to our business and our industry, including those discussed below. In addition, these factors represent risks and uncertainties that could cause actual results to differ materially from those implied by forward-looking statements in this report. We refer you to our "*Cautionary Note Regarding Forward-Looking Statements*," on page I-13 of this report, which identifies forward-looking statements in this report. The risks described below are not the only risks we face. Additional risk and uncertainties not currently known to us or that we currently deem to be immaterial may also materially and adversely affect our business, financial condition or results of operations.

### *Risks Associated with Product Pricing and Demand*

**Government restrictions on pricing and reimbursement, including growing cost-containment initiatives, may negatively impact our net revenue.**

Sales of our products both inside and outside the U.S. depend significantly on payments from government healthcare authorities. These government entities increasingly employ cost-containment programs, including price controls and restrictions on reimbursement, to limit the amounts they pay for our products, which constrain our net revenue. The U.S. government, state legislatures, and foreign governments have shown significant interest in pursuing additional price controls and restrictions on access to drugs. Adoption of price controls and cost-containment measures in new jurisdictions, and adoption of more restrictive policies in jurisdictions with existing controls and measures, would further limit our net revenue. Our net revenue will continue to be impacted by pricing and reimbursement decisions made by global government entities and there can be no assurance that these entities will not adopt increasingly restrictive policies.

The Medicare Prescription Drug Improvement and Modernization Act of 2003 included a prescription drug benefit for individuals eligible for Medicare. Because this benefit first went into effect on January 1, 2006, our reported 2005 results do not reflect the impact of this legislation. We expect the enhanced purchasing power of entities that negotiate on behalf of Medicare beneficiaries will result in further pricing pressure, which could impact our net revenues.

I-15

**Payment for our products by managed care organizations and private insurers is becoming more restrictive, which may constrain our net revenues.**

Managed care organizations and other private insurers frequently adopt their own payment or reimbursement reductions following government reductions and consolidation among managed care organizations has increased the negotiating power of these entities. Private third party payors, as well as governments, increasingly employ formularies to control costs by negotiating discounted prices in exchange for inclusion in the formulary. In addition, private health insurance companies and employers that self-insure have been raising co-payments required from beneficiaries, particularly for branded pharmaceuticals and biotechnology products, among other reasons, to encourage beneficiaries to utilize generic products. There can be no assurance that these entities will not adopt increasingly restrictive reimbursement policies, in which case our net revenues would be negatively impacted.

**More extensive importation of products from other jurisdictions may negatively impact our net revenue.**

In the U.S. and abroad, our products are subject to competition from products originating from jurisdictions where government price controls or other market dynamics, including production of counterfeit products, result in lower prices. The ability of U.S. consumers to obtain lower priced imports has grown significantly in recent years, despite legal restrictions, and may increase in the future. Any such increase in imports could negatively impact our net revenue. Furthermore, to the extent that legal restrictions on product importation are reduced or eliminated, importation of products would likely increase, further negatively impacting our net revenue.

**Data generated or analyzed after a product is approved may result in product withdrawal or decrease demand.**

As a condition to granting marketing approval of a product, the FDA may require a company to conduct additional clinical trials. The results generated in these Phase IV trials could result in loss of marketing approval, changes in product labeling or concerns about side-effects or efficacy of a product. Post-marketing studies, whether conducted by us or by others, that are not mandated by regulatory agencies, and other emerging data about marketed products such as adverse event reports, may have the same impact. Accordingly, new data about our products, or products similar to our products, could negatively impact demand for our products and our net revenue due to real or perceived side-effects or uncertainty regarding efficacy. For example, our **EFFEXOR** family of products and other antidepressants have been subject to regulatory review and labeling changes. See Item 1. BUSINESS – REGULATION of this report. We believe that these regulatory actions and related publicity have contributed to a slowdown in overall demand for antidepressants, and this scrutiny and resultant slowdown may continue in the future. Furthermore, new data may lead government agencies, professional societies, practice management groups, or organizations involved in various diseases to publish guidelines or recommendations related to the use of our products, recommended dosages of our products, or the use of related therapies. Such guidelines or recommendations may lead to lower sales of our products.

I-16

**If alternative or generic pharmaceuticals and biotechnology products are viewed as safer or more cost-effective than our products, our net revenue will be negatively impacted.**

We face substantial competition from other products produced by pharmaceutical companies and biotechnology companies, including generic alternatives to our products and competing branded products. If doctors, patients, or third party payors prefer these products, or if these products have superior safety, efficacy, pricing, or reimbursement characteristics, our net revenue would be negatively impacted.

Our industry is characterized by significant technological change. In addition, generic competitors are becoming more aggressive and generic products are an increasing percentage of overall pharmaceutical sales. The introduction of new competitive products or generic alternatives to our products and competing branded products would negatively impact our net revenue. Many of our competitors are conducting research and development activities in indications served by our products and in areas for which we and our collaborators are developing product candidates or new indications for existing products. Discoveries by others may make our products or product candidates less attractive.

Our **EFFEXOR** family of products competes against another SNRI, several SSRIs, and other products. The increasing availability of generic versions of the active ingredient in several SSRIs and other antidepressant products puts pressure on the pricing of **EFFEXOR** and **EFFEXOR XR**. Pursuant to the settlement agreement we entered into with Teva Pharmaceutical Industries Ltd. (Teva) with respect to the U.S. patent litigation pertaining to Teva's generic version of **EFFEXOR XR**, Teva will be permitted to launch generic versions of **EFFEXOR XR** (extended release capsules) and **EFFEXOR** (immediate release tablets) in the United States under certain licenses effective on certain entry dates. See Note 14 of the Notes to Consolidated Financial Statements in the Company's 2005 Financial Report to Stockholders – Contingencies and Commitments – Patent Litigation – **EFFEXOR** Litigation. In addition, agreements with Teva were also reached with respect to a generic version of **EFFEXOR XR** in Canada. Additional generic entrants (SSRIs, SNRIs and other antidepressant products) will place additional pricing pressure on **EFFEXOR** and **EFFEXOR XR**. **PROTONIX** faces competition from other prescription proton pump inhibitors, including several generic products, and multiple over-the-counter remedies. **ENBREL** faces competition from multiple alternative therapies depending on the indication. Our conjugated estrogens products, including **PREMARIN**, **PREMPRO** and **PREMPHASE**, may be subject to generic competition, as **PREMARIN**'s natural composition is not subject to patent protection and we may only rely on trade secret and other non-patent rights to protect against alternative products being introduced. Certain competitors may be conducting research and development activities in competing estrogen and other products targeted for **PREMARIN**'s approved indications and **PREMARIN** may be subject to generic competition from either synthetic or natural conjugated estrogens products in the future. These examples are illustrative. Many of our products in some respect face competition from competitive products claiming superior safety and/or efficacy profiles or cost-effectiveness than our products.

I-17

**Our biotechnology products, including ENBREL and PREVNAR, may face competition from generic biologics.**

Government regulation may, in the future, allow for approval of so-called follow-on biologics (also referred to as "generic biologics"). Both U.S. and foreign regulatory authorities have articulated the view that such approvals should be allowed, primarily as a way to reduce the cost of biotechnology products. However, no legal pathway for such approvals currently exists in the United States, with a few narrow exceptions, and public reports indicate that FDA is not actively working on the issue at present. In contrast, the European regulatory authorities have taken significant steps toward creating such a pathway and have recently issued a favorable opinion for one such product, a recombinant human growth hormone. If competitors are able to obtain marketing approval for follow-on biologics, our biotechnology products may become subject to follow-on competition, with the attendant pricing pressure. Expiration or successful challenge of the applicable patent rights would generally trigger this competition, and we expect that we would face more litigation with respect to the validity and/or scope of patents relating to our successful biotechnology products.

### Risks Associated with Product and Customer Concentration

**If we fail to maintain or increase sales of our principal products, we will not meet our financial goals.**

Over the next few years, our financial success will depend substantially on our ability to maintain or increase our net revenue from the following products: **EFFEXOR/EFFEXOR XR, PROTONIX, PREVNAR, ENBREL**, our nutrition franchise, our **PREMARIN** family of products and **ZOSYN/TAZOCIN**. Our ability to maintain or increase sales of these products, and our other products, will depend on a number of factors, including:

- Acceptance by doctors and patients of each product;

- Availability of competing treatments that are deemed safer or more efficacious, more convenient to use, or more cost-effective than each product;

- Our ability, and the ability of our collaborators, to efficiently manufacture sufficient quantities of each product to meet demand and to do so in a cost-efficient manner;

- Regulation by the FDA and foreign regulatory authorities of each product;

- The scope of the labeling approved by regulatory authorities for each product and competitive products;

- New data reporting the safety and efficacy of each product and competitive products;

- The patent protection applicable to each product;

- The effectiveness of our sales force, including our new U.S. primary care sales force model;

I-18

- The extent of coverage, pricing, and level of reimbursement from government agencies and other third party payors of each product; and
- The size of the patient population for each product.

**Because a few large wholesale distributors account for a significant portion of our net revenue, any financial or other difficulties of our wholesale distributors could negatively impact our results of operations.**

Our largest wholesale distributor accounts for over 12% of our net revenue, and our top three wholesale distributors account for approximately 29% of our net revenue. If one of our significant wholesale distributors encounters financial or other difficulties, we may be unable to collect all the amounts that customer owes to us and may be unable to collect any such amounts on a timely basis, which could negatively impact our results of operations.

### *Risks Associated with Legal Liabilities*

**We may be required to pay substantial damages for product liability claims.**

Like all pharmaceutical companies in the current legal environment, we face potential product liability claims for products we have sold and for products we may sell in the future. Product liability claims, regardless of their merits or their outcome, are costly, divert management attention, and may adversely affect our reputation and demand for our products. We have been sued in the past when patients using our products experience adverse and undesirable health conditions, regardless of any connection between those conditions and our products. We cannot predict with certainty the eventual outcome of any pending or future product liability litigation matter, which may lead to a judgment or settlement involving a significant monetary award or restrictions on our operations, and may result in substantial damage to our reputation and could result in a material adverse effect on our financial condition, results of operations and/or cash flows.

We have taken charges totaling $21,100.0 million in connection with product liability legal actions relating to the diet drugs **PONDIMIN** and **REDUX**. While we believe that our current reserve is adequate and represents our best estimate, within a range of outcomes, of the aggregate amount required to cover diet drug litigation cost, it is possible that we may take future charges with respect to this litigation, which may be significant.

In addition, we have been involved in various legal proceedings involving allegations of injuries caused by our pharmaceutical products, vaccines and over-the-counter products, including, without limitation, the prior formulations of **DIMETAPP** and **ROBITUSSIN, PREMPRO, PREMARIN** and **EFFEXOR**. If the outcomes of any or all of these proceedings are unfavorable to us, it is possible that we may take future charges with respect to these matters, which may be significant. Please refer to Note 14 to the Company's consolidated financial statements, Contingencies and Commitments, in the Company's 2005 Financial Report for descriptions of this and other significant pending product liability litigation.

I-19

**Adverse outcomes in other legal matters could negatively impact our business and financial condition.**

Our financial position could be negatively impacted by unfavorable results in other pending litigation matters, including those described under Note 14 to the Company's consolidated financial statements, Contingencies and Commitments, in the Company's 2005 Financial Report in this report, or in lawsuits that may be initiated in the future. These matters include intellectual property lawsuits, breach of contract claims, tort claims, and allegations of violations of U.S. and foreign competition and environmental laws, any of which, if adversely decided, could negatively impact our business and financial condition.

**If we fail to comply with numerous and varied legal and regulatory requirements governing the healthcare industry, we may face substantial fines, other costs, and restrictions on our business activities.**

Our activities relating to the sale and marketing of our products are subject to extensive regulation under the Federal Food, Drug, and Cosmetic Act, the Public Health Service Act, and other federal and state statutes, including anti-kickback and false claims laws, as well as counterpart laws in foreign jurisdictions which, in some cases, are more stringent than those in the United States. Violations of these regulations and laws may be punishable by criminal and civil sanctions, including substantial fines, as well as, in the United States, possible exclusion from federal and state health care programs, including Medicare and Medicaid. In addition, plaintiffs both in the United States and in foreign jurisdictions are increasingly bringing actions against international pharmaceutical companies for alleged violations of U.S. and foreign laws regarding drug sales and marketing activities.

The U.S. government, state governments, and private payors are investigating pricing practices of numerous pharmaceutical companies and biotechnology companies, and many have filed actions alleging that inaccurate reporting of prices has improperly inflated reimbursement rates. A number of these actions have been brought against us. Please see Note 14 to the Company's consolidated financial statements, Contingencies and Commitments, in the Company's 2005 Financial Report for a discussion of these investigations and lawsuits. In addition, the U.S. Department of Justice has requested documents from us relating to pricing issues.

Regardless of merit or eventual outcome, these types of investigations and related litigation can result in:

- Diversion of management time and attention;

- Expenditure of large amounts of cash on legal fees, costs, and payment of damages;

- Limitations on our ability to continue some of our operations;

- Decreased demand for our products; and

- Injury to our reputation.

I-20

**We may be subject to loss of permits and face substantial fines and clean-up costs in connection with our use of hazardous materials, which could adversely impact our operations.**

We use certain hazardous materials in connection with our research and manufacturing activities. We have in the past been, and may in the future be, notified of our potential responsibility relating to the generation, storage, treatment, and disposal of hazardous waste. This may result in loss of permits, fines or penalties, and other adverse governmental or private actions. In addition, we have been advised in the past, and may be advised in the future, that we may be a responsible party for several sites on the National Priority List created by the Comprehensive Environmental Response, Compensation and Liability Act, commonly known as the Superfund. Please read the discussion of significant pending environmental matters under Note 14 to the Company's consolidated financial statements, Contingencies and Commitments, in the Company's 2005 Financial Report. Payment of substantial fines, penalties, or environmental remediation costs, or the loss of permits or other authorizations to operate affected facilities, could adversely impact our operations.

### Risks Associated with Intellectual Property

**If our intellectual property rights are challenged or circumvented, competitors may be able to take advantage of our research and development efforts.**

Our long-term success largely depends on our ability to market technologically competitive products. If we fail to obtain and maintain adequate intellectual property protection, we may not be able to prevent third parties from using our proprietary technologies. Our currently pending or future patent applications and/or extensions may not be issued/approved on a timely basis or at all. In addition, our issued patents may not contain claims sufficiently broad to protect us against third parties with similar technologies or products or provide us with any competitive advantage. Under the Hatch-Waxman Act, a generic manufacturer can challenge our patents. Patents for **PROTONIX, ALTACE** and **EFFEXOR XR** are currently subject to, and may be subject in the future to, such generic challenges. If a third party challenges patents we rely upon, and the third party is successful, a court could determine that the patents are invalid or unenforceable or limit the scope of coverage of those patents, resulting in a potential loss in net revenue.

**When our patent rights expire, previously protected products may become subject to competition from generic versions, which may lower our net revenue.**

Our patent protection for our products is limited by the applicable terms of our patents. Following expiration of patents covering our products, other entities may be able to obtain approval to manufacture and market generic alternatives, which we would expect to result in a substantial decrease in the prices at which we are able to sell our products. For example, our patent protection in the United Kingdom for **ZOTON** expired in December 2005. The United Kingdom had been the principal market for this product. In anticipation of generic competition, wholesalers depleted inventories rather than purchasing additional **ZOTON**

I-21

from us. Accordingly, our net revenue from **ZOTON** declined substantially in 2005, and we do not expect to generate significant net revenue from this product in the future. Furthermore, as noted above, we may face competition prior to patent expiration if third parties successfully challenge our patents.

**We may incur substantial costs in litigation or other proceedings involving intellectual property rights and the results of such litigation or proceedings may reduce our net revenue.**

A third party may sue us or one of our collaborators for infringing the third party's patents or other intellectual property rights. Likewise, one of our collaborators or we may sue to enforce intellectual property rights or to determine the scope and validity of third party proprietary rights. If we do not prevail in this type of litigation, we or our strategic collaborators may be required to:

- Pay monetary damages;
- Stop commercial activities relating to the affected products;
- Obtain a license in order to continue manufacturing or marketing the affected products; or
- Compete in the market with substantially similar products.

For example, parties alleging that our manufacture and sale of **ENBREL** infringes patent rights of those parties have sued Amgen and us.

*Risks Associated with Development and Marketing of New Drugs*

**The development of novel pharmaceuticals, vaccines, and biotechnology products involves a lengthy and complex process, and we may be unable to commercialize, or be delayed in commercializing, any of our product candidates currently under development.**

We have multiple product candidates in development and devote considerable resources to research and development activities, including clinical trials. These activities involve a high degree of risk and take many years. Our product development efforts with respect to any product candidate may fail, and we may be unable to commercialize it, for multiple reasons, including:

- Failure of the product candidate in preclinical studies;
- Difficulty enrolling patients in clinical trials;
- Adverse reactions to the product candidate or indications of other safety concerns;
- Insufficient clinical trial data to support the safety and/or effectiveness of the product candidate;
- Our inability to manufacture sufficient quantities of the product candidate for development or commercialization activities in a timely and cost-efficient manner; and
- Our failure to obtain the required regulatory approvals for the product candidate or the facilities in which it is manufactured.

I-22

**The development and commercialization of novel drugs requires significant expenditures with a low probability of success.**

Successful development and commercialization of new pharmaceuticals, vaccines, and biotechnology products is expensive. Conducting Phase III clinical trials is particularly costly. If our large-scale clinical trials are not successful, we will not recover our substantial investments in applicable product candidates. Even where our clinical trials are sufficient to obtain product approval, we may not be able to achieve our anticipated product labeling, which could adversely impact the commercial success of the applicable product. The substantial funds we spend developing new products depress near-term profitability with no assurance that the expenditures will generate future profits to offset these costs.

**If our strategic alliances are unsuccessful, our operating results will be negatively impacted.**

Several of our strategic initiatives involve alliances with other companies, including our collaborations with:

- Amgen on **ENBREL**;

- Altana on **PROTONIX**;

- King Pharmaceuticals on **ALTACE**;

- Johnson & Johnson under which we supply sirolimus, the active ingredient in **RAPAMUNE**, to coat the **CYPHER** stent; and

- Medtronic Sofamor Danek, Inc. on **rhBMP-2**.

The success of these and similar arrangements is largely dependent on technology and other intellectual property contributed by our strategic partners and the resources, efforts, and skills of our partners. If unsuccessful, our operating results will be negatively impacted. Disputes and difficulties in such relationships are common, often due to conflicting priorities or conflicts of interest. The benefits of these alliances would be reduced or eliminated when strategic partners:

- Terminate the agreements;

- Fail to devote sufficient financial or other resources to the alliances; or

- Suffer negative outcomes in intellectual property disputes.

Under many of our strategic alliances we make milestone payments well in advance of commercialization of products, with no assurance that we will ever recoup those payments in which case our operating results may be negatively affected.

I-23

EXHIBIT G

10-K 1 d10k.htm ANNUAL REPORT FOR THE FISCAL YEAR ENDED DECEMBER 31, 2006

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-K

---

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2006**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission file number 1-1225**

---

# Wyeth
#### (Exact name of registrant as specified in its charter)

---

| | |
|---|---|
| **Delaware** | **13-2526821** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **Five Giralda Farms, Madison, NJ** | **07940-0874** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code (973) 660-5000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| $2 Convertible Preferred Stock, $2.50 par value | New York Stock Exchange |
| Common Stock, $0.33 ¹/₃ par value | New York Stock Exchange |

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

ITEM 1A. <u>RISK FACTORS</u>

Our future operating results may differ materially from the results described or incorporated by reference in this report due to the risks and uncertainties related to our business and our industry, including those discussed below. In addition, these factors represent risks and uncertainties that could cause actual results to differ materially from those implied by forward-looking statements in this report. We refer you to our *"Cautionary Note Regarding Forward-Looking Statements,"* on pages I-10 and I-11 of this report, which identifies forward-looking statements included or incorporated by reference in this report. The risks described below are not the only risks we face. Additional risk and uncertainties not currently known to us or that we currently deem to be immaterial may also materially and adversely affect our business, financial condition or results of operations.

*Risks Associated with Product Pricing and Demand*

**Government restrictions on pricing and reimbursement, including growing cost-containment initiatives, may negatively impact our net revenue.**

Sales of our products both inside and outside the United States depend significantly on payments from government healthcare authorities. These government entities increasingly employ cost-containment programs, including price controls and restrictions on reimbursement, to limit the amounts they pay for our products, which constrain our net revenue. The U.S. government, state legislatures, and foreign governments have shown significant interest in pursuing additional price controls and restrictions on access to drugs. Adoption of price controls and cost-containment measures in new jurisdictions, and adoption of more restrictive policies in jurisdictions with existing controls and measures, could further limit our net revenue. Our net revenue will continue to be impacted by pricing and reimbursement decisions made by global government entities and there can be no assurance that these entities will not adopt increasingly restrictive policies.

The Medicare Prescription Drug Improvement and Modernization Act of 2003 included a prescription drug benefit for individuals eligible for Medicare. This benefit first went into effect on January 1, 2006. Although the prescription drug benefit had a modest beneficial impact on our results in 2006, it is difficult to predict the impact that this benefit will have on pharmaceutical companies over the long term. While the number of Medicare beneficiaries will grow as the U.S. population ages, we expect the enhanced purchasing power of, and increased shift of insurance risk to, the entities that negotiate on behalf of Medicare beneficiaries will result in further pricing pressure, which could negatively impact our net revenues. Additionally, the cost-sharing structure of the benefit could result in gaps in coverage for some products (the so-called "doughnut-hole"), such as **ENBREL**, which could negatively impact sales of these products in the United States. In addition, the U.S. Congress is considering legislation that would amend the Medicare law and direct the Secretary of Health and Human Services to negotiate drug prices in the new Medicare prescription drug coverage program. If this proposed legislation is enacted into law, this government-driven approach could lead to price controls and have a negative impact on our net revenue.

**Payment for our products by managed care organizations and private insurers is becoming more restrictive, which may constrain our net revenues.**

Managed care organizations and other private insurers frequently adopt their own payment or reimbursement reductions, and consolidation among managed care organizations has increased the negotiating power of these entities. Private third party payors, as well as governments, increasingly employ formularies to control costs by negotiating discounted prices in exchange for inclusion in the formulary. In addition, private health insurance companies and employers that self-insure have been raising co-payments required from beneficiaries, particularly for branded pharmaceuticals and biotechnology products, requiring prior authorization to use a branded product if a generic product is available or requiring that patients start with a generic product before switching to a branded product, among other reasons, to encourage beneficiaries to utilize generic products. There can be no assurance that these entities will not adopt increasingly restrictive payment and reimbursement policies, in which case our net revenues could be negatively impacted.

**More extensive importation of products from other jurisdictions may negatively impact our net revenue.**

In the United States and abroad, our products are subject to competition from products originating from jurisdictions where government price controls or other market dynamics, including production of counterfeit products, result in lower prices. The ability of U.S. consumers to obtain lower priced imports has grown

I-12

significantly in recent years, despite legal restrictions, and may increase in the future. For example, Congress passed legislation that allows U.S. consumers to personally import a 90-day supply of drugs (excluding biologics and controlled substances) from Canada. Any such increase in imports could negatively impact our net revenue. Furthermore, to the extent that legal restrictions on product importation are reduced or eliminated, as is contemplated in various pieces of legislation currently pending in Congress, importation of products would likely increase, further negatively impacting our net revenue.

### Data generated or analyzed after a product is approved may result in product withdrawal or decrease demand.

As a condition to granting marketing approval of a product, the FDA may require a company to conduct additional clinical trials. The results generated in these Phase IV trials could result in loss of marketing approval, changes in product labeling or new or increased concerns about side-effects or efficacy of a product. Post-marketing studies, whether conducted by us or by others, that are not mandated by regulatory agencies, and other emerging data about marketed products such as adverse event reports, may have the same impact. Accordingly, new data about our products, or products similar to our products, could negatively impact both demand for our products and our net revenue due to real or perceived side-effects or uncertainty regarding efficacy and, in some cases, could result in product withdrawal. For example, our **EFFEXOR** family of products and other antidepressants have been subject to regulatory review and labeling changes. We believe that these regulatory actions and related publicity have contributed to a slowdown in overall demand for antidepressants, and this scrutiny and resultant slowdown may continue in the future. Furthermore, new data, including information about product misuse, may lead government agencies, professional societies, practice management groups, or organizations involved in various diseases to publish guidelines or recommendations related to the use of our products, recommended dosages of our products or the use of related therapies or place restrictions on sales. Such guidelines or recommendations may lead to lower sales of our products. For example, our Consumer Healthcare business has been subject to federal and state legislation imposing restrictions on sales of products containing certain ingredients, such as pseudoephedrine. If additional ingredients, such as dextromethorphan, undergo similar scrutiny, this could negatively impact our sales of products containing these ingredients.

### If alternative or generic pharmaceuticals and biotechnology products are viewed as safer or more cost-effective than our products, our net revenue will be negatively impacted.

We face substantial competition from other products produced by pharmaceutical companies and biotechnology companies, including generic alternatives to our products and competing branded products. If doctors, patients, or third party payors prefer these products, or if these products have better safety, efficacy, pricing, or reimbursement characteristics, our net revenue could be negatively impacted.

Our industry is characterized by significant technological change. In addition, generic competitors are becoming more aggressive and generic products are an increasing percentage of overall pharmaceutical sales. The introduction of new competitive products or generic alternatives to our products or competing branded products could negatively impact our net revenue. Many of our competitors are conducting research and development activities in indications served by our products and in areas for which we and our collaboration partners are developing product candidates or new indications for existing products. Discoveries by others may make our products or product candidates less attractive.

Our **EFFEXOR** family of products competes against another SNRI, several SSRIs, and other antidepressant products. The increasing availability of generic versions of the active ingredient in several SSRIs and other antidepressant products puts competitive pressure on **EFFEXOR** (immediate release tablets) and **EFFEXOR XR** (extended release capsules). Pursuant to the settlement agreement we entered into with Teva Pharmaceutical Industries Ltd. (Teva) with respect to the U.S. patent litigation pertaining to Teva's generic version of **EFFEXOR XR** (extended release capsules), Teva launched generic versions of **EFFEXOR** (immediate release tablets) in the United States in August 2006 and will be permitted to launch generic versions of **EFFEXOR XR** (extended release capsules) in the United States beginning on July 1, 2010, subject to earlier launch based on certain specified events. Events that could trigger an earlier U.S. market entry by Teva with generic versions of **EFFEXOR XR** (extended release capsules) include specified market conditions or developments regarding the applicable Wyeth patents, including the outcome of other generic challenges to these patents. Two litigations concerning such generic challenges are currently pending and a third company recently notified Wyeth that it is challenging these same patents. There can be no assurance that the outcome of these litigations, or the occurrence of specific market conditions, will not trigger generic entry, by Teva or another generic manufacturer, earlier than July 1, 2010. In addition, pursuant to an agreement reached with Teva with respect to a generic version of **EFFEXOR XR** (extended release capsules) in Canada, Teva was permitted to launch generic versions of **EFFEXOR XR** (extended release capsules) in Canada in December 2006. We estimate that greater than three-fourths of **EFFEXOR** (immediate release tablets) prescriptions in the United States have been converted to

Teva's generic versions since the August 2006 launch, and we expect that Teva's launch of generic versions of **EFFEXOR XR** (extended release capsules) in Canada in December 2006 will decrease our net sales

I-13

significantly in that market. While we have not experienced any significant impact to date, it is possible that Teva's introduction of a generic version of **EFFEXOR** (immediate release tablets) in the United States could adversely impact our future U.S. sales of **EFFEXOR XR** (extended release capsules). See "Management's Discussion and Analysis of Financial Condition and Results of Operations – Overview – Our Challenging Business Environment" in our 2006 Financial Report. Additionally, generic versions of **EFFEXOR** (immediate release tablets) and **EFFEXOR XR** (extended release capsules) have begun to appear in select markets outside the United States. As this trend continues and additional generic SSRIs, SNRIs and other antidepressant products enter markets, additional competitive pressure will occur, and we expect lower sales of, our **EFFEXOR** family of products in those markets.

**PROTONIX** faces competition from other prescription proton pump inhibitors, including several generic products, and multiple over-the-counter remedies. **ENBREL** faces competition from multiple alternative therapies depending on the indication and from other potential therapies being developed. In the United States, while **ENBREL** continues to have a market leading position, it has experienced share loss to competitors. Our conjugated estrogens products, including **PREMARIN**, **PREMPRO** and **PREMPHASE**, may be subject to generic competition, as **PREMARIN**'s natural composition is not subject to patent protection and we may only rely on trade secret and other non-patent rights to protect against alternative products being introduced. Certain competitors may be conducting research and development activities in competing estrogen and other products targeted for **PREMARIN**'s approved indications and **PREMARIN** may be subject to generic competition in the future. In addition, we have a 13-valent pneumococcal vaccine and GlaxoSmithKline plc has a ten-valent pneumococcal vaccine under development that, if approved, would compete with **PREVNAR**. Generic versions of **INDERAL LA**, which had not been subject to generic competition for many years, entered the U.S. market in early 2007. As a result, we expect that our net sales of this product in the United States, which totaled approximately $198 million in 2006, will decline substantially.

The above examples are illustrative. Many of our products face competition from competitive products claiming better safety and/or efficacy profiles or cost-effectiveness than our products.

In addition, we may pursue licensing arrangements, strategic alliances or acquisitions to expand our product pipeline, and we compete with other pharmaceutical and biotechnology companies for these strategic opportunities. If we are unable to identify or consummate these types of transactions, our business may be negatively impacted.

**Our biotechnology products, including ENBREL and PREVNAR, may face competition from follow-on biologics.**

Government regulation may, in the future, allow for approval of follow-on biologics (also referred to as "biosimilars"). While no specific legal pathway for these approvals currently exists in the United States, legislation has recently been introduced in Congress that would establish such a pathway and the FDA recently approved a follow-on biologic (recombinant human growth hormone) that referenced a biotechnology product approved under the Food, Drug, and Cosmetic Act. In Europe, regulatory authorities have taken significant steps toward creating such a pathway. The European Commission recently granted marketing authorizations for two follow-on biologics (both recombinant human growth hormone) pursuant to a set of general and product class-specific guidelines for biosimilar approvals issued over the past few years. If competitors are able to obtain marketing approval for follow-on biologics, our biotechnology products may become subject to follow-on competition, with the attendant competitive pressure. Expiration or successful challenge of the applicable patent rights would generally trigger this competition, and we expect that we would face more litigation with respect to the validity and/or scope of patents relating to our successful biotechnology products.

*Risks Associated with Product and Customer Concentration*

**Strong performance from our principal products and our anticipated new product introductions will be necessary to meet our financial goals.**

Over the next few years, our financial success will depend substantially on the performance of our six product lines that achieved billion or multi-billion dollar revenue status in 2006, **EFFEXOR/EFFEXOR XR**, **ENBREL**, **PREVNAR**, **PROTONIX**, our Wyeth Nutrition product line and our **PREMARIN** family of products, particularly our ability to continue to significantly grow our net revenue from **ENBREL** and **PREVNAR**. Our ability to achieve strong performances with these and our other principal products, including

I-14

**ZOSYN/TAZOCIN** and **TYGACIL**, and our ability to achieve our goals for the new products that we anticipate launching over the next few years, will depend on a number of factors, including:

- Acceptance by doctors and patients of each product;
- Availability of competing treatments that are deemed safer or more efficacious, more convenient to use, or more cost-effective than each product;
- Our ability, and the ability of our collaboration partners, to efficiently manufacture sufficient quantities of each product to meet demand and to do so in a cost-efficient manner;
- Regulation by the FDA and foreign regulatory authorities of each product and our manufacturing operations;
- The scope of the labeling approved by regulatory authorities for each product and competitive products;
- New data reporting the safety and efficacy of each product and competitive products;
- The patent protection applicable to each product and the introduction of any generic competition;
- The effectiveness of our sales force;
- The extent of coverage, pricing, and level of reimbursement from government agencies and other third party payors of each product; and
- The size of the patient population for each product.

**Because a few large wholesale distributors account for a significant portion of our net revenue, any financial or other difficulties of our wholesale distributors could negatively impact our results of operations.**

In 2006, our largest wholesale distributor accounted for 14% of our net revenue, and our top three wholesale distributors accounted for approximately 31% of our net revenue. If one of our significant wholesale distributors encounters financial or other difficulties, we may be unable to collect all the amounts that customer owes to us and may be unable to collect any such amounts on a timely basis, which could negatively impact our results of operations.

### Risks Associated with Legal Liabilities

**We may be required to pay substantial damages for product liability claims.**

Like all pharmaceutical companies in the current legal environment, we face potential product liability claims for products we have sold and for products we may sell in the future. Product liability claims, regardless of their merits or their ultimate outcome, are costly, divert management attention, and may adversely affect our reputation and demand for our products, as well as result in significant damages. We have been sued in the past when patients using our products experience adverse and undesirable health conditions, regardless of any connection between those conditions and our products. We cannot predict with certainty the eventual outcome of pending or future product liability litigation matters and the ultimate outcome of such matters could be material to our results of operations, cash flows and financial condition.

We have taken charges totaling $21,100.0 million in connection with product liability legal actions relating to the diet drugs **PONDIMIN** and **REDUX**. While we believe that our current reserve is adequate and represents management's best estimate, within a range of outcomes, of the aggregate amount required to cover diet drug litigation costs, it is possible that additional reserves may be required in the future.

In addition, we have been involved in various other legal proceedings involving allegations of injuries caused by our pharmaceutical products. These include individual lawsuits and putative class actions in state and federal courts in the United States and foreign jurisdictions involving allegations of injuries caused by **PREMARIN** or **PREMPRO**, two of our hormone therapy products. As of February 20, 2007, there have been four completed

I-15

trials involving allegations of injury caused by **PREMARIN** or **PREMPRO**, two of which returned verdicts in our favor and two of which resulted in a compensatory damages award to the plaintiffs. In addition to these trial results, plaintiffs have voluntarily dismissed a number of cases set for trial and we have been granted summary judgment dismissing other cases on the grounds, among others, that the products' labeling was adequate as a matter of law or that plaintiffs' warning claims are preempted by the regulation of drug labeling by the FDA. Additional hormone therapy trials are scheduled throughout 2007 and in 2008. Other of our pharmaceutical products, vaccines and over-the-counter products that are involved in product liability litigation include, without limitation, the prior formulations of certain childhood vaccines and of **DIMETAPP** and **ROBITUSSIN**, and our **EFFEXOR** family of products. If the outcomes of any or all of these proceedings are unfavorable to us, it is possible that we may take future charges with respect to these matters, which may be significant. Please refer to Note 14 to our consolidated financial statements, Contingencies and Commitments, in our 2006 Financial Report for descriptions of these matters and other significant pending product liability litigation.

**Adverse outcomes in other legal matters could negatively impact our business, results of operations and financial condition.**

Our financial condition could be negatively impacted by unfavorable results in other pending litigation matters, including those described in Note 14 to our consolidated financial statements, Contingencies and Commitments, in our 2006 Financial Report, or in lawsuits that may be initiated in the future. These matters include intellectual property lawsuits, breach of contract claims, tort claims, and allegations of violations of U.S. and foreign competition and environmental laws, any of which, if adversely decided, could negatively impact our business, results of operations and financial condition.

**If we fail to comply with the numerous and varied legal and regulatory requirements governing the healthcare industry, we may face substantial fines, other costs, and restrictions on our business activities.**

Our activities relating to the sale and marketing of our products are subject to extensive regulation under the Federal Food, Drug, and Cosmetic Act, the Public Health Service Act, and other federal and state statutes, including anti-kickback and false claims laws, as well as counterpart laws in foreign jurisdictions. Violations of these regulations and laws may be punishable by criminal and civil sanctions, including substantial fines, as well as, in the United States, possible exclusion from federal and state health care programs, including Medicare and Medicaid. In addition, plaintiffs both in the United States and in foreign jurisdictions are increasingly bringing actions against international pharmaceutical companies for alleged violations of U.S. and foreign laws regarding drug sales and marketing activities.

The U.S. government, state governments, and private payors are investigating pricing practices of numerous pharmaceutical companies and biotechnology companies, and many have filed actions alleging that inaccurate reporting of prices has improperly inflated reimbursement rates. A number of these actions have been brought against us. Please see Note 14 to our consolidated financial statements, Contingencies and Commitments, in our 2006 Financial Report for a discussion of these investigations and lawsuits. In addition, government agencies have requested documents from us relating to pricing issues.

Regardless of merit or eventual outcome, these types of investigations and related litigation can result in:

- Diversion of management time and attention;
- Expenditure of large amounts of cash on legal fees, costs, and payment of damages;
- Limitations on our ability to continue some of our operations;
- Decreased demand for our products; and
- Injury to our reputation.

**We may be subject to loss of permits and face substantial fines and clean-up costs in connection with our use of hazardous materials, which could adversely impact our operations and financial condition.**

We use certain hazardous materials in connection with our research and manufacturing activities. We have in the past been, and may in the future be, notified of our potential responsibility relating to the generation,

storage, treatment, and disposal of hazardous waste. This may result in loss of permits, fines or penalties, and other adverse governmental or private actions. In addition, we have been advised in the past, and may be advised in the future, that we may be a responsible party for several sites on the National Priority List created by the Comprehensive Environmental Response, Compensation and Liability Act, commonly known as the Superfund. Please read the discussion of significant pending environmental matters in Note 14 to our consolidated financial statements, Contingencies and Commitments, in our 2006 Financial Report. Payment of substantial fines, penalties, or environmental remediation costs, or the loss of permits or other authorizations to operate affected facilities, could adversely impact our operations and financial condition.

### *Risks Associated with Intellectual Property*

**If our intellectual property rights are challenged or circumvented, competitors may be able to take advantage of our research and development efforts.**

Our long-term success largely depends on our ability to market technologically competitive products. If we fail to obtain and maintain adequate intellectual property protection, we may not be able to prevent third parties from using our proprietary technologies. Our currently pending or future patent applications and/or extensions may not result in issued patents or be approved on a timely basis or at all. In addition, our issued patents may not contain claims sufficiently broad to protect us against third parties with similar technologies or products or provide us with any competitive advantage. In addition, the scope of our patent claims may vary between countries, as individual countries have their own patent laws. For example, some countries only permit the issuance of patents covering methods of making a drug compound, not the chemical compound itself. Our ability to enforce our patents also depends on the laws of individual countries and each country's history of enforcing, or not enforcing, intellectual property rights.

Mechanisms exist in much of the world permitting some form of challenge by generic manufacturers to our patents prior to or immediately following the expiration of any regulatory exclusivity. In the United States, under the Hatch-Waxman Act, a generic manufacturer can challenge our patents as soon as four (4) years following FDA approval of a New Drug Application. Patents for **PROTONIX** and **EFFEXOR XR** (extended release capsules) are currently subject to, and may be subject in the future to, such challenges in the United States or elsewhere. If a third party successfully challenges patents we rely upon, a court could determine that the patents are invalid or unenforceable or limit the scope of coverage of those patents, potentially reducing our revenue from the related products.

In many countries, as a patent owner, we must seek a preliminary injunction or similar legal device to avoid premature generic market entry. In circumstances where a preliminary injunction is issued, but the asserted patents are held invalid or not infringed, we may be liable for the generic company's lost profits. In some circumstances, where no preliminary injunction is available, we may be limited to an action for damages and perhaps a permanent injunction. In such cases, the generic may enter the market and money damages are likely to be inadequate to compensate us for our losses.

**When our patent rights expire, previously protected products may become subject to competition from generic versions, which may lower our net revenue.**

Our patent protection for our products is limited by the applicable terms of our patents. Following expiration of patents covering our products, other entities may be able to obtain approval to manufacture and market generic alternatives, which we expect would result in lower net revenue. For example, our sales of **ZOSYN** could be significantly affected if the product faces generic competition in the United States and other major markets in the future. In February 2007, the compound patent claiming one of the active ingredients of **ZOSYN** expired in the United States. Additional process and manufacturing patents extend beyond that expiration. Our new formulation of **ZOSYN** was approved by the FDA in 2005 and has additional patent protection extending until 2023. While our best estimate is that generic competition for **ZOSYN** in the United States will not occur until at least late 2007, it is possible that we will face generic competition as early as the 2007 first quarter, depending upon the FDA's response to the petitions filed by Wyeth and third parties regarding **ZOSYN**, which are discussed in greater detail in Note 14 to our consolidated financial statements, Contingencies and Commitments, in our 2006 Financial Report, and other factors. The compound patent claiming one of the active ingredients in **ZOSYN** will expire in most major countries outside the United States in the 2007 third quarter. Thus, we may face generic competition in these countries as early as the 2007 third quarter.

I-17

**We may incur substantial costs in litigation or other proceedings involving intellectual property rights and the results of such litigation or proceedings may reduce our net revenue.**

A third party may sue us or one of our collaboration partners, alleging infringement of the third party's patents or other intellectual property rights. Likewise, one of our collaboration partners or we may sue to enforce intellectual property rights or to determine the scope and validity of third party proprietary rights. If we do not prevail in this type of litigation, we or our strategic collaboration partners may be required to:

- Pay monetary damages;
- Stop commercial activities relating to the affected products;
- Obtain a license in order to continue manufacturing or marketing the affected products; or
- Compete in the market with substantially similar products.

### Risks Associated with Development and Marketing of New Drugs

**The development of novel pharmaceuticals, vaccines, and biotechnology products involves a lengthy and complex process, and we may be unable to commercialize, or be delayed in commercializing, any of our product candidates currently under development.**

We have multiple product candidates in development and devote considerable resources to research and development activities, including clinical trials. These activities involve a high degree of risk and take many years. Currently, we have a large number of product candidates in development. Our product candidates in late-stage development include four potential new products with respect to which we filed New Drug Applications (NDAs) with the FDA in 2006: **PRISTIQ** (for the treatment of vasomotor symptoms), **VIVIANT, TORISEL**, and bifeprunox. We also filed NDAs in 2005 for **PRISTIQ** (for the treatment of major depressive disorder) and **LYBREL**, and we expect to file a number of additional NDAs for potential new products and important new indications for existing products in 2007. Our product development efforts with respect to any product candidate may fail or be delayed, and we may be unable to commercialize it or be delayed in commercializing it, for multiple reasons, including:

- Failure of the product candidate in preclinical studies;
- Difficulty enrolling patients in clinical trials;
- Adverse reactions to the product candidate or indications of other safety concerns;
- Insufficient clinical trial data to support the safety and/or effectiveness of the product candidate;
- Our inability to manufacture sufficient quantities of the product candidate for development or commercialization activities in a timely and cost-efficient manner; and
- Our failure to obtain, or our experiencing delays in obtaining, the required regulatory approvals for the product candidate or the facilities in which it is manufactured.

Notably, clinical trial data are subject to differing interpretations and, even when we view data as sufficient to support the safety and/or effectiveness of a product candidate or a new indication for an existing product, regulatory authorities may not share our views and may require additional data or may deny approval altogether. Additionally, regulatory authorities in different countries often apply differing standards for the approval of product candidates and/or new indications for existing products, meaning that approval of a particular product candidate or new indication in one country may not be predictive of approval in other countries.

**The development and commercialization of novel drugs requires significant expenditures with a low probability of success.**

Successful development and commercialization of new pharmaceuticals, vaccines, and biotechnology products is expensive and inherently uncertain. Conducting late-stage clinical trials is particularly costly. If our clinical trials are not successful, we will not recover our substantial investments in applicable product candidates. Even where our clinical trials are sufficient to obtain product approval, we may not be able to achieve our anticipated product labeling, which could adversely impact the commercial success of the applicable product. The substantial funds we spend developing new products depress near-term profitability with no assurance that the expenditures will generate future profits to offset these costs.

I-18

**If our strategic alliances are unsuccessful, our operating results will be negatively impacted.**

Several of our strategic initiatives involve alliances with other companies, including our collaborations with:

- Amgen on **ENBREL**;
- Nycomed (previously Altana) on **PROTONIX**;
- Johnson & Johnson under which we supply sirolimus, the active ingredient in **RAPAMUNE**, to coat the **CYPHER** stent;
- Medtronic Sofamor Danek, Inc. on **rhBMP-2**;
- Solvay Pharmaceuticals on the development and North America promotion of bifeprunox for schizophrenia;
- Progenics Pharmaceuticals, Inc. on the development of methylnaltrexone for the treatment of opioid-induced side effects and post-operative ileus;
- Trubion Pharmaceuticals, Inc. on the development of TRU-015 for the treatment of rheumatoid arthritis and certain other therapies; and
- Elan Corporation on the development of amyloid immunotherapies to address Alzheimer's disease.

The success of these and similar arrangements depends not only on our contributions and capabilities, but also on the technology and other intellectual property contributed by our partners and their resources, efforts and skills. If these and similar arrangements are unsuccessful, our operating results will be negatively impacted. Disputes and difficulties in such relationships are common, often due to conflicting priorities or conflicts of interest. For example, we are currently in litigation with Johnson & Johnson regarding our collaboration with respect to the **CYPHER** stent. The benefits of these alliances would be reduced or eliminated if strategic partners:

- Terminate or breach the agreements;
- Fail to devote sufficient financial or other resources to the alliances; or
- Suffer negative outcomes in intellectual property disputes.

Under many of our strategic alliances we make milestone payments well in advance of commercialization of products, with no assurance that we will ever recoup those payments, in which case our operating results may be negatively impacted.

### Risks Associated with Manufacturing our Products

**Manufacturing problems may cause product launch delays, inventory shortages, recalls, and unanticipated costs.**

In order to sell our products, we must be able to produce sufficient quantities. Many of our products are difficult to manufacture, including **PREVNAR** and **ENBREL**, and/or are sole sourced from certain manufacturing facilities. Minor deviations in our manufacturing processes could result in unacceptable changes in the products that result in lot failures, which may result in launch delays, inventory shortages, unanticipated costs, product recalls, product liability, and/or regulatory action. In addition, a number of factors could cause production interruptions at our facilities or the facilities of our third party providers, including equipment malfunctions, labor problems, natural disasters, regulatory action, power outages or terrorist activities. These interruptions could result in launch delays, inventory shortages, unanticipated costs and issues with our agreements under which we supply third parties.

We have spent considerable resources constructing and seeking regulatory approvals for new manufacturing facilities. There can be no assurance that these facilities will prove sufficient to meet demand for our products or that we will not have excess capacity at these sites. In addition, building facilities is expensive, and our

ability to recover these costs will depend on increased net revenue from the products produced at the sites, which is uncertain.

**Our manufacturing operations are subject to extensive government regulation.**

Regulatory authorities must approve the facilities in which health care products are produced. Any third party we use to manufacture, fill-finish, or package our products also must be licensed by applicable regulatory authorities. As a result, substitute third party providers may not be readily available on a timely basis in the event our or our third party manufacturers' manufacturing facilities are not approved or are unable to comply with applicable regulations. Manufacturing facilities are subject to ongoing inspections by regulatory authorities that may result in regulatory action. In addition, minor changes in manufacturing processes may require additional regulatory approvals. Either of these situations could cause us to incur significant additional costs and lose revenue.

In the event that a regulatory authority objects to practices or conditions at any of our or our third party manufacturer's manufacturing facilities, such facility could be subject to adverse regulatory actions. These possible regulatory actions could include, among others, warning letters, fines, injunctions, and recalls, which could result in, among other things, a total or partial shutdown of production in one or more of the manufacturing facilities; the inability to obtain future pre-market clearances or approvals; and withdrawals or suspensions of current products from the market. Any of these events, in combination or alone, could disrupt our business and negatively impact our revenues and financial condition.

Our Guayama, Puerto Rico manufacturing facility is currently the subject of a Warning Letter from the FDA that raised several specific concerns about manufacturing at the facility. Although it remains our goal to resolve these issues as quickly as possible, we cannot exclude the possibility that these issues will result in further regulatory action or delays in the approval of new products or release of approved products manufactured at the Guayama, Puerto Rico facility. Please see "Management's Discussion and Analysis of Financial Condition and Results of Operations – Overview – Our Challenging Business Environment" in our 2006 Financial Report for further discussion of the Warning Letter.

We are also in continued discussions with various regulatory authorities outside the United States regarding manufacturing process issues at certain of our manufacturing facilities. We are unable to predict the outcome of these discussions or the impact the issues will have on the supply of our products manufactured at these facilities.

**We rely on third parties to provide us with materials and services in connection with the manufacturing of our products and, in some instances, for the manufacture of entire products.**

Unaffiliated third-party suppliers provide some materials necessary for commercial production of our products, including specialty chemicals and components necessary for manufacture, fill-finish, and packaging, and, in some instances such as in the case of **REFACTO**, for the manufacture of entire products. For example, we have sole source suppliers for materials used in **PREVNAR, ENBREL, BENEFIX, RAPAMUNE, ZOSYN, TYGACIL** and oral contraceptives. We may be unable to manufacture our products in a timely manner, or at all, if any of our third-party suppliers cease or interrupt production or otherwise fail to supply us or if the supply agreements are suspended or terminated.

*Risks Associated with Operations*

**Our international sales and operations are subject to the economic, political, legal, and business environments of the countries in which we do business, and our failure to operate successfully or adapt to changes in these environments could cause our international sales and operations to be limited or disrupted, and the value of our foreign direct investments may be diminished.**

Our international operations could be limited or disrupted, and the value of our foreign direct investments may be diminished, by any of the following:

- Fluctuations in currency exchange rates;
- The imposition of governmental controls;

I-20

- Import and export license requirements;
- Political instability;
- Difficulties enforcing contractual and intellectual property rights;
- Terrorist activities and armed conflicts;
- Trade restrictions and restrictions on direct investments by foreign entities;
- Changes in tax laws and tariffs;
- Costs and difficulties in staffing, managing and monitoring international operations; and
- Longer payment cycles.

We conduct a substantial portion of our business in currencies other than the U.S. dollar. While we attempt to hedge certain currency risks, currency fluctuations between the U.S. dollar and the currencies in which we do business have caused foreign currency transaction gains and losses in the past and will likely do so in the future. Likewise past currency fluctuations have at times resulted in foreign currency transaction gains, and there can be no assurance that these gains can be reproduced.

The multinational nature of our business subjects us to potential risks that various taxing authorities may challenge the pricing of our cross border arrangements. While we believe that our pricing methodology is in accordance with applicable laws, taxing authorities may disagree and subject us to additional tax, adversely impacting our effective tax rate and our tax liability. For example, the U.S. Internal Revenue Service (IRS) currently is examining our 1998 through 2001 tax returns, including the pricing of our cross-border arrangements. While we believe that the pricing of these arrangements is appropriate and that our reserves are adequate with respect to such pricing, it is possible that the IRS will propose adjustments in excess of such reserves and that conclusion of the audit will result in adjustments in excess of such reserves. An unfavorable resolution could have a material effect on our results of operations or cash flows in the period in which an adjustment is recorded and in future periods. We believe that an unfavorable resolution would not be material to our financial position; however, each year we record significant tax benefits with respect to our cross-border arrangements, and we cannot exclude the possibility of a resolution that is material to our financial position.

**We rely on third parties to provide us with services in connection with the administration of our business.**

We outsource a number of processing and administrative functions to unaffiliated third parties. For example, as part of our Project Springboard initiatives, we entered into a master services agreement with Accenture LLP (Accenture) in July 2006 under which Accenture will provide us with transactional processing and administrative support services over a broad range of areas, including information services, finance and accounting, human resources and procurement functions. Certain transactional processing services have commenced in 2007. There can be no assurance that the transition of these functions to Accenture will be successful or that we will not encounter difficulties during the transition process. Services provided by third parties as a part of outsourcing initiatives could be interrupted as a result of many factors, such as force majeure events or contract disputes, and any failure by these third parties to provide us with these services on a timely basis or at all could result in a disruption of our business.

**Increases in costs of pension benefits and current and post-retirement medical and other employee health and welfare benefits may reduce our profitability.**

With more than 50,000 employees, our profitability is substantially affected by costs of pension benefits and current and post-retirement medical and other employee health and welfare benefits. These costs can vary substantially as a result of changes in health care costs, volatility in investment returns on pension plan assets, and changes in discount rates used to calculate related liabilities. At least some of these factors may put upward pressure on the cost of providing pensions and medical benefits. We can provide no assurance that we will succeed in limiting future cost increases, and upward pressure may reduce our profitability.

**Our indebtedness could adversely affect our operations.**

As of December 31, 2006, we had approximately $9,096.7 million of long-term debt.

Our indebtedness:

- Requires us to dedicate a portion of our cash flow from operations to debt service;
- Imposes certain restrictions on our business activities; and
- May place us at a competitive disadvantage compared to our competitors that have less debt.

# EXHIBIT H

10-K 1 d10k.htm FORM 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-K

---

(Mark One)

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

   For the fiscal year ended December 31, 2007

                                            OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

   For the transition period from _____ to _____

                        Commission file number 1-1225

---

# Wyeth
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **13-2526821** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **Five Giralda Farms, Madison, NJ** | **07940-0874** |
| (Address of principal executive offices) | (Zip Code) |

### Registrant's telephone number, including area code (973) 660-5000

### Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| $2 Convertible Preferred Stock, $2.50 par value | New York Stock Exchange |
| Common Stock, $0.33 1/3 par value | New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

We caution investors not to place undue reliance on the forward-looking statements contained in this report. Each statement speaks only as of the date of this report (or any earlier date indicated in the statement), and we undertake no obligation to update or revise any of these statements, whether as a result of new information, future developments or otherwise. From time to time, we also may provide oral or written forward-looking statements in other materials, including our earnings press releases. You should consider this cautionary statement, including the risk factors identified in Item 1A. RISK FACTORS of this report, when evaluating those statements as well. Our business is subject to substantial risks and uncertainties, including those identified in this report. Investors, potential investors and others should give careful consideration to these risks and uncertainties.

<u>Availability of Information</u>

This annual report on Form 10-K and all of our quarterly reports on Form 10-Q, current reports on Form 8-K and all amendments thereto are available on our Internet Web site at www.wyeth.com, without charge, promptly after filing with the Securities and Exchange Commission. Copies are also available, without charge, by contacting Wyeth Investor Relations at (877) 552-4744.

ITEM 1A. <u>RISK FACTORS</u>

Our future operating results may differ materially from the results described or incorporated by reference in this report due to risks and uncertainties related to our business and our industry, including those discussed below. In addition, these factors represent risks and uncertainties that could cause actual results to differ materially from those expressed or implied by forward-looking statements included or incorporated by reference into this report. We refer you to our "Cautionary Note Regarding Forward-Looking Statements," on pages I-9 through I-11 of this report, which identifies some of the forward-looking statements included or incorporated by reference in this report. The risks described below are not the only risks we face. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial may also materially and adversely affect our business, financial condition or results of operations.

***Risks Associated with Product Pricing and Demand***

**Government restrictions on pricing and reimbursement, including growing cost-containment, may negatively impact our net revenue and results.**

Sales of our pharmaceutical products both inside and outside the United States depend significantly on coverage and payment policies set by government health care authorities. These government entities increasingly employ cost-containment programs, including price controls, restrictions on reimbursement and requirements for substitution of generic products, to limit patient access to and the amounts these entities and patients pay for our products. The U.S. government, state legislatures and foreign governments have shown significant interest in implementing price controls and imposing additional restrictions on access to drugs. Adoption of price controls and cost-containment measures in new jurisdictions or programs, and adoption of more restrictive policies in jurisdictions with existing controls and measures, could further limit our net revenue and results. In addition, in the United States, federal legislation and other proposals have been introduced periodically that would increase the statutory minimum rebate under Medicaid from 15.1% to a higher amount, which could negatively impact our net revenue and results.

The Medicare Prescription Drug Improvement and Modernization Act of 2003 included a prescription drug benefit for individuals eligible for Medicare. This benefit first went into effect on January 1, 2006. While public opinion polls indicate high levels of satisfaction among Medicare beneficiaries with the new benefit, the U.S. Congress has periodically considered legislation that would amend this law and direct the Secretary of Health and Human Services to negotiate drug prices in the Medicare prescription drug coverage program. Several candidates for U.S. President have expressed support for this type of government-driven approach, which, if enacted into law, could have the effect of price controls and have a negative impact on our net revenue and results. Many of the presidential candidates also support universal health insurance programs. If enacted and implemented, such programs could include a variety of provisions that could decrease net revenue and results from our prescription pharmaceutical products and decrease potential returns from our research and development initiatives.

**Payment for our products by managed care organizations and private insurers is becoming more restrictive, which may constrain our net revenue and results.**

Managed care organizations and other private insurers frequently adopt their own payment or reimbursement reductions, and consolidation among managed care organizations has increased the negotiating power of these

I - 11

http://www.sec.gov/Archives/edgar/data/5187/000119312508042780/d10k.htm                    7/25/2008

entities. Private third-party payors, as well as governments, increasingly employ formularies to control costs by negotiating discounted prices in exchange for inclusion in the formulary. In addition, private health insurance companies and employers that self-insure have been raising co-payments required from beneficiaries, particularly for branded pharmaceuticals and biotechnology products, requiring prior authorization to use a branded product if a generic product is available or requiring that patients start with a generic product before switching to a branded product to encourage beneficiaries to utilize generic products. These actions may have the effect of decreasing the usage and negatively impacting the pricing of our products. These entities may adopt increasingly restrictive payment and reimbursement policies, in which case our net revenue and results could be negatively impacted.

**More extensive importation of products from other jurisdictions may negatively impact our net revenue and results.**

In some markets outside the United States, our products are subject to competition from products originating from jurisdictions where government price controls or other market dynamics, including insertion of counterfeit products in the supply of medicines, result in lower revenues and income. For example, the World Health Organization currently estimates that ten percent of medications being sold globally are counterfeit. Counterfeit products not only negatively impact our sales but, more importantly, pose significant risks to consumers. In addition, despite the well-documented risks, it is possible that the U.S. Congress could enact legislation allowing commercial-scale importation of drugs into the United States, which could negatively impact our net revenue and results.

**Data generated or analyzed after a product is approved may result in product withdrawal or decreased demand.**

As a condition to granting marketing approval of a product, the FDA may require a company to conduct additional clinical trials. The results generated in these Phase IV trials could result in loss of marketing approval, changes in product labeling or new or increased concerns about side effects or efficacy of a product. On September 27, 2007, the FDAAA was enacted, giving the FDA enhanced post-market authority, including the explicit authority to require post-market studies and clinical trials, labeling changes based on new safety information and compliance with FDA-approved risk evaluation and mitigation strategies. The FDA's exercise of its new authority could result in delays or increased costs during product development, clinical trials and regulatory review, increased costs to comply with new post-approval regulatory requirements and potential restrictions on sales of approved products. Foreign regulatory agencies often have similar authority and may impose comparable costs. Post-marketing studies, whether conducted by us or by others and whether mandated by regulatory agencies or voluntary, and other emerging data about marketed products, such as adverse event reports, may also adversely affect sales of our products. Further, the discovery of significant problems with a product similar to one of our products that implicate (or are perceived to implicate) an entire class of products could have an adverse effect on sales of the affected products. Accordingly, new data about our products, or products similar to our products, could negatively impact demand for our products due to real or perceived side-effects or uncertainty regarding efficacy and, in some cases, could result in product withdrawal. For example, Amgen, our marketing partner for **ENBREL** in the United States, is in discussions with the FDA with respect to the class of tumor necrosis factor (TNF) inhibitor agents around several safety issues. Such discussions may result in additional patient safety information in the form of a boxed warning that will apply to the **ENBREL** label as has been the case with other TNF inhibitor agents.

Furthermore, new data and information, including information about product misuse, may lead government agencies, professional societies, practice management groups or organizations involved in various diseases to publish guidelines or recommendations related to the use of our products, recommended dosages of our products or the use of related therapies or place restrictions on sales. Such guidelines or recommendations may lead to lower sales of our products. For example, in 2007, our Consumer Healthcare business voluntarily withdrew our infant cough and cold products from the market, and an FDA joint advisory committee meeting recommended that these products no longer be used in children under the age of six. In January 2008, the FDA issued a Public Health Advisory recommending against the use of over-the-counter (OTC) cough and cold products in children under two years of age, and announcing that the FDA plans to issue recommendations in the 2008 second quarter with respect to the use of OTC cough and cold products in children two through 11 years of age. These recommendations could adversely impact sales of our **ROBITUSSIN** and **DIMETAPP** family of products. In addition, in December 2007, an FDA advisory committee recommended additional studies of the efficacy and/or safety of the oral decongestant phenylephrine (PE), an ingredient used in several **ROBITUSSIN** and **DIMETAPP** products, at certain doses. Depending on the FDA's response to this recommendation, our **ROBITUSSIN** and **DIMETAPP** family of products could be adversely impacted. In addition, it is possible that concerns about misuse will lead to new point-of-sale restrictions on dextromethorphan-containing products, such as our **ROBITUSSIN** products.

I - 12

**If alternative or generic products are viewed as safer or more cost-effective than our products, our net revenue and results will be negatively impacted.**

We face substantial competition from other products produced by pharmaceutical companies and biotechnology companies, including generic alternatives to our products and competing branded products. If doctors, patients or third-party payors prefer these products, or if these products have better safety, efficacy, pricing or reimbursement characteristics or are easier to administer, our net revenue and results could be negatively impacted.

Our industry is characterized by significant technological change. In addition, generic competitors are becoming more aggressive and generic products are an increasing percentage of overall pharmaceutical sales. The introduction of new competitive products or generic alternatives to our products could negatively impact our net revenue and results. Many of our competitors are conducting research and development activities in indications served by our products and in areas for which we and our collaboration partners are developing product candidates or new indications for existing products. Discoveries by others may make our products or product candidates less attractive.

**PROTONIX** faces competition from other prescription proton pump inhibitors, including several generic products, and multiple over-the-counter remedies. In late 2007, Teva launched a generic version of **PROTONIX** tablets, despite the existence of the unexpired U.S. compound patent we exclusively license from Nycomed (previously Altana). Following this "at risk" launch and its resulting impact on the market, we launched our own generic version of **PROTONIX** tablets in January 2008. A second generic manufacturer, Sun, also launched a generic version of **PROTONIX** tablets in January 2008. See Note 14 to our consolidated financial statements, Contingencies and Commitments, and "Management's Discussion and Analysis of Financial Condition and Results of Operations—Our Challenging Business Environment" in our 2007 Financial Report for a description of the status of our patent litigation with Teva and Sun regarding **PROTONIX**. Generic competition has negatively impacted, and is expected to continue to negatively impact, our revenue from **PROTONIX** significantly.

Our **EFFEXOR** family of products competes against another serotonin norepinephrine reuptake inhibitor (SNRI), several selective serotonin reuptake inhibitors (SSRIs), and other antidepressant products. The increasing availability of generic versions of the active ingredient in several SSRIs and other antidepressant products puts competitive pressure on **EFFEXOR** (immediate release tablets) and **EFFEXOR XR** (extended release capsules). Pursuant to the settlement agreement we entered into with Teva with respect to the U.S. patent litigation pertaining to Teva's generic version of **EFFEXOR XR** (extended release capsules), Teva launched a generic version of **EFFEXOR** (immediate release tablets) in the United States in August 2006 and will be permitted to launch a generic version of **EFFEXOR XR** (extended release capsules) in the United States beginning on July 1, 2010, subject to earlier launch based on certain specified events. Events that could trigger an earlier U.S. market entry by Teva with generic versions of **EFFEXOR XR** (extended release capsules) include specified market conditions and developments regarding the applicable Wyeth patents, including the outcome of other generic challenges to these patents. Six lawsuits concerning such generic challenges currently are pending. There can be no assurance that the outcome of these litigations or the occurrence of specific market conditions will not trigger generic entry by Teva or another generic manufacturer before July 1, 2010. We estimate that approximately 96% of **EFFEXOR** (immediate release tablets) prescriptions in the United States have been converted to Teva's generic version since the August 2006 launch, and we cannot exclude the possibility that Teva's introduction of a generic version of **EFFEXOR** (immediate release tablets) in the United States could adversely impact our U.S. sales of **EFFEXOR XR** (extended release capsules), though we have not experienced any significant impact to date.

In August 2007, we received notice that Sun had filed an ANDA with the FDA for a venlafaxine HCl extended release tablet product. We granted Sun a covenant not to sue with respect to this potential tablet product. The impact of this ANDA on future sales of our **EFFEXOR** family of products is unclear due to uncertainty regarding if and when the FDA will approve the ANDA (which should not be earlier than June 13, 2008). In early 2008, we reached a proposed settlement of our U.S. patent litigation with Osmotica Pharmaceutical Corp., which has filed an NDA pursuant to 21 U.S.C. 355(b)(2) seeking FDA approval to market an extended release venlafaxine tablet. Under the terms of the proposed settlement, we would grant Osmotica a royalty-bearing license under certain patents. The effectiveness of the proposed settlement, which we have elected to submit to the FTC for review, is subject to the court entering certain orders requested by the parties. In the event that Sun and/or Osmotica obtain FDA approval and successfully launch a venlafaxine extended release tablet, our sales of **EFFEXOR XR** (extended release capsules) would be negatively impacted.

I - 13

In addition, pursuant to an agreement reached with Teva with respect to a generic version of **EFFEXOR XR** (extended release capsules) in Canada, Teva launched a generic version of **EFFEXOR XR** (extended release capsules) in Canada in December 2006. Teva's launch decreased our net sales significantly in that market, and we believe that the recent entry of additional generic competition into the Canadian market will increase this decline. As a result of this additional generic competition, our royalty from Teva on its Canadian sales of generic extended release venlafaxine HCl capsules has been suspended.

Generic versions of **EFFEXOR** (immediate release tablets) and **EFFEXOR XR** (extended release capsules) also have been introduced in select markets outside the United States and Canada. As generic competition intensifies globally and additional generic SSRIs, SNRIs and other antidepressant products enter markets, additional competitive pressure will occur, and we expect lower sales of our **EFFEXOR** family of products.

**ENBREL** faces competition from multiple alternative therapies depending on the indication and faces potential competition from therapies under development. In the United States, while **ENBREL** continues to have a market leading position, it has experienced share loss to competitors.

**ZOSYN** has begun to face generic competition in Spain, Portugal, Greece, France and Switzerland, as well as in several markets outside Europe, and may face generic competition in additional countries in the near future, including in Canada. Future sales of **ZOSYN** will be further negatively impacted in the event of generic competition in the United States and additional major markets. In February 2007, compound patent protection for **ZOSYN** expired in the United States. Certain additional process and manufacturing patent protection remains. Our new formulation of **ZOSYN** was approved by the FDA in 2005 and has additional patent protection extending until 2023. We believe that the timing and impact of generic competition for **ZOSYN** in the United States will depend, among other factors, upon the timing and nature of the FDA's response to the citizen petitions filed by Wyeth and third parties regarding **ZOSYN**, which are discussed in greater detail in Note 14 to our consolidated financial statements, Contingencies and Commitments, in our 2007 Financial Report. However, generic competition for **ZOSYN** in the United States could occur at any time and likely would have a significant adverse impact on our sales of the product.

Our conjugated estrogens products, including **PREMARIN** and **PREMPRO**, may be subject to generic competition, as **PREMARIN**'s natural composition is not subject to patent protection, and we may depend on trade secret and other non-patent rights to protect against alternative products being introduced. Certain competitors may be conducting research and development activities in competing estrogen and other products targeted for **PREMARIN**'s approved indications.

We have a 13-valent pneumococcal vaccine under development in Phase 3 clinical trials, and GlaxoSmithKline plc recently filed for regulatory approval in the EU for a ten-valent pneumococcal vaccine, each of which, if approved, would compete with **PREVNAR**.

**TYGACIL**, which was approved in June 2005 for treatment of complicated skin and skin structure infections and complicated intra-abdominal infections, faces competition from a number of I.V. antibiotics approved for these indications, as well as several others that are used off-label. Approvals of new products for complicated skin and skin structure infections that may compete with **TYGACIL** are anticipated in the next few years.

**TORISEL**, which was approved in 2007 for use in the treatment of patients with advanced renal cell carcinoma, faces competition from biologics approved for this indication as well as several oncology products that are used off-label.

The above examples are illustrative. Many of our products face competition from competitive products claiming better safety and/or efficacy profiles or cost-effectiveness than our products. Similarly, many of our products under development, if approved for marketing by regulatory authorities, will face competition from established products. In particular, we note that, if approved, **PRISTIQ** will face competition from our **EFFEXOR** family of products and other marketed antidepressants.

In addition, we may pursue licensing arrangements, strategic alliances or acquisitions to expand our product pipeline, and we compete with other pharmaceutical and biotechnology companies for these strategic opportunities. If we are unable to identify or consummate these types of transactions, our business and growth prospects may be negatively impacted.

**Our biotechnology products, including ENBREL and PREVNAR, may face competition from follow-on biologics.**

Government regulation may, in the future, allow more permissive approval regimes for follow-on biologics (also referred to as "biosimilars" or "generic biologics"). While no specific abbreviated legal pathway for these approvals currently exists in the United States, the U.S. Congress is considering legislation that would establish such a pathway, and the FDA has approved a follow-on biologic product (recombinant human growth hormone)

that referenced a biotechnology product approved under the U.S. Federal Food, Drug, and Cosmetic Act. In Europe, regulatory authorities have taken significant steps toward creating such a pathway. The European Commission has granted marketing authorizations for several follow-on biologics pursuant to a set of general and product class-specific

I - 14

guidelines for biosimilar approvals issued over the past few years. If competitors are able to obtain marketing approval for follow-on biologics referencing our biotechnology products, our biotechnology products may become subject to follow-on biologic competition, with the attendant competitive pressure. Expiration or successful challenge of applicable patent rights could generally trigger this competition, and we expect that we could face more litigation with respect to the validity and/or scope of patents relating to our biotechnology products with substantial revenue.

### Risks Associated with Product and Customer Concentration

**Strong performance from our principal products and our anticipated new product introductions will be necessary to meet our financial goals.**

Over the next few years, our financial performance will depend substantially on the performance of our seven product lines that achieved billion or multi-billion dollar revenue status in 2007, **EFFEXOR/EFFEXOR XR**, **PREVNAR**, **ENBREL**, **PROTONIX**, our Wyeth Nutrition product line, **ZOSYN/TAZOCIN** and our **PREMARIN** family of products, particularly our ability to continue to significantly grow our net revenue from **ENBREL** and **PREVNAR**. Our ability to achieve strong performance with these and our other principal products, including **TYGACIL**, **TORISEL** and **BENEFIX**, and our ability to achieve our goals for the new products and new product indications that we anticipate launching over the next few years, will depend on a number of factors, including:

- The patent protection applicable to each product and the introduction of any generic competition, including the impact of generic competition for **PROTONIX**, our **EFFEXOR** family of products and **ZOSYN/TAZOCIN**, which could significantly impact our revenue from these products;

- Acceptance by doctors and patients of our products;

- Availability of competing treatments that are deemed safer or more efficacious, more convenient to use or more cost-effective than our products;

- Our ability, and the ability of our collaboration partners, to efficiently manufacture sufficient quantities of our products to meet demand and to do so in a cost-efficient manner;

- Regulation by the FDA and foreign regulatory authorities of our products and our manufacturing operations;

- The scope of the labeling approved by regulatory authorities for our products and competitive products;

- New data on the safety and efficacy of our products and competitive products;

- The effectiveness of our sales force;

- The extent of coverage, pricing, and level of reimbursement from government agencies and other third-party payors for our products; and

- The size of the patient population for our products.

**Several of our products are expected to be subject to generic competition over the next several years, and if we are unable to mitigate the loss of revenue and income from these products with revenues from new products in development and through licensing arrangements, strategic alliances or acquisitions, our net revenue and results of operations will be adversely affected.**

Several of our billion or multi-billion dollar products are expected to lose patent protection in the next several years, including our **EFFEXOR** family of products and **PROTONIX**. In addition, compound patent protection for **ZOSYN** expired in the United States in February 2007, and generic competition for **PROTONIX** emerged in late 2007 despite the existence of compound patent protection. Our net revenue and results of operations will be adversely affected if we are unable to generate revenue and income from alternate products, either developed internally through research and development or acquired through licensing arrangements, strategic alliances and/or acquisitions, to mitigate our loss of revenue and income as these products experience generic competition. Research and development of pharmaceutical product candidates involves significant cost and many uncertainties, and it is possible that we will not be able to obtain regulatory approval for, or successfully commercialize, new products that will generate sufficient revenues to mitigate this loss of revenue and income. In addition, there is heavy competition for promising licensing, strategic and acquisition opportunities, and we might be unable to identify and/or compete for external product candidates or companies.

I - 15

**We make significant investments in assets that may become impaired as a result of patent expirations/ generic competition or as a result of our failure to obtain regulatory approval or market acceptance of new products, process changes and/or reformulations.**

As part of our business, we have made and will continue to make significant investments in assets, including inventory, plant and equipment, which relate to potential new products and potential changes in manufacturing processes or reformulations of existing products. Our ability to realize value on these investments is contingent on, among other things, regulatory approval and market acceptance of these new products, process changes and reformulations. In addition, as noted above, several of our principal products are nearing the end of their compound patent terms. If we are unable to find alternative uses for the assets supporting these products, these assets will need to be evaluated for impairment and/or we may need to incur additional costs to convert these assets to an alternate use. Earlier than anticipated generic competition for these products also may result in excess inventory and associated charges.

**Because a few large wholesale distributors account for a significant portion of our net revenue, any financial or other difficulties of our wholesale distributors could negatively impact our results of operations.**

In 2007, our largest wholesale distributor accounted for approximately 13% of our net revenue, and our top three wholesale distributors accounted for approximately 32% of our net revenue. If one of our significant wholesale distributors encounters financial or other difficulties, we may be unable to collect all the amounts that customer owes to us and may be unable to collect any such amounts on a timely basis, which could negatively impact our results of operations.

### *Risks Associated with Legal Liabilities*

**We may be required to pay substantial damages for product liability claims.**

Like all pharmaceutical companies in the current legal environment, we face potential product liability claims for products we have sold and for products we may sell in the future. Product liability claims, regardless of their merits or their ultimate outcomes, are costly, divert management's attention and may adversely affect our reputation and demand for our products and may result in significant damages. We have been sued in the past when patients using our products experience adverse and undesirable health conditions, regardless of any connection between those conditions and our products. We cannot predict with certainty the eventual outcome of pending or future product liability litigation matters and the ultimate outcome of such matters could be material to our results of operations, cash flows and financial condition.

We have taken charges totaling $21,100.0 million in connection with product liability legal actions relating to the diet drugs **PONDIMIN** and **REDUX**. While we believe that our current reserve is adequate and represents management's best estimate, within a range of outcomes, of the aggregate amount required to cover diet drug litigation costs, including payments in connection with the nationwide settlement, opt outs from the nationwide settlement and primary pulmonary hypertension (PPH) claims, and including our legal fees related to the diet drug litigation, it is possible that additional reserves may be required in the future.

In addition, we have been involved in various other legal proceedings involving allegations of injuries caused by our pharmaceutical products. These include individual lawsuits and putative class actions in state and federal courts in the United States and foreign jurisdictions involving allegations of injuries caused by **PREMPRO** or **PREMARIN**, two of our hormone therapy products. Of the 27 hormone therapy cases alleging breast cancer that have been resolved after being set for trial, 22 have now been resolved in our favor (by voluntary dismissal by the plaintiffs, summary judgment, defense verdict or judgment for us notwithstanding the verdict), several of which are being appealed by the plaintiff. Of the remaining five cases, two such cases have been settled, one resulted in a plaintiffs' verdict that was vacated by the court and a new trial ordered (which plaintiffs have appealed), and two resulted in plaintiffs' verdicts that we plan to appeal. Additional cases have been voluntarily dismissed by plaintiffs before a trial setting. Trials of additional hormone therapy cases also are scheduled throughout 2008. We also face putative class action lawsuits from users of **PREMPRO** or **PREMARIN** seeking medical monitoring and purchase price refunds, as well as other damages. While most of these putative class actions have been dismissed or withdrawn, a motion for class certification was recently denied without prejudice in a California statewide refund class action and a hearing in a similar case in West Virginia is set for later this year. Other of our pharmaceutical products, vaccines and over-the-counter products that are involved in product liability litigation include, without limitation, the prior formulations of certain childhood vaccines and of **DIMETAPP** and **ROBITUSSIN**, and our **EFFEXOR** family of products. If the outcomes of any or all of these proceedings are unfavorable to us, it is possible that we may take future charges with respect to these matters, which may be significant. Please refer to Note 14 to our consolidated financial statements, Contingencies and Commitments, in our 2007 Financial Report for descriptions of these matters and other significant pending product liability

litigation.

I - 16

**Adverse outcomes in other legal matters could negatively impact our business, results of operations and financial condition.**

Our financial condition could be negatively impacted by unfavorable results in other pending litigation matters, including those described in Note 14 to our consolidated financial statements, Contingencies and Commitments, in our 2007 Financial Report, or in lawsuits that may be initiated in the future. These matters include, among other things, intellectual property lawsuits, securities litigation, breach of contract claims, tort claims, and allegations of violations of U.S. and foreign pharmaceutical pricing or marketing, competition and environmental laws, any of which, if adversely decided, could negatively impact our business, results of operations and financial condition.

**If we fail to comply with the numerous and varied legal and regulatory requirements governing the health care industry, we may face substantial fines, other costs and restrictions on our business activities.**

Our activities relating to the sale and marketing of our products are subject to extensive regulation under the U.S. Federal Food, Drug, and Cosmetic Act, the U.S. Public Health Service Act, the U.S. Deficit Reduction Act of 2005, the U.S. Foreign Corrupt Practices Act and other federal and state statutes, including anti-kickback and false claims laws, as well as similar laws in foreign jurisdictions. For example, our Nutrition business, which has significant operations in the Asia/Pacific region, is subject to a variety of foreign laws relating to sales and promotional practices. Violations of these regulations and laws may be punishable by criminal and civil sanctions, including substantial fines, as well as, in the United States, possible exclusion from federal and state health care programs, including Medicare and Medicaid. In addition, plaintiffs both in the United States and in foreign jurisdictions are increasingly bringing actions against international pharmaceutical companies for alleged violations of U.S. and foreign anti-trust laws and laws regarding drug sales and marketing activities.

The U.S. government, state governments and private payors are investigating pricing practices of numerous pharmaceutical companies and biotechnology companies, and many have filed actions alleging that inaccurate reporting of prices has improperly inflated reimbursement rates. A number of these actions have been brought against us. Please see Note 14 to our consolidated financial statements, Contingencies and Commitments, in our 2007 Financial Report for a discussion of these investigations and lawsuits. In addition, government agencies have requested documents from us relating to pricing and rebate issues, including without limitation the United States Attorney's Office for the District of Massachusetts with respect to **PROTONIX**.

Regardless of merit or eventual outcome, these types of investigations and related litigation can result in:

- Diversion of management time and attention;
- Expenditure of large amounts of cash on legal fees, costs, and payment of damages;
- Limitations on our ability to continue some of our operations;
- Decreased demand for our products; and
- Injury to our reputation.

**We may be subject to loss of permits and face substantial fines and clean-up costs in connection with our use of hazardous materials, which could adversely impact our operations and financial condition.**

We use certain hazardous materials in connection with our research and manufacturing activities. We have in the past been, and may in the future be, notified of our potential responsibility relating to the generation, storage, treatment and disposal of hazardous waste. This may result in loss of permits, fines or penalties, and other adverse governmental or private actions. In addition, we have been advised in the past, and may be advised in the future, that we may be a responsible party for several sites on the National Priority List created by the Comprehensive Environmental Response, Compensation and Liability Act, commonly known as the Superfund. Please read the discussion of significant pending environmental matters in Note 7 to our consolidated financial statements, Other Noncurrent Liabilities, and in Note 14 to our consolidated financial statements, Contingencies and Commitments, in our 2007 Financial Report. Payment of substantial fines, penalties or environmental remediation costs, or the loss of permits or other authorizations to operate affected facilities, could adversely impact our operations and financial condition.

### Risks Associated with Intellectual Property

**If our intellectual property rights are challenged or circumvented, competitors may be able to take advantage of our research and development efforts.**

Our long-term success largely depends on our ability to market technologically competitive products. If we fail to obtain and maintain adequate intellectual property protection, we may not be able to prevent third parties

I - 17

from using our proprietary technologies. Our currently pending or future patent applications and/or extensions may not result in issued patents or be approved on a timely basis or at all. In addition, our issued patents may not contain claims sufficiently broad to protect us against third parties with similar technologies or products or provide us with any competitive advantage. The scope of our patent claims also may vary between countries, as individual countries have their own patent laws. For example, some countries only permit the issuance of patents covering methods of making a drug compound, not the chemical compound itself. Our ability to enforce our patents also depends on the laws of individual countries and each country's practice with respect to enforcement of intellectual property rights.

Mechanisms exist in much of the world permitting some form of challenge by generic manufacturers to our patents prior to or immediately following the expiration of any regulatory exclusivity. In the United States, under the Hatch-Waxman Act, New Chemical Entities (NCE) receive five (5) years of regulatory exclusivity and generic manufacturers can challenge our patents as soon as four (4) years following FDA approval of an NDA. Products that are not subject to NCE exclusivity may receive three (3) years of regulatory exclusivity, but our patents may be challenged immediately following FDA approval. Patents for **PROTONIX, EFFEXOR XR** (extended release capsules) and **LYBREL** are currently subject to, and may be subject in the future to, such challenges in the United States or elsewhere. If a third-party successfully challenges patents we rely upon, a court could determine that the patents are invalid or unenforceable or limit the scope of coverage of those patents, potentially reducing our revenue from the related products.

In many countries, as a patent owner, we must seek a preliminary injunction or similar legal device to avoid premature generic market entry. In circumstances where a preliminary injunction is issued, but the asserted patents are held invalid or not infringed, we may be liable for the generic manufacturer's lost profits. In some circumstances, where no preliminary injunction is available, we may be limited to an action for damages and perhaps a permanent injunction. In such cases, the generic may enter the market and money damages may be inadequate to compensate us for our losses. For example, we were recently denied a preliminary injunction against Teva and Sun seeking to prevent the "at risk" launch of generic versions of **PROTONIX** following the expiration of the 30-month stay under Hatch-Waxman. These generic manufacturers subsequently launched generic versions of **PROTONIX**, and there is no assurance that we will recover monetary damages that compensate us for our losses. In other situations, generic manufacturers may be able to design around certain of our patents.

**When our patent rights expire, previously protected products may become subject to competition from generic versions, which may lower our net revenue.**

Our patent protection for our products is limited by the applicable terms of our patents. Following expiration of patents covering our products, other entities may be able to obtain approval to manufacture and market generic alternatives, which we expect would result in lower net revenue. For example, our **EFFEXOR** family of products and **ZOSYN (TAZOCIN** internationally) have begun to experience generic competition in several markets and may face generic competition in additional markets in the near future.

**We may incur substantial costs in litigation or other proceedings involving intellectual property rights and the results of such litigation or proceedings may reduce our net revenue.**

A third-party may sue us or one of our collaboration partners, alleging infringement of the third-party's patents or other intellectual property rights. Likewise, one of our collaboration partners or we may sue to enforce intellectual property rights or to determine the scope and validity of third-party proprietary rights. If we do not prevail in this type of litigation, we or our strategic collaboration partners may be required to:

- Pay monetary damages;
- Stop commercial activities relating to the affected products;
- Obtain a license in order to continue manufacturing or marketing the affected products; or
- Compete in the market with substantially similar products.

I - 18

### Risks Associated with Development and Marketing of New Drugs

**The development of novel pharmaceuticals, biologics and vaccines involves a lengthy and complex process, and we may be unable to commercialize, or may be delayed in commercializing, any of our product candidates currently under development.**

We have multiple product candidates in development and devote considerable resources to research and development activities, including clinical trials. These activities involve a high degree of risk and take many years, and there can be no guarantee that the development of any particular product candidate or new indication for an existing product will be approved by regulators and lead to a commercial product. The length of time that it takes to complete clinical trials and obtain regulatory approval, if at all, for a product candidate or new indication has in the past varied and we expect similar variability in the future.

We finished 2007 with three key potential new products under review by the FDA, as follows: **PRISTIQ**, for the treatment of major depressive disorder and vasomotor symptoms associated with menopause; **RELISTOR** (methylnaltrexone), for the treatment of opioid-induced constipation in patients receiving palliative care; and **VIVIANT**, for prevention and treatment of postmenopausal osteoporosis, as well as several new products and product indications under review in the EU and other countries. Our product development or commercialization efforts with respect to any product candidate may fail or be delayed, and we may be unable to commercialize it or may be delayed in commercializing it, for multiple reasons, including:

- Failure of the product candidate in preclinical studies;

- Difficulty enrolling patients in clinical trials;

- Delays in completing formulation and other testing and work that is necessary to support an application for regulatory approval;

- Adverse reactions to the product candidate or indications of other safety concerns;

- Insufficient clinical trial data to support the safety and/or effectiveness of the product candidate;

- Our inability to manufacture sufficient quantities of the product candidate for development or commercialization activities in a timely and cost-efficient manner; and

- Our failure to obtain, or our experiencing delays in obtaining, the required regulatory approvals for the product candidate or the facilities in which it is manufactured.

Notably, clinical trial data are subject to differing interpretations and, even when we view data as sufficient to support the safety and/or effectiveness of a product candidate or a new indication for an existing product, regulatory authorities may not share our views and may require additional data or may deny approval altogether. For example, the current regulatory environment makes it increasingly difficult to obtain approval for product candidates where there are already existing approved products for the same indications that have longer-term safety and efficacy data available.

For these and other reasons, the process for seeking approvals for our product candidates, both in the United States and internationally, is characterized by significant regulatory interaction and timing uncertainty. For example, with each of **VIVIANT** for the prevention indication and **PRISTIQ** for the treatment of vasomotor symptoms, the FDA has issued approvable letters requesting additional data and/or analysis with respect to safety and/or efficacy issues. For these and our other product candidates, we are unable to predict with certainty what issues the FDA and other regulators may raise during the review process and whether we will be able to adequately address them. Similarly, we cannot precisely project the length of time that will be necessary to compile additional data and analysis requested by regulatory agencies during the review process or predict with certainty whether our submissions will be deemed sufficient or, instead, result in additional requests.

Regulatory authorities in different countries often apply differing standards for the approval of product candidates and/or new indications for existing products, meaning that approval of a particular product candidate or new indication in one country may not be predictive of approval in other countries. For example, if **PRISTIQ** is approved for the treatment of major depressive disorder in the United States, there can be no assurance that it will be approved in other countries or for other indications (including treatment of vasomotor symptoms associated with menopause) in the future.

From time to time, we may predict potential dates for the submission of applications for regulatory approval of our product candidates or new indications and potential dates for other key development or regulatory milestones, any of which we may not meet for these same reasons.

**The development and commercialization of novel drugs requires significant expenditures with a low probability of success.**

Successful development and commercialization of new pharmaceuticals, vaccines and biotechnology products is expensive and inherently uncertain. Conducting late-stage clinical trials, like our global Phase 3 program for

I - 19

our 13-valent pneumococcal conjugate vaccine and the Elan Corp. (Elan)-Wyeth global Phase 3 clinical program for bapineuzumab, is particularly costly. If our clinical trials are not successful, we will not recover our substantial investments in the related product candidate. Even where our clinical trials are sufficient to obtain product approval, we may not be able to achieve our anticipated product labeling and profile, which could adversely impact the commercial success of the product. The substantial funds we spend developing new products depress near-term profitability with no assurance that the expenditures will generate future profits.

**If our strategic alliances are unsuccessful, our operating results will be negatively impacted.**

Several of our strategic initiatives involve alliances with other companies, including our collaborations with:

- Amgen on **ENBREL**;
- Nycomed on **PROTONIX**;
- Johnson & Johnson to which we supply sirolimus, the active ingredient in **RAPAMUNE**, to coat the **CYPHER** stent;
- Medtronic Sofamor Danek, Inc. on **rhBMP-2**;
- Progenics on the development of **RELISTOR** (methylnaltrexone) for the treatment of opioid-induced side effects and post-operative ileus;
- Trubion on the development of TRU-015 for the treatment of rheumatoid arthritis and certain other therapies; and
- Elan on the development of amyloid immunotherapies to address Alzheimer's disease.

The success of these and similar arrangements depends not only on our contributions and capabilities, but also on the technology and other intellectual property contributed by our partners and their resources, efforts and skills. If these and similar arrangements are unsuccessful, our operating results will be negatively impacted. For example, as a result of a recent decision of the U.S. Court of Appeals for the Federal Circuit invalidating the enantiomer patent for **ALTACE**, we expect our future alliance revenue from **ALTACE** to be adversely impacted by generic competition for the product. In addition, alliance revenue has been adversely impacted by declining sales of the **CYPHER** coronary stent marketed by Johnson & Johnson. Disputes and difficulties in such relationships are common, often due to conflicting priorities or conflicts of interest. The benefits of these alliances would be reduced or eliminated if strategic partners:

- Terminate or breach the agreements;
- Fail to devote sufficient financial or other resources to the alliances; or
- Suffer negative outcomes in intellectual property disputes.

Under many of our strategic alliances we make milestone payments well in advance of commercialization of products, with no assurance that we will ever recoup those payments. For example, in late February 2008, we and our partner Solvay Pharmaceuticals terminated our collaboration agreements for the development and North American promotion of bifeprunox for schizophrenia. There can be no guarantee that any particular strategic alliance will be successful and result in a commercial product.

### Risks Associated with Manufacturing our Products

**Manufacturing problems may cause product launch delays, inventory shortages, recalls and unanticipated costs.**

In order to sell our products, we must be able to produce sufficient quantities. Many of our products are difficult to manufacture, including **PREVNAR** and **ENBREL**, and/or are sole sourced from certain manufacturing facilities. Minor deviations in our manufacturing processes could result in unacceptable changes in the products that result in lot failures, which may result in launch delays, inventory shortages, unanticipated costs, product recalls, product liability and/or regulatory action. In addition, a number of factors could cause production interruptions at our facilities or the facilities of our third-party providers, including equipment malfunctions, labor problems, natural disasters, regulatory action, power outages or terrorist activities. These interruptions could result in launch delays, inventory shortages, unanticipated costs and issues with our agreements under which we supply third parties.

We have spent considerable resources constructing and seeking regulatory approvals for manufacturing facilities. There can be no assurance that these facilities will prove sufficient to meet demand for our products or that we will not have excess capacity at these sites. In addition, building facilities is expensive, and our ability to recover these costs will depend on increased net revenue from the products produced at the sites, which is uncertain.

**Our manufacturing operations are subject to extensive government regulation.**

Regulatory authorities must approve the facilities in which our health care products are produced. Any third-party we use to manufacture, fill-finish or package our products also must be licensed by applicable regulatory authorities. As a result, substitute third-party providers may not be readily available on a timely basis in the event our or our third-party manufacturers' manufacturing facilities are not approved or are unable to comply with applicable regulations. Manufacturing facilities are subject to ongoing inspections by regulatory authorities that may result in regulatory action. In addition, minor changes in manufacturing processes may require additional regulatory approvals. Either of these situations could cause us to incur significant additional costs and lose revenue.

In the event that a regulatory authority objects to practices or conditions at any of our or our third-party manufacturers' manufacturing facilities, such facility could be subject to adverse regulatory actions. These possible regulatory actions could include, among others, warning letters, fines, injunctions and recalls, which could result in, among other things, a total or partial shutdown of production in one or more of the manufacturing facilities; the inability to obtain future pre-market clearances or approvals; and withdrawals or suspensions of current products from the market. Any of these events, in combination or alone, could disrupt our business and negatively impact our revenues and financial condition.

**We rely on third parties to provide us with materials and services in connection with the manufacturing of our products and, in some instances, for the manufacture of entire products.**

Unaffiliated third-party suppliers provide some materials necessary for commercial production of our products, including specialty chemicals, commodities and components necessary for manufacture, fill-finish and packaging, and, in some instances, such as in the case of **REFACTO**, for the manufacture of entire products. For example, we have sole source suppliers for materials used in **PREVNAR, ENBREL, BENEFIX, RAPAMUNE, ZOSYN, TYGACIL** and oral contraceptives. We may be unable to manufacture our products in a timely manner, or at all, if any of our third-party suppliers cease or interrupt production or otherwise fail to supply us or if the supply agreements are suspended or terminated, which could constrain sales of these products.

Commodities such as milk, which is used in large quantities by our Nutrition business and has recently been subject to sharp price increases, often experience price volatility caused by conditions outside of our control, including fluctuations in commodities markets, currency fluctuations and changes in governmental programs. Rising milk prices have had, and are expected to continue to have, an adverse effect on our margins from this business.

### Risks Associated with Operations

**Our international sales and operations are subject to the economic, political, legal and business environments of the countries in which we do business, and our failure to operate successfully or adapt to changes in these environments could cause our international sales and operations to be limited or disrupted, and the value of our foreign direct investments may be diminished.**

Our international operations could be limited or disrupted, and the value of our foreign direct investments may be diminished, by any of the following:

- Fluctuations in currency exchange rates;

- The imposition of governmental controls;

- Import and export license requirements;

- Political instability;

- Difficulties enforcing contractual and intellectual property rights;

- Changes in laws, regulations or enforcement practices with respect to our business, including without limitation laws relating to reimbursement, competition, pricing and sales and marketing of our products;

- Terrorist activities and armed conflicts;

I - 21

- Trade restrictions and restrictions on direct investments by foreign entities;
- Changes in tax laws and tariffs;
- Costs and difficulties in staffing, managing and monitoring international operations; and
- Longer payment cycles.

We conduct a substantial portion of our business in currencies other than the U.S. dollar. While we attempt to hedge certain currency risks, currency fluctuations between the U.S. dollar and the currencies in which we do business have caused foreign currency transaction gains and losses in the past and will likely do so in the future. Likewise past currency fluctuations have at times resulted in foreign currency transaction gains, and there can be no assurance that these gains can be reproduced.

The multinational nature of our business subjects us to potential risks that various taxing authorities may challenge the pricing of our cross border arrangements. While we believe that our pricing methodology is in accordance with applicable laws, taxing authorities may disagree and subject us to additional tax, adversely impacting our effective tax rate and our tax liability. For example, the U.S. Internal Revenue Service (IRS) has begun its audit of our tax returns for the 2002-2005 tax years. As part of this audit, the IRS is examining the pricing of our cross-border arrangements. While we believe that the pricing of these arrangements is appropriate and that our reserves are adequate with respect to such pricing, it is possible that the IRS will propose adjustments in excess of such reserves and that conclusion of the audit will result in adjustments in excess of such reserves. An unfavorable resolution for open tax years could have a material effect on our results of operations or cash flows in the period in which an adjustment is recorded and in future periods. We believe that an unfavorable resolution for open tax years would not be material to our financial position; however, each year we record significant tax benefits with respect to our cross-border arrangements, and the possibility of a resolution that is material to our financial position cannot be excluded.

**We rely on third parties to provide us with services in connection with the administration of our business.**

We outsource a number of processing and administrative functions to unaffiliated third parties. For example, as part of our productivity initiatives, we entered into a master services agreement with Accenture LLP (Accenture) in July 2006 under which Accenture provides us with transactional processing and administrative support services over a broad range of areas, including informational services, finance and accounting, human resources and procurement functions. Certain of the functions originally contracted for by us as part of the outsourcing initiative with Accenture have been subsequently retained by us. There can be no assurance that further transition of functions to Accenture will be successful or that we will not encounter difficulties during the remainder of the transition process. Services provided by third parties as a part of outsourcing initiatives could be interrupted as a result of many factors, such as force majeure events or contract disputes, and any failure by these third parties to provide us with these services on a timely basis or at all could result in a disruption of our business.

**Increases in costs of pension benefits and current and post-retirement medical and other employee health and welfare benefits may reduce our profitability.**

With more than 50,000 employees, our profitability is substantially affected by costs of pension benefits and current and post-retirement medical and other employee health and welfare benefits. These costs can vary substantially as a result of changes in health care costs, volatility in investment returns on pension plan assets and changes in discount rates used to calculate related liabilities. These factors may put upward pressure on the cost of providing pensions and medical benefits. We can provide no assurance that we will succeed in limiting future cost increases, and upward pressure may reduce our profitability.

**Our indebtedness could adversely affect our operations.**

As of December 31, 2007, we had $11,492.9 million of long-term debt.

Our indebtedness:

- Requires us to dedicate a portion of our cash flow from operations to debt service;
- Imposes certain restrictions on our business activities; and
- May place us at a competitive disadvantage compared to our competitors that have less debt.

I - 22

**Changes in interest rates could adversely affect our results of operations.**

As of December 31, 2007 we had marketable securities of $2,993.8 million, which are impacted by fluctuations in interest rates. Additionally, within marketable securities are investments that are subject to changes in fair value as a result of other market factors, such as the recent turmoil in the housing and credit markets. Further, as noted above, we had long-term debt at December 31, 2007 of $11,492.9 million. Some of our interest payments on our debt are also subject to fluctuations in interest rates, including our use of interest rate swaps (see Note 6 to our consolidated financial statements, Debt and Financing Arrangements, in our 2007 Financial Report). Accordingly, fluctuations in interest rates may adversely affect our results.

ITEM 1B.  UNRESOLVED STAFF COMMENTS

We have not received any written comments from the staff of the Securities and Exchange Commission regarding our periodic or current reports that remain unresolved.

ITEM 2.  PROPERTIES

Our corporate headquarters and the headquarters of our Consumer Healthcare business are located in owned facilities in Madison, New Jersey. Our U.S. and international Pharmaceuticals operations are headquartered in owned facilities in Collegeville and Great Valley, Pennsylvania. Our Animal Health business is headquartered in Overland Park, Kansas, a leased facility. Our international subsidiaries and affiliates, which generally own their properties, have manufacturing facilities in 15 countries outside the United States.

The properties listed below are our principal manufacturing plants (M) and research laboratories (R) as of December 31, 2007, listed in alphabetical order by state or country. All of these properties are owned except certain facilities in Guayama, Puerto Rico and Rouses Point, New York, which are under lease. We also own or lease a number of other smaller properties worldwide, which are used for manufacturing, research, warehousing and office space.

I - 23