UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――

No. 07 Civ. 10329 (RJS)

―――――――――――――――

CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

VERSUS

WYETH, ET AL.,

Defendants.

―――――――――――――――

MEMORANDUM AND ORDER
September 29, 2010

―――――――――――――――

RICHARD J. SULLIVAN, District Judge:

Lead Plaintiff Pipefitters Union Local 537 Pension Fund and named Plaintiff City of Livonia Employees' Retirement System bring this putative securities class action against Defendants Wyeth, Robert Essner, Joseph Mahady, Kenneth Martin, Bernard Poussot, Robert Ruffolo, Jr., and Ginger Constantine, pursuant to § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"); Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder; and § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Plaintiffs, bringing their action on behalf of all purchasers of Wyeth securities during the period from June 26, 2006 through July 24, 2007 (the "Class Period"), allege that Defendants defrauded class members by making materially false misstatements and omissions in public statements relating to the safety of Pristiq, a drug Wyeth was planning to market as a treatment for, *inter alia*, post-menopausal vasomotor symptoms ("VMS"), also known as hot flashes or hot flushes.

Before the Court is Defendants' motion to dismiss Plaintiffs' Consolidated Complaint ("CC") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Defendants' motion is denied.

I. BACKGROUND

A. Facts[1]

At all times relevant to this lawsuit, Wyeth was a pharmaceutical company whose stock traded on the New York Stock Exchange. (CC ¶ 51.) Essner was the Chairman of the Board and Chief Executive Officer of Wyeth; Mahady was Senior Vice President and President of Global Business at Wyeth Pharmaceuticals; Martin was Wyeth's Chief Financial Officer and Vice Chairman; Poussot was President, Chief Operating Officer, and Vice Chairman of the Board of Directors; Ruffolo was Senior Vice President and President of Wyeth Research; and Constantine was Vice President of Women's Health. (*Id.* ¶¶ 52-57.)[2]

Like other pharmaceutical companies, Wyeth had a business model which depended on the continued development of its drug "pipeline," whereby the company endeavored to create newly-approved, patent-protected products to replace drugs whose patents were about to expire. (*Id.* ¶ 9.) In 2007, sales of Effexor and Effexor XR, two drugs produced by Wyeth, represented 17% of the company's yearly net revenue. (*Id.* ¶ 12.) The patent protection for Effexor had expired in 2006 and the patent protection for Effexor XR was set to expire in 2008. (*Id.* ¶ 11.) Wyeth was developing Pristiq, an anti-depressant closely related to Effexor and Effexor XR, as a new product to replace the lost revenue streams from those drugs. (*Id.* ¶¶ 4, 13.) The company saw Pristiq as a drug with "multi-billion dollar potential" (*id.* ¶ 17), and expected "annual sales of $2 billion or more for the drug" (*id.* ¶ 34).

To differentiate Pristiq from Effexor and Effexor XR, "defendants increasingly focused on Pristiq as a treatment for VMS and other women's health issues." (*Id.* ¶ 16.) Prior to 2002, VMS was usually treated through hormone therapy, including Premarin and Prempro, two of Wyeth's more profitable drugs. (*Id.* ¶ 7.) However, a study released in that year by the Women's Health Initiative Hormone Program (the "WHI study") demonstrated various risks associated with taking supplemental hormones after menopause. (*Id.*) Wyeth promoted Pristiq as a non-hormonal alternative. (*Id.* ¶¶ 7, 8.)

Before a drug may be marketed in the United States for a particular use, that use must be approved by United States Food and Drug Administration (the "FDA"). (*Id.* ¶ 5.)

---

[1] The following facts are taken from the Consolidated Complaint. The Court also considers statements or documents incorporated into the Consolidated Complaint by reference, legally required public disclosure documents filed with the Securities and Exchange Commission, analyst reports, documents upon which Plaintiffs relied in bringing suit, and matters of which the Court may take judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). These facts also form the basis of a related shareholder derivative action pending before the Court, *Staehr v. Essner*, 07 Civ. 10465 (RJS), and a recent ERISA case in which the Court granted a motion to dismiss, *Herrera v. Wyeth*, No. 08 Civ. 4688 (RJS), 2010 WL 1028163 (S.D.N.Y. March 17. 2010).

[2] Although the Consolidated Complaint does not include this information, the Court takes judicial notice of the fact that Wyeth was acquired by Pfizer Inc. in 2009. *See* Pfizer Inc., Annual Report (Form 10-K) (Feb. 26, 2010). The Consolidated Complaint does not attempt to differentiate or distinguish Wyeth Pharmaceuticals and Wyeth Research from Defendant Wyeth. Women's Health is a division of Wyeth. (*See* CC ¶ 57.)

2

The approval process includes a series of monitored clinical trials, culminating in "Phase 3" trials with human patients. (*Id.*) Defendants conducted three such Phase 3 trials in an attempt to obtain FDA approval for Pristiq as a treatment for VMS. (*Id.* ¶ 6.)

One of these Phase 3 trials, Study 315, began in December 2003, and the review of the survey data was completed in May 2005. (*Id.* ¶ 23.) The data from this study "showed that the use of Pristiq for treatment of VMS could cause serious hepatic (liver damage) and cardiovascular (heart attacks, partial or complete obstruction of the coronary artery, and hypertension) side effects." (*Id.* ¶ 25.) Of the 707 participants, 27 suffered serious adverse effects ("SAEs"), including three coronary occlusions and two heart attacks. (*Id.* ¶¶ 23, 25.) Women in the study who were taking Pristiq were 353% to 508% more likely to suffer hypertension, depending on dosage level, than those taking a placebo. (*Id.* ¶ 25.) The study also revealed that Pristiq was only "marginally" more effective at treating VMS than the placebo. (*Id.* ¶ 28.) In two other trials, Study 319 and Study 321, patients with a history of heart attack, chest pains, high blood pressure, or blood clots were excluded. (*Id.* ¶ 30.)

By the beginning of the Class Period, Defendants "were well aware of or recklessly disregarded the SAEs reported during Study 315, including the hepatic and cardiovascular side effects associated with the use of Pristiq for treatment of VMS." (*Id.* ¶ 32.) Essner, Mahady, Martin, Poussot, and Ruffolo served on Wyeth's Law/Regulatory Review Committee (*id.* ¶¶ 52-56), which was "tasked with monitoring legal and regulatory issues pertinent to Wyeth, including the FDA submissions for Pristiq" (*see, e.g.*, *id.* ¶ 52). Throughout the Class Period, each individual Defendant "presented himself as knowledgeable about the status and results of Wyeth's clinical trials and the [New Drug Application] for the use of Pristiq for VMS." (*Id.* ¶¶ 52-57). The data from Study 315 was submitted to the FDA, but all of the data "was not made available to investors or the public." (*Id.* ¶ 32.)

On July 24, 2007, Wyeth issued a press release, which stated that the FDA had not approved the drug as a treatment for VMS, due to concerns about the hepatic and cardiovascular side effects found in the Phase 3 trials. (*Id.* ¶ 42.) The FDA required Wyeth to conduct at least one additional Phase 3 study before it would consider approving Pristiq for use as a VMS treatment. (*Id.*) In the wake of the company's press release, Wyeth's stock dropped more than 10%, or $5.70 per share. (*Id.* ¶ 47.)

B. The Alleged False and Misleading Statements

In the Consolidated Complaint, Plaintiffs identify a large number of allegedly misleading statements and omissions made by Defendants during the Class Period. These statements can be divided into two categories. The first category consists of statements suggesting that Wyeth was confident that Pristiq would receive FDA approval (the "FDA Approval Statements"). For example, various company executives stated that "we think we have a package that could warrant

3

approvability by FDA" (*id.* ¶ 65),[3] that "our regulatory and clinical teams . . . remain pretty optimistic that the current filing can result in favorable action" (*id.* ¶ 74), and that "the package that we filed is an approvable one" (*id.* ¶ 86). The second category consists of statements suggesting that Pristiq was safe (the "Safety-Related Statements"). For example, various Wyeth executives stated that Pristiq was "'[s]imilar to Effexor XR in terms of efficacy, safety, and tolerability'" (*id.* ¶ 69), that "Pristiq possesses much of the proven SNRI clinical profile with respect to efficacy, safety, tolerability" (*id.* ¶ 71), that "[t]he safety and tolerability profile of Pristiq in both programs, vasomotor symptoms and MDD is consistent with the SNRI class" (*id.* ¶ 73), and that there was "nothing new" with regard to side effects (*id.* ¶ 87).

Plaintiffs allege that, in these statements, Defendants "concealed the SAEs and safety issues uncovered during the Pristiq clinical trials for VMS. Specifically, defendants failed to disclose that Study 315 identified SAEs, including liver damage, cardiovascular events and hypertension, associated with the use of Pristiq for VMS." (*Id.* ¶ 39) They contend this information was highly material because "Pristiq was one of only a couple of drugs in Wyeth's development pipeline with 'blockbuster' potential and a chance to obtain FDA approval in time to offset both the declining revenues the Company faced as Effexor XR went generic and the market's reaction to the WHI studies." (*Id.* ¶ 21.)

---

[3] Emphases are omitted from this and the following quotations in this paragraph.

### C. Procedural History

The initial complaint in this action was filed on November 14, 2007 by named Plaintiff City of Livonia Employees' Retirement System. On February 25, 2008, the Court granted the motion of Pipefitters Union Local 537 Pension Fund for appointment as Lead Plaintiffs and approval of selection of lead counsel. Lead Plaintiffs filed the Consolidated Complaint on April 11, 2008. Defendants now move to dismiss the Consolidated Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II. LEGAL STANDARDS

### A. Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept all well-pleaded allegations contained in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998). Nonetheless, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Therefore, this standard "demands more than an unadorned, the-defendant-unlawfully-

4

harmed-me accusation." *Id.* at 1949.

Ultimately, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. By contrast, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Under this standard, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### B. Securities Fraud

In securities fraud cases, a plaintiff must satisfy the heightened pleading standards imposed by Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id*. "The PSLRA . . . requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976)); *see also* 15 U.S.C. § 78u-4(b)(1), (2).

### III. DISCUSSION

#### A. Section 10(b) and Rule 10b-5 Claim

"To state a claim under Rule 10b-5 for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI*, 493 F.3d at 105.

In their motion, Defendants argue that Plaintiffs fail to allege three of these necessary components: the existence of material misrepresentations or omissions, scienter, and loss causation. Because the Court finds that Plaintiffs have adequately alleged all three components, the Court denies Defendants' motion to dismiss.

#### 1. Misrepresentations and Omissions

"An omission is materially misleading if 'there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *In re Pfizer,*

5

*Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 629 (S.D.N.Y. 2008) (quoting *Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103, 110 (2d Cir. 2005)).

Defendants argue that the alleged misstatements and omissions relied upon by Plaintiffs are not actionable for two reasons. First, they argue that their statements fall into the PSLRA's "safe harbor" categories (Defs.' Mem. at 12), and are "protected from liability under the judicially-created 'bespeaks caution' doctrine" (*id.* at 17). Under the PSLRA's safe harbor provision, forward-looking statements that are identified as such, and are either "immaterial" or "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" are not actionable. 15 U.S.C. § 78u-5(c)(1)(A). "Similarly, under the judicially created bespeaks caution doctrine, 'alleged misrepresentations . . . are deemed immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language . . . .'" *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)). In addition, "expressions of puffery and corporate optimism do not give rise to securities violations." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

The first category of statements – the FDA Approval Statements – are non-actionable because they are forward-looking statements that fall within the safe harbor provision. The statements explicitly speak to future events and are accompanied by sufficient cautionary statements and/or immaterial. However, Defendants admit that the second category of statements, the Safety-Related Statements, "were not forward-looking" (Defs.' Reply at 6), so neither the safe harbor provision nor the bespeaks caution doctrine applies.

For these Safety-Related Statements, Defendants make a second argument: that the alleged omissions were disclosed during the Class Period and are immaterial. (Defs.' Mem. at 18-21.) Recognizing that "there can be no omission where the allegedly omitted facts are disclosed," *In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005), Defendants argue that the safety data from Study 315 was reported in a poster shown at the 55th Annual Clinical Meeting of the American College of Obstetricians and Gynecologists (the "ACOG poster") and in an analyst report issued by Prudential (the "Prudential report"). (Defs.' Mem. at 19.) Because the price of Wyeth's stock "stayed essentially the same" in the wake of the Prudential report, Defendants argue that the information was therefore immaterial. (*Id.* at 20.)

Even assuming *arguendo* that the ACGO poster may be considered on a motion to dismiss,[4] neither the poster nor the Prudential report discusses hepatic side effects or the combination of the cardiovascular and hepatic effects. (*See* Affidavit of Michael J. Chepiga ("Chepiga Aff."), Ex. 11, 12.) Defendants point to no

---

[4] Defendants argue the ACOG poster is incorporated by reference into paragraph 100 of the Consolidated Complaint. (*See* Defs.' Reply at 11). However, that paragraph discusses a Wyeth press release about the conference, not the poster itself.

6

other instances where the Study 315 data was publicly revealed to the market prior to the July 24, 2007 disclosure by Wyeth. As a result, Plaintiffs have adequately pleaded the existence of material misrepresentations or omissions with respect to the Study 315 safety data and Defendants have failed to demonstrate on the pleadings that the information was fully disclosed and immaterial during the Class Period.

Defendants also argue they had no duty to disclose the adverse events because they were not statistically significant and "Plaintiffs have not alleged facts regarding a 'causal relationship' between the drug and the adverse outcome." (Def.'s Reply at 7-10). This argument is addressed in the following section.

### 2. Scienter

A plaintiff must "state with particularity facts giving rise to a strong inference of scienter." 15 U.S.C. § 78u-4(b)(2). The plaintiff may satisfy the scienter requirement "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. A court is also required to "take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. Accordingly, a complaint survives a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324. For the following reasons, the Court finds that Plaintiffs have, at the very least, sufficiently pleaded a theory of conscious misbehavior or recklessness.

"To survive dismissal under the 'conscious misbehavior' theory, [plaintiffs] must show that they alleged reckless conduct by the [defendants], which is 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)). Where the defendant being sued under this theory is a pharmaceutical company, it is not necessary for the company to "disclose isolated reports of illnesses suffered by users of their drugs until those reports provide *statistically significant evidence* that the ill effects may be caused by – rather than randomly associated with – use of the drugs and are sufficiently serious and frequent to affect future earnings." *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 157 (2d Cir. 1998) (emphasis added).

Plaintiffs have alleged that not all of the information from Study 315 was revealed to the public during the Class Period and that the study provided statistically significant evidence to Defendants that serious adverse events may have been caused by the use of Pristiq. (*See, e.g.,* CC ¶ 25 ("The safety data associated with Study 315 . . . showed that the use of Pristiq for treatment of VMS could cause serious hepatic (liver damage) and cardiovascular (heart attacks, partial or complete obstruction of the coronary artery, and hypertension) side effects."); *id*. ("Study

7

315 demonstrated that women on a regimen of Pristiq were 353% to 508% more likely to suffer hypertension, depending on dosage level, in comparison to women on a placebo."); *id.* ¶ 22 ("a significant number of women taking Pristiq . . . suffered serious adverse events ("SAEs") during Phase 3 clinical trials"), *id.* ¶ 95 ("usage of Pristiq for treatment of VMS was associated with hepatic and cardiovascular side effects"); *id.* ¶ 121 (Defendants "had actual knowledge, through Wyeth's own clinical trial . . . of the undisclosed and significant cardiovascular and hepatic side effects associated with using Pristiq for the treatment of VMS . . . .").) As discussed *supra*, Plaintiffs allege Pristiq had "critical importance" to Wyeth. (*Id.* ¶ 17.)

Defendants argue that "the cardiac, hepatic and hypertension outcomes that Plaintiffs cite are not statistically significant" and that "Plaintiffs' calculation of statistical significance by citing the increased percentage of an incident occurring in the overall treatment group compared to the placebo group is simply an erroneous statistical analysis." (Defs.' Reply at 7.) However, "the Court cannot determine as a matter of law whether such links were statistically insignificant because statistical significance is [ordinarily] a question of fact." *See In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 635-36 (S.D.N.Y. 2008).

Therefore, at least at this stage of the litigation, Plaintiffs have made sufficient allegations that Defendants should have been aware of the impact of Study 315's results on Wyeth's stock and that they recklessly omitted the information when making their statements during the Class Period. Accordingly, Plaintiffs have adequately alleged scienter.

### 3. Loss Causation

To adequately plead loss causation, a plaintiff must plead "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broundo*, 544 U.S. 336, 342 (2005). The "plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). (citations and quotation marks omitted). Therefore, the plaintiff's loss must both "be foreseeable" and "be caused by the materialization of the concealed risk." *Id.* "One of the ways a plaintiff can plead loss causation is to allege that the market reacted negatively to a corrective disclosure regarding the falsity of the defendants' representations." *In re Winstar Commc'ns*, Nos. 01 Civ. 3014 (GBD), 01 Civ. 11522 (GBD), 2006 WL 473885, at *13 (S.D.N.Y. Feb. 27, 2006). "It requires a 'showing that plaintiff suffered an economic loss fairly attributable to the public airing of the alleged fraud, *i.e.*, a significant stock price decline immediately following the announcement that reveals the fraud to the public.'" *Id.* (quoting *D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 748-49 (E.D. Mich. 2003)).

In their Consolidated Complaint, Plaintiffs make just such an allegation. Specifically, they assert that Defendants were aware of the adverse cardiac and

8

hepatic effects shown in Study 315, but failed to disclose it to the market. They claim that "[a]s a direct result of the July 24, 2007 disclosure that the FDA was requiring significant additional study of the cardiovascular and hepatic side effects associated with Pristiq, Wyeth's stock price immediately dropped $5.70 per share on unusually high volume." (CC ¶ 133.)

On their motion to dismiss, Defendants argue that Plaintiffs have inadequately pleaded loss causation because the adverse safety data from Study 315 had already been disclosed to the market. (*See* Defs.' Mem at 34-35.) Specifically, they point to the poster displayed at the 55th Annual Clinical Meeting of the American College of Obstetricians and Gynecologists and a May 21, 2007 analyst report issued by Prudential. However, as discussed above, the Court has determined that both documents discuss only adverse cardiovascular effects, not hepatic events or the combination of the two. (*See* Chepiga Aff. Exs. 11, 12.) Accordingly, at this stage of the proceeding the Court cannot conclude that the full extent of the adverse reactions was revealed to the market prior to the July 24, 2007 disclosure.

Therefore, the Court finds that Plaintiffs have adequately pleaded loss causation by contending that this full disclosure caused the strong negative market reaction and caused their damages.

### B. Section 20(a) Claim

To establish a prima facie case of control person liability under § 20(a) of the Securities Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108. If a plaintiff fails to allege a primary violation, it cannot establish control person liability. *Id*. A plaintiff must also "allege 'some level of culpable participation at least approximating recklessness in the section 10(b) context.'" *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 231 (S.D.N.Y. 2008).

In their motion to dismiss, Defendants argue that Plaintiffs failed to plead both scienter and a primary violation of the securities law. (Defs.' Mem at 35-36.) As discussed above, Plaintiffs have adequately made both required showings. Therefore, Defendants' motion to dismiss Plaintiffs' claim under § 20(a) is also denied.

### IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED.

IT IS HEREBY ORDERED THAT, by October 14, 2010, the parties shall submit a joint letter, not to exceed five (5) pages, providing the following information in separate paragraphs: (1) a brief description of any discovery that has already taken place, and that which will be necessary for the parties to engage in meaningful settlement negotiations; (2) a list of all prior settlement discussions, including the date, the parties involved, and the approximate duration of such discussions, if any; and (3) the estimated length of trial.

IT IS FURTHER ORDERED THAT, by October 14, 2010, the parties shall submit a proposed case management plan and scheduling order to my chambers. A template for the case management plan is available at http://www.1.nysd.uscourts.gov/judge_info.php?id=99.

IT IS FURTHER ORDERED THAT the parties shall appear for a status conference on October 21, 2010 at 9:00 a.m. in Courtroom 21C of the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York.

The Clerk of the Court is respectfully directed to terminate the motion docketed as document number 23.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 29, 2010
New York, New York

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/29/10
```

\*\*\*

Plaintiffs are represented by David Avi Rosenfeld, Laurie L. Largest, Samuel Howard Rudman, Tor Gronborg, and Trig Randall Smith of Robbins Geller Rudman & Dowd LLP, 58 South Service Road, Suite 200, Melville, NY 11747 and 655 West Broadway, Suite 1900, San Diego, CA 92101. Defendants are represented by Alexandra Emily Greif, Lynn Katherine Neuner, Michael Joseph Chepiga, and Chad Henry Atlas of Simpson Thatcher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017.