UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

CITY OF LIVONIA EMPLOYEES'
RETIREMENT SYSTEM, On Behalf of Itself
and All Others Similarly Situated,

                      Plaintiff,

      vs.

WYETH, et al.,

                Defendants.

———————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:07-cv-10329-RJS

<u>CLASS ACTION</u>

**ECF CASE**

MEMORANDUM OF LAW IN SUPPORT
OF LEAD COUNSEL'S MOTION FOR AN
AWARD OF ATTORNEYS' FEES AND
EXPENSES AND LEAD PLAINTIFF'S
EXPENSES PURSUANT TO 15 U.S.C. §78u-
4(a)(4)

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   LEAD COUNSEL'S REQUESTED FEE IS FAIR AND REASONABLE AND
      SHOULD BE APPROVED...................................................................................3

      A.    Lead Counsel Are Entitled to a Reasonable Percentage of the Common
            Fund ...........................................................................................................3

      B.    The Court Should Award a Reasonable Percentage of the Common Fund
            to Lead Counsel .........................................................................................4

      C.    The Requested Fee Is Well Within the Range of What Courts Have Found
            to Be Fair and Reasonable Under the Percentage Method ........................5

      D.    The *Goldberger* Factors Support Lead Counsel's Requested Fee ...........7

            1.    The Action's Magnitude and Complexity Support the Requested
                  Fee ...............................................................................................7

            2.    The Risks of the Litigation Support the Requested Fee ............10

                  a.    Risks of Establishing Liability Against the Defendants...............10

                  b.    The Risks of Establishing Damages and Related Loss
                        Causation Issues ..........................................................10

                  c.    General Litigation Risks and the Fully Contingent Nature
                        of Lead Counsel's Retention ........................................11

            3.    The Quality of Lead Counsel's Representation Supports the
                  Requested Fee.............................................................................13

                  a.    The Results Obtained from Lead Counsel's Efforts.....................13

                  b.    The Court's Observations as to the Quality of Lead
                        Counsel's Work ............................................................14

                  c.    The Standing and Expertise of Lead Counsel ...............................15

                  d.    The Standing and Expertise of Defendants' Counsel...................15

            4.    The Requested Fee Is Fair and Reasonable in Relation to the Size
                  of the Recoveries and Comparable Fee Awards........................16

                                                                                    Page

          5.    The Time and Labor Expended by Lead Counsel, Including a
                "Lodestar Crosscheck," Support the Requested Fee ................................. 16

          6.    Important Public Policy Considerations Further Support the
                Requested Fee .......................................................................................... 19

     E.   Lead Plaintiff's Endorsement Should Also Be Considered in Determining
          Reasonableness of the Requested Fee ................................................................. 21

III. LEAD COUNSEL'S REQUEST FOR PAYMENT OF LITIGATION
     EXPENSES SHOULD BE APPROVED .......................................................................... 22

IV.  CLASS REPRESENTATIVE SHOULD RECEIVE REIMBURSEMENT FOR
     ITS EXPENSES ................................................................................................................ 23

V.   CONCLUSION ................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page**

## CASES

*Anixter v. Home-Stake Prod. Co.*,
   77 F.3d 1215 (10th Cir. 1996) ................................................................ 12

*Backman v. Polaroid Corp.*,
   910 F.2d 10 (1st Cir. 1990) .................................................................... 12

*Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*,
   No. 96 CIV. 0583 (DAB), 2002 WL 1315603
   (S.D.N.Y. June 17, 2002) ......................................................................... 6

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
   472 U.S. 299 (1985) ................................................................................. 4

*Bentley v. Legent Corp.*,
   849 F. Supp. 429 (E.D. Va. 1994),
   *aff'd sub nom. Herman v. Legent Corp.*,
   50 F.3d 6 (4th Cir. 1995) ....................................................................... 12

*Blum v. Stenson*,
   465 U.S. 886 (1984) ................................................................................. 4

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) ................................................................................. 3

*Cent. States SE & SW Areas Health & Welfare Fund v.*
*Merck-Medco Managed Care, L.L.C.*,
   504 F.3d 229 (2d Cir. 2007) ................................................................ 4, 6

*Cornwell v. Credit Suisse Grp.*,
   No. 08-cv-03758(VM), slip op.
   (S.D.N.Y. July 20, 2011) .......................................................................... 7

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................... 20

*Fogarazzo v. Lehman Bros., Inc.*,
   No. 03 Civ. 5194 (SAS), 2011 WL 671745
   (S.D.N.Y. Feb. 23, 2011) ...................................................................... 5, 8

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000) ............................................................ *passim*

**Page**

*Hensley v. Eckerhart,*
461 U.S. 424 (1983) .................................................................................... 13

*Hicks v. Morgan Stanley,*
No. 01 Civ. 10071 (RJH), 2005 WL 2757792
(S.D.N.Y. Oct. 24, 2005) ................................................................ 11, 19, 23

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,*
No. 03 MDL 1529 (LMM), 2006 WL 3378705
(S.D.N.Y. Nov. 16, 2006) ........................................................................... 15

*In re Alstom SA Sec. Litig.,*
741 F. Supp. 2d 469 (S.D.N.Y. 2010) ....................................................... 12

*In re Am. Bank Note Holographics, Inc., Sec. Litig.,*
127 F. Supp. 2d 418 (S.D.N.Y. 2001) ....................................................... 11

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,*
No. MDL 1500, 2006 WL 903236
(S.D.N.Y. Apr. 6, 2006) ............................................................................... 7

*In re Apple Computer Sec. Litig.,*
No. C-84-20148(A)-JW, 1991 WL 238298
(N.D. Cal. Sept. 6, 1991) ........................................................................... 12

*In re AremisSoft Corp. Sec. Litig.,*
210 F.R.D. 109 (D.N.J. 2002) .................................................................... 18

*In re BankAtlantic Bancorp, Inc.,*
No. 07-61542-CIV, 2011 WL 1585605
(S.D. Fla. Apr. 25, 2011) ........................................................................... 12

*In re Buspirone Antitrust Litig.,*
No. MDL 1413 (JGK), 2003 U.S. Dist. LEXIS 26538
(S.D.N.Y. Apr. 17, 2003) ........................................................................... 18

*In re China Sunergy Sec. Litig.,*
No. 07 Civ. 7895 (DAB), 2011 WL 1899715
(S.D.N.Y. May 13, 2011) ........................................................................... 22

*In re CIT Grp. Inc. Sec. Litig.,*
No. 1:08-cv-06613-BSJ-THK, slip op.
(S.D.N.Y. June 13, 2012) ............................................................................. 7

797700_1

**Page**

*In re Comverse Tech., Inc. Sec. Litig.*,
  No. 06-CV-1825 (NGG)(RER), 2010 WL 2653354
  (E.D.N.Y. June 24, 2010)....................................................................................21

*In re Doral Fin. Corp. Sec. Litig.*,
  No. 1:05-md-01706-RO, slip op.
  (S.D.N.Y. July 17, 2007)....................................................................................18

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  No. 02-CV-3400(CM)(PED), 2010 WL 4537550
  (S.D.N.Y. Nov. 8, 2010)..........................................................................8, 11, 19

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004)....................................................................17, 23

*In re Initial Pub. Offering Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009) .................................................................6

*In re Interpublic Sec. Litig.*,
  No. 02 Civ. 6527 (DLC), 2004 WL 2397190
  (S.D.N.Y. Oct. 26, 2004)......................................................................................4

*In re JDS Uniphase Corp. Sec. Litig.*,
  No. C-02-1486 CW(EDL), 2007 WL 4788556
  (N.D. Cal. Nov. 27, 2007) ..................................................................................12

*In re L.G. Philips LCD Co., Ltd. Sec. Litig.*,
  No. 1:07-cv-00909-RJS, slip op.
  (S.D.N.Y. Mar. 17, 2011)......................................................................................6

*In re Lernout & Hauspie Sec. Litig.*,
  138 F. Supp. 2d 39 (D. Mass. 2001).................................................................21

*In re Lucent Techs., Inc. Sec. Litig.*,
  327 F. Supp. 2d 426 (D.N.J. 2004).....................................................................22

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
  No. 04 Civ. 8144 (CM), 2009 WL 5178546
  (S.D.N.Y. Dec. 23, 2009) ......................................................................................5

*In re Med. X-Ray Film Antitrust Litig.*,
  No. CV-93-5904, 1998 WL 661515
  (E.D.N.Y. Aug. 7, 1998)........................................................................................6

- v -

Page

*In re Mills Corp. Sec. Litig.*,
   265 F.R.D. 246 (E.D. Va. 2009)..................................................................22

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998)................................................................18

*In re Noah Educ. Holdings Ltd. Sec. Litig.*,
   No. 1:08-cv-09203-RJS, slip op.
   (S.D.N.Y. May 27, 2011) ............................................................................6

*In re Orion Sec. Litig.*,
   No. 1:08-cv-01328-RJS, slip op.
   (S.D.N.Y. Apr. 14, 2011) ............................................................................6

*In re Oxford Health Plans, Inc., Sec. Litig.*,
   No. MDL 1222 (CLB), 2003 U.S. Dist. LEXIS 26795
   (S.D.N.Y. June 12, 2003) ...........................................................................7

*In re Priceline.com, Inc. Sec. Litig.*,
   No. 3:00-CV-1884 (AVC), 2007 WL 2115592
   (D. Conn. July 20, 2007) ...........................................................................19

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
   912 F. Supp. 97 (S.D.N.Y. 1996) ..............................................................6

*In re Rite Aid Corp. Sec. Litig.*,
   146 F. Supp. 2d 706 (E.D. Pa. 2001)...................................................17, 18

*In re Rite Aid Corp. Sec. Litig.*,
   362 F. Supp. 2d 587 (E.D. Pa. 2005).........................................................17

*In re Rite Aid Corp. Sec. Litig.*,
   396 F.3d 294 (3d Cir. 2005) ......................................................................18

*In re Sumitomo Copper Litig.*,
   74 F. Supp. 2d 393 (S.D.N.Y. 1999) ......................................................6, 18

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008) .......................................................10

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
   724 F. Supp. 160 (S.D.N.Y. 1989) ............................................................16

- vi -

**Page**

*In re Veeco Instruments Inc. Sec. Litig.*,
No. 05 MDL 01695 (CM), 2007 WL 4115808
(S.D.N.Y. Nov. 7, 2007) ............................................................ 16, 21, 22

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005) ...................................................... 5, 19

*In re Xcel Energy, Inc.*,
364 F. Supp. 2d 980 (D. Minn. 2005) ....................................................... 23

*J.I. Case Co. v. Borak*,
377 U.S. 426 (1964) ............................................................................ 4, 20

*Kurzweil v. Philip Morris Cos., Inc.*,
No. 94 Civ. 2373 (MBM), 1999 WL 1076105
(S.D.N.Y. Nov. 30, 1999) ........................................................................ 6

*Landy v. Amsterdam*,
815 F.2d 925 (3d Cir. 1987) .................................................................... 12

*LeBlanc-Sternberg v. Fletcher*,
143 F.3d 748 (2d Cir. 1998) .................................................................... 22

*Maley v. Del Global Techs. Corp.*,
186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................................................ *passim*

*Missouri v. Jenkins*,
491 U.S. 274 (1989) ............................................................................... 16

*Morrison v. Nat'l Austl. Bank Ltd.*,
___ U.S. ___, 130 S. Ct. 2869 (2010) ....................................................... 13

*Newman v. Caribiner Int'l, Inc.*,
No. 99 Civ. 2271(GEL) (S.D.N.Y. Oct. 19, 2001) ................................... 18, 19

*Robbins v. Koger Props., Inc.*,
116 F.3d 1441 (11th Cir. 1997) ............................................................... 12

*Savoie v. Merchs. Bank*,
166 F.3d 456 (2d Cir. 1999) .................................................................. 4, 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ............................................................................... 20

- vii -

**Page**

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
396 F.3d 96 (2d Cir. 2005) ...................................................................4

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§78j(b) ...................................................................................10
§78u-4(a)(4)...........................................................................23
§78u-4(a)(6)..............................................................................5

Federal Rules of Civil Procedure
Rule 23(f)................................................................................10
Rule 30(b)(6) .............................................................................9

**SECONDARY AUTHORITIES**

Dr. Jordan Milev, Robert Patton, Svetlana Starykh, and
Dr. John Montgomery, *Recent Trends in Securities Class
Action Litigation: 2011 Year-End Review,*
(NERA Dec. 14, 2011) .....................................................14, 16

Elliott J. Weiss and John S. Beckerman, *Let the Money Do
the Monitoring: How Institutional Investors Can Reduce
Agency Costs in Securities Class Actions,*
104 Yale L.J. 2053 (1995) ...................................................21

*Securities Class Action Filings – 2011 Year in Review*
(Cornerstone Research 2012) ................................................2

Third Circuit Task Force on *Selection of Class Counsel,*
208 F.R.D. 340 (Jan. 15, 2002) ............................................11

**LEGISLATIVE HISTORY**

H.R. Conf. Rep. No. 104-369, 1995 WL 709276 (1995) .....................20, 21

797700_1

## I.    INTRODUCTION

Lead Counsel have succeeded in obtaining a cash Settlement Fund of $67,500,000 for the benefit of the Class.[1]   Lead Counsel achieved this substantial recovery solely through skill, persistence, and effective advocacy in the face of considerable risk.  As compensation for their efforts in achieving this result, Lead Counsel respectfully move this Court for an award of attorneys' fees of 24.5% of the Settlement Fund, plus expenses incurred in the prosecution of the Litigation in the amount of $461,050.19.  In addition, Lead Counsel request approval of reimbursement for time and expenses of Lead Plaintiff incurred in prosecuting the alleged fraud in the amount of $4,526.25.

Lead Counsel's prosecution of this Litigation spanned almost five years and was risky and difficult from the outset.  Settlement was only reached after Lead Counsel successfully defeated Defendants' motion to dismiss and motion for reconsideration, obtained class certification, aggressively pursued discovery, consulted with medical, biostatistics, FDA, loss causation, and damages experts, and engaged in arduous, arm's-length settlement negotiations with the assistance of a mediator for over a period of nearly six months.  Lead Counsel filed this action in 2007.  Shortly thereafter, Pipefitters Union Local 537 Pension Fund was appointed Lead Plaintiff.  No other party moved to be lead plaintiff and no other counsel sought to be lead counsel.  Had Lead Plaintiff and Lead Counsel not been tenacious in bringing and pursuing this action, it is doubtful that Class Members would have recovered anything from Defendants.

The Litigation is subject to the provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the effect of which has been to make it harder for investors to bring and successfully prosecute allegations of securities fraud.  A study of securities class actions filed after

---

[1]     Unless otherwise noted, all capitalized terms used herein are defined in the November 7, 2012 Settlement Agreement (the "Stipulation").  Dkt. No. 112.

the passage of the PSLRA between 1996 through 2011, found that 32% of the cases that reached the point of a motion to dismiss were dismissed in defendants' favor.[2] Here, Lead Plaintiff and Lead Counsel faced and overcame not only this very real risk but also the additional risk of class certification and reached a substantial settlement for the benefit of the Class. Lead Counsel firmly believe that the settlement is a result of their diligent and effective advocacy, as well as their reputations as attorneys who are unwavering in their dedication to the interests of the class and unafraid to zealously prosecute a meritorious case through trial.

The substantial efforts of Lead Counsel in achieving this settlement are set forth in detail in the Declaration of Tor Gronborg in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds and Award of Attorneys' Fees and Expenses and Lead Plaintiff's Expenses Pursuant to 15 U.S.C. §78u-4(a)(4) ("Gronborg Decl."), submitted herewith. Counsel in this action and their paraprofessionals combined have expended over 6,800 hours in the prosecution of this Litigation with a resulting lodestar of more than $3.9 million. Lead Counsel undertook the representation of the Class on a contingent fee basis and no payment has been made to date for their services or for the litigation expenses they have advanced on behalf of the Class.

Importantly, the amount of the fee request was approved by Lead Plaintiff, who is an experienced institutional investor with a financial stake in the outcome of the Litigation, and who is the paradigmatic fiduciary for the Class that Congress envisioned in enacting the PSLRA. Such endorsement strongly weighs in favor of approving the requested fee.

---

[2]   *See Securities Class Action Filings – 2011 Year in Review*, at 18 (Cornerstone Research 2012), attached as Exhibit 1 to the accompanying Compendium of Unreported and Secondary Authorities Cited in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Lead Plaintiff's Expenses Pursuant to 15 U.S.C. §78u-4(a)(4) ("Compendium").

797700_1

The reaction of the Class to date also weighs in favor of the requested fee. Pursuant to the Court's Order Preliminarily Approving Settlement and Providing for Notice (Dkt. No. 114), more than 302,000 copies of the detailed Court-approved Notice have been mailed to potential Class Members and nominees, and the Summary Notice has been published in a leading business publication and widely disseminated over the Internet through *Business Wire*. *See* Declaration of Carole K. Sylvester Re A) Mailing of the Notice of Proposed Settlement of Class Action and the Proof of Claim Form, B) Publication of the Summary Notice, and C) Internet Posting ("Sylvester Decl."), ¶¶3-10, 13. The Notice advised Class Members that Lead Counsel would seek an attorneys' fee award of 24.5% of the Settlement Fund, plus expenses not to exceed $650,000 plus interest thereon. Although the January 28, 2013 deadline for objecting to the requested fees and expenses has not yet passed, to date no such objections have been received.

For all the reasons set forth herein and in the Gronborg Declaration, Lead Counsel respectfully submit that the requested attorneys' fees are fair and reasonable under the applicable legal standards and should be awarded by the Court.

## II.    LEAD COUNSEL'S REQUESTED FEE IS FAIR AND REASONABLE AND SHOULD BE APPROVED

### A.    Lead Counsel Are Entitled to a Reasonable Percentage of the Common Fund

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The purpose of the common fund doctrine is to fairly and adequately compensate class counsel for services rendered and to ensure that all class members contribute equally towards the costs associated with litigation pursued on their behalf. *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir.

- 3 -

2000); *Cent. States SE & SW Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 249 (2d Cir. 2007).

Indeed, for nearly 50 years the Supreme Court has repeatedly emphasized that private securities actions provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)).

Courts in this Circuit and District have consistently adhered to these teachings. *See In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2004 WL 2397190, at *10 (S.D.N.Y. Oct. 26, 2004) ("It is well established that where an attorney creates a common fund from which members of a class are compensated for a common injury, the attorneys who created the fund are entitled to 'a reasonable fee – set by the court – to be taken from the fund.'") (citation omitted).

**B.   The Court Should Award a Reasonable Percentage of the Common Fund to Lead Counsel**

The Second Circuit has expressly approved the "percentage-of-the-fund" method for awards of fees in common fund cases, recognizing that "the lodestar method proved vexing" and had resulted in "an inevitable waste of judicial resources." *Goldberger*, 209 F.3d at 48, 49; *see also Savoie v. Merchs. Bank*, 166 F.3d 456, 460 (2d Cir. 1999) (the "percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in common fund cases"); *Blum v. Stenson*, 465 U.S. 886, 903* (1984) ("'In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery.'") (concurring) (citation omitted). The Second Circuit recognized how the percentage method "'directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation,'" and noted that the "trend in this Circuit is toward the percentage method." *Wal-Mart Stores, Inc. v. Visa*

- 4 -

*U.S.A. Inc.*, 396 F.3d 96, 122 (2d Cir. 2005) (citation omitted); *see also Fogarazzo v. Lehman Bros., Inc.*, No. 03 Civ. 5194 (SAS), 2011 WL 671745, at *2 (S.D.N.Y. Feb. 23, 2011) ("The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.").[3]

The text of the PSLRA itself also supports awarding attorneys' fees in securities cases using the percentage method, as it provides that the "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a ***reasonable percentage*** of the amount" recovered for the class. 15 U.S.C. §78u-4(a)(6) (emphasis added); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005) (the PSLRA expressly contemplates that "the percentage method will be used to calculate attorneys' fees in securities fraud class actions"); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (by using this language, Congress "indicated a preference for the use of the percentage method" rather than the lodestar method).

Given the language of the PSLRA, the Supreme Court's indication that the percentage method is proper in this type of case, the Second Circuit's explicit approval of the percentage method, and the trend among the district courts in this Circuit, it is appropriate for the Court to award Lead Counsel attorneys' fees based on a percentage of the fund.

### C. The Requested Fee Is Well Within the Range of What Courts Have Found to Be Fair and Reasonable Under the Percentage Method

Before determining whether Lead Counsel merit a percentage fee award that is within a reasonable range, it is appropriate to consider what constitutes a "reasonable range."

---

[3] *See also In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *14 (S.D.N.Y. Dec. 23, 2009) ("the percentage method continues to be the trend of district courts in this Circuit and has been expressly adopted in the vast majority of circuits").

797700_1

In *Cent. States*, the Second Circuit affirmed a fee award of 30% of a $42.5 million settlement noting that the "District Court applied the *Goldberger* test and made specific and detailed findings from the record, as well as from its own familiarity with the case, including the fact that counsel expended substantial time and effort in the litigation [and] that the case was litigated on a purely contingent basis." 504 F.3d at 249; *see also Maley*, 186 F. Supp. 2d at 374 (awarding 33-1/3% fee); *In re Med. X-Ray Film Antitrust Litig.*, No. CV-93-5904, 1998 WL 661515, at *7 (E.D.N.Y. Aug. 7, 1998) (awarding 33-1/3% of $40 million settlement); *Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*, No. 96 CIV. 0583 (DAB), 2002 WL 1315603, at *2 (S.D.N.Y. June 17, 2002) (awarding 30% of settlement fund).

Moreover, in the Southern District of New York, in class actions where plaintiffs' counsel have secured recoveries for investors of over one million dollars, courts, including this one, have routinely approved attorneys' fees in the range of 26.5% up to 33-1/3%. *See In re L.G. Philips LCD Co., Ltd. Sec. Litig.*, No. 1:07-cv-00909-RJS, slip op. at 1 (S.D.N.Y. Mar. 17, 2011) (approving 30% fee on $18 million recovery);[4] *In re Orion Sec. Litig.*, No. 1:08-cv-01328-RJS, slip op. at 1 (S.D.N.Y. Apr. 14, 2011) (approving 30% fee on $3.25 million recovery); *In re Noah Educ. Holdings Ltd. Sec. Litig.*, No. 1:08-cv-09203-RJS, slip op. at 2 (S.D.N.Y. May 27, 2011) (approving 33-1/3% fee on $1.75 million recovery); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (approving 33-1/3% fee on total recovery of $586 million); *Kurzweil v. Philip Morris Cos., Inc.*, No. 94 Civ. 2373 (MBM), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) (approving 30% fee on $123 million settlement); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393 (S.D.N.Y. 1999) (approving 27.5% fee on $116 million settlement); *In re Prudential Sec. Inc. Ltd.*

---

[4] All unreported authorities are attached to the Compendium.

*P'ships Litig.*, 912 F. Supp. 97 (S.D.N.Y. 1996) (approving 27% fee on $110 million settlement); *In re Oxford Health Plans, Inc., Sec. Litig.*, No. MDL 1222 (CLB), 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) (approving 28% fee on recovery of $300 million); *In re CIT Grp. Inc. Sec. Litig.*, No. 1:08-cv-06613-BSJ-THK, slip op. at 1 (S.D.N.Y. June 13, 2012) (approving 26.5% on a $75 million recovery); *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758(VM), slip op. at 2 (S.D.N.Y. July 20, 2011) (approving 27.5% fee on $70 million recovery).

For the reasons set forth below and in the Gronborg Declaration, Lead Counsel respectfully submit that the excellent result achieved here, in the face of exceptional risks, would plainly justify a fee award at the top of any reasonable range relevant to other cases analyzed under *Goldberger* – and that the 24.5% fee requested here is fully merited.

### D.    The *Goldberger* Factors Support Lead Counsel's Requested Fee

In *Goldberger*, the Second Circuit provided guidance to district courts for analyzing fee applications by requiring that they consider the following factors in a common fund case: (1) the magnitude and complexities of the action; (2) the litigation risks involved; (3) the quality of class counsel's representation; (4) the size of the requested fee in relation to the recoveries obtained; (5) the time and labor expended by class counsel; and (6) public policy considerations. 209 F.3d at 50. These factors are non-exclusive, and, as noted below, courts in this District and elsewhere have also considered, among other things, the endorsement of a sophisticated lead plaintiff.

Although none of them is controlling, each of the foregoing factors weighs strongly in favor of approving the requested 24.5% fee here.

### 1.    The Action's Magnitude and Complexity Support the Requested Fee

Courts have long recognized that securities class actions are notoriously complex and difficult to prove. *See, e.g., In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. MDL 1500,

2006 WL 903236, at *9 (S.D.N.Y. Apr. 6, 2006) ("the legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages"); *Fogarazzo*, 2011 WL 671745, at *3 ("securities actions are highly complex"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400(CM)(PED), 2010 WL 4537550, at *27 (S.D.N.Y. Nov. 8, 2010) (courts have long recognized that securities class litigation is "'notably difficult and notoriously uncertain'") (citation omitted).

As detailed in the Gronborg Declaration at ¶¶8-11, 18-44, 65-74, there is no question that this Litigation presented a number of sharply contested issues of both law and fact and that Lead Plaintiff faced formidable defenses to liability and damages.  This was a complex class action involving unique and difficult legal and factual issues under the federal securities laws.  Lead Plaintiff alleged that Defendants made misrepresentations and omissions to investors about the safety and approvability of Pristiq for treatment of vasomotor symptoms ("VMS").  Adequately pleading these claims was a significant undertaking, which involved, among other things, (a) the review and analysis of thousands of pages of SEC and FDA filings, news articles, analyst reports, and other written materials; (b) identifying, locating, and interviewing former Wyeth employees with relevant knowledge; and (c) consulting with medical, biostatistics, damages, and loss causation consultants/experts.

Throughout the Litigation, Defendants have adamantly denied liability and asserted they had absolute defenses to Lead Plaintiff's claims, including that the cardiovascular adverse events associated with Pristiq were publicly disclosed prior to the end of the Class Period, that Defendants' misstatements and omissions were not material, that Defendants believed Pristiq was a safe and effective treatment for VMS with allegedly no statistically significant evidence to the contrary, and that Lead Plaintiff could not prove loss causation and damages.  If the Litigation had not been

- 8 -

settled, Lead Counsel would have been faced with additional complex factual and legal issues as Defendants continued to pursue a vigorous defense.  Unquestionably, absent a settlement there would have been additional fact discovery, expert discovery, contested motions for summary judgment, and trial.

The proposed settlement was reached less than two months before the fact discovery cut-off and only after the case was actively prosecuted for almost five years.  During that time, Lead Counsel on behalf of Lead Plaintiff (1) successfully opposed Defendants' motion to dismiss and motion for reconsideration; (2) engaged in bifurcated discovery on the issues of materiality and statistical significance; (3) prepared for and attended a face-to-face discovery and settlement meeting with defense counsel where each side presented their respective positions on the merits of the case, along with supporting evidence and expert presentations; (4) addressed Defendants' proposed summary judgment on the issue of materiality; (5) obtained class certification after extensive briefing, class certification discovery, and argument; (6) engaged in many months of fact discovery, including the review of over 1.3 million pages of documents produced by Defendants, a large portion of which concerned the Pristiq for VMS clinical trials and were highly technical, the review of over 52,000 pages of documents produced by third parties, including financial analysts and the European Medicines Agency, depositions of former and current Wyeth employees, including the depositions of corporate representatives pursuant to Fed. R. Civ. P. 30(b)(6), and preparation for over 20 fact depositions, including the deposition of each Defendant; and (7) engaged in settlement discussions with the assistance of Judge Layn R. Phillips (Ret.) over a nearly six month period.

The "magnitude" of this class action is also apparent, as it involves thousands of investors. The Notice of Proposed Settlement of Class Action was mailed to over 302,000 potential Class Members, including hundreds of institutional investors. *See* Sylvester Decl., ¶¶3-10.

In sum, the "magnitude and complexity" factor clearly weighs in favor of the requested fee.

### 2. The Risks of the Litigation Support the Requested Fee

The Second Circuit has identified "the risk of success as 'perhaps the foremost' factor to be considered in determining [a reasonable fee award]." *Goldberger*, 209 F.3d at 54 (citation omitted); *see also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 592 (S.D.N.Y. 2008) ("Courts have repeatedly recognized that 'the risk of the litigation' is a pivotal factor in assessing the appropriate attorneys' fees to award to plaintiffs' counsel in class actions.") (citation omitted).  As set forth below, Lead Counsel confronted a host of significant risks in establishing both liability and damages.

### a. Risks of Establishing Liability Against the Defendants

Lead Counsel faced very significant risks in establishing liability as to the Defendants.  As detailed in the Gronborg Declaration, these risks included, among other things: the risk Lead Plaintiff could not demonstrate a genuine issue of material fact with respect to each element of its securities claims to the Court's satisfaction; the risk Lead Plaintiff could not prove loss causation; the risk Lead Plaintiff could not prove scienter; and the risk a jury would find the alleged false statements were immaterial or not actionable.  Lead Plaintiff also faced the risk that, in response to Defendants' Rule 23(f) petition, the Second Circuit would reverse or amend the Court's Order certifying the Class.  The risky nature of this Litigation is also underscored by the fact that no counsel other than Lead Counsel even moved to be appointed to represent the Class.

### b. The Risks of Establishing Damages and Related Loss Causation Issues

Under the federal securities laws, there can be no recovery in a §10(b) case where the loss was caused by factors unrelated to an alleged false statement or omission.  Here, the amount of damages that the Lead Plaintiff could have reasonably hoped to recover after taking into account causation issues was hotly disputed – and any resolution of this issue would have inevitably boiled

- 10 -

down to a "battle of the experts" and the inherent risk that the jury would credit Defendants' experts over those of Lead Plaintiff. *See Hicks v. Morgan Stanley*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *6 (S.D.N.Y. Oct. 24, 2005) ("battle[s] of the experts" invariably "create[] a significant obstacle to plaintiffs"); *In re Am. Bank Note Holographics, Inc., Sec. Litig.*, 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001) ("[i]n such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount of Plaintiffs' losses").

The only certainty regarding damages was that the cause of the losses would be vigorously contested, and the risk of recovering nothing was all too real even if Lead Plaintiff succeeded on all liability issues. In any event, the numerous, specific, and serious risks of litigation presented by the facts of this case also weigh strongly in favor of the requested fee.

### c.   General Litigation Risks and the Fully Contingent Nature of Lead Counsel's Retention

In evaluating the contingent litigation risk, the Third Circuit Task Force on *Selection of Class Counsel*, 208 F.R.D. 340, 343 (Jan. 15, 2002) recognized that "[t]he fact that there will be no payment if there is no settlement or trial victory means that there is greater risk for plaintiffs' counsel in these class action cases than in cases in which an hourly rate or flat fee is guaranteed. The *quid pro quo* for the risk, and for the delay in receiving any compensation in the best of circumstances, is some kind of risk premium if the case is successful." *See also Flag Telecom*, 2010 WL 4537550, at *27 ("Courts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award."); *Am. Bank Note Holographics*, 127 F. Supp. 2d at 433 (it is "appropriate to take this [contingent-fee] risk into account in determining the appropriate fee to award").

- 11 -

The risk of no recovery in complex cases of this type is real, and is heightened when plaintiffs' counsel press to achieve the very best result for those they represent. Indeed, even if Lead Plaintiff here had defeated Defendants' anticipated summary judgment motion and prevailed at trial on both liability and damages, no judgment would have been secure until after the rulings on the inevitable post-judgment motions and appeals became final – a process that would likely take years. Lead Counsel know from experience that despite the most vigorous and skillful efforts, a firm's success in contingent litigation, such as this, is never assured, and there are many class actions in which plaintiffs' counsel expended tens of thousands of hours and received ***nothing*** for their efforts. Indeed, even judgments affirmed on appeal by an appellate panel are no assurance of a recovery. *See, e.g., Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (after 11 years of litigation, and following a jury verdict for plaintiffs and an affirmance by a First Circuit panel, plaintiffs' claims were dismissed by an *en banc* decision and plaintiffs recovered nothing). Countless other significant cases have been lost after the investment of tens of thousands of hours of attorney time and millions of dollars on expert and other litigation costs at summary judgment or after trial.[5]

Similarly, even the most promising cases can be eviscerated by a sudden change in the law after years of litigation. *See, e.g., In re Alstom SA Sec. Litig.*, 741 F. Supp. 2d 469 (S.D.N.Y. 2010)

---

[5]     *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversal of jury verdict of $81 million against accounting firm after a 19-day trial); *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994) (directed verdict after plaintiffs' presentation of their case to the jury), *aff'd sub nom. Herman v. Legent Corp.*, 50 F.3d 6 (4th Cir. 1995); *Landy v. Amsterdam*, 815 F.2d 925 (3d Cir. 1987) (directed verdict for defendants after five years of litigation); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict following two decades of litigation); *In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict vacated on post-trial motions); *In re JDS Uniphase Corp. Sec. Litig.*, No. C-02-1486 CW(EDL), 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) (defense verdict after four weeks of trial); *In re BankAtlantic Bancorp, Inc.*, No. 07-61542-CIV, 2011 WL 1585605, at *1 (S.D. Fla. Apr. 25, 2011) (defendants' motion for judgment as matter of law granted following a four week trial).

(after completion of extensive foreign discovery, 95% of plaintiffs' damages were eliminated by the Supreme Court's reversal of 40 years of circuit court precedent in *Morrison v. Nat'l Austl. Bank Ltd.*, ___ U.S. ___, 130 S. Ct. 2869 (2010)).

Unlike counsel for the Defendants, who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, Lead Plaintiff's counsel have not been compensated for any of their time (6,838.45 hours with a lodestar value of $3,909,020.75) or reimbursed for any of their litigation expenses ($461,050.19) incurred over the almost five years that have passed since the Litigation was commenced. Moreover, Lead Plaintiff's counsel would not have been compensated for their time at all had they been unsuccessful in this Litigation. Because the fee to be awarded in this matter is entirely contingent, the only certainties from the outset were that there would be no fee without a successful result, and that a successful result, if any, could be achieved only after lengthy and difficult effort. Lead Counsel therefore respectfully submit that the fully contingent nature of their retention in this high-risk action weighs strongly in favor of the requested fees and expenses, and should be given serious consideration by the Court.

### 3. The Quality of Lead Counsel's Representation Supports the Requested Fee

A number of considerations may be relevant to assessing the quality of class counsel's representation of a plaintiff class, including the court's own observations, class counsel's experience and standing at the bar, and the quality of the opposing counsel whom class counsel had to litigate against. The seminal test for evaluating "quality of the representation," however, is the quality of the results achieved for the class members whom they were appointed to represent.

#### a. The Results Obtained from Lead Counsel's Efforts

Courts have consistently recognized that the results achieved is a major factor to be considered in making a fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). For all the

reasons detailed in the accompanying Gronborg Declaration, Lead Counsel respectfully submit that the results that they obtained for the Class in this Litigation are outstanding by any measure. These results, without more, weigh strongly in favor of finding that the quality of Lead Counsel's representation here was at the top end of the scale. Lead Counsel have secured a settlement that provides for a substantial and certain cash payment of $67,500,000 for the benefit of the Class. The excellent nature of this settlement is supported by a review of recoveries in other securities class action settlements. A study by National Economic Research Associates ("NERA"), an economic consulting firm, states that in 2011, the median settlement amount in shareholder class actions was $8.7 million. Dr. Jordan Milev, Robert Patton, Svetlana Starykh, and Dr. John Montgomery, *Recent Trends in Securities Class Action Litigation: 2011 Year-End Review*, at 17 (NERA Dec. 14, 2011), attached as Exhibit 2 to the Compendium. The present settlement is nearly eight times the 2011 median recovery. Moreover, the recovery in this case was made without the benefit of any SEC or other regulatory investigation and without the benefits of any admissions of any wrongdoing from Defendants. This was not a case where Lead Plaintiff or Lead Counsel could rely on the work done in any other litigation or rely on any admission by Defendants. When measured against the results in comparable cases, Lead Counsel achieved an excellent recovery for Class Members. Thus, the $67,500,000 recovery for the Class strongly supports the requested fee award.

> b.    **The Court's Observations as to the Quality of Lead Counsel's Work**

The Court may, of course, also take into account its own observations of the quality of Lead Counsel's representation during the course of this Litigation. The Court has reviewed the Consolidated Complaint and Lead Counsel's briefing and argument regarding, *inter alia*, the motion to dismiss, motion for reconsideration, and class certification. Although this work represents only a small fraction of the total work that Lead Counsel have performed in the course of litigating the case,

- 14 -

we respectfully submit that the quality of that work is reflective of the quality, thoroughness, and professionalism of the efforts that Lead Counsel have devoted to all aspects of this Litigation on behalf of the Lead Plaintiff and the Members of the Class.

**c.**      **The Standing and Expertise of Lead Counsel**

Lead Counsel are highly experienced in prosecuting securities class actions, and worked diligently and efficiently to prosecute this Litigation. Lead Counsel's experience and track record in complex securities class action litigation is summarized in the firm resume attached as Exhibit A to the accompanying Declaration of Laurie L. Largent Filed on Behalf of Lead Counsel in Support of Application for Award of Attorneys' Fees and Expenses ("Largent Decl."). Lead Counsel are consistently ranked among the top plaintiffs' firms in the country. Further, Lead Counsel have taken multiple complex securities fraud class action cases to trial, and are among the few firms to have done so. Lead Counsel respectfully submit that their willingness and ability to litigate cases through trial added critical leverage in the settlement negotiations.

**d.**      **The Standing and Expertise of Defendants' Counsel**

The quality of the work performed by Lead Counsel in obtaining the settlement should also be evaluated in light of the quality of the opposition. *See, e.g.*, *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 (LMM), 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work."). Here, the Defendants were represented by one of the country's preeminent law firms, Simpson Thacher & Bartlett LLP, which vigorously defended the Litigation from the filing of the first complaint. The corporate defendant, Wyeth (now Pfizer), is also well-versed in complex litigation and has demonstrated a willingness to take cases to trial. That Lead Counsel was able to

- 15 -

negotiate such an excellent recovery in the face of such formidable (and well-financed) opposition is a testament to the skill and dedication that Lead Counsel brought to every phase of this Litigation.

In sum, all of the customary metrics indicative of exceptional "quality of representation" weigh in favor of the requested fee.

### 4. The Requested Fee Is Fair and Reasonable in Relation to the Size of the Recoveries and Comparable Fee Awards

As discussed previously, the requested 24.5% fee falls in the "range of reasonableness" based on fees awarded by courts across the nation in other securities cases settling in the $25 million to $100 million range.  The NERA study confirms that between 1996 and 2011, the median plaintiffs' attorneys' fees for settlements between $25 and $99.9 million was 27% of the settlement. Compendium, Ex. 2 at 22.  This study suggests that the requested 24.5% fee here is justified in relation to the size of the recovery.

### 5. The Time and Labor Expended by Lead Counsel, Including a "Lodestar Crosscheck," Support the Requested Fee

The Second Circuit permits courts to utilize a lodestar "cross check" to further test the reasonableness of a percentage-based fee.  *See Goldberger*, 209 F.3d at 50.  The "lodestar" is calculated by multiplying the number of hours expended on the litigation by each particular attorney or paraprofessional by their current hourly rate, and totaling the amounts for all timekeepers.[6]

---

[6]    Both the Supreme Court and courts in this Circuit have long approved the use of current hourly rates to calculate the base lodestar figure as a means of compensating for the delay in receiving payment that is inherent in class actions, inflationary losses, and the loss of access to legal and monetary capital that could otherwise have been employed had class counsel been paid on a current basis during the pendency of the litigation.  *See In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 160, 163 (S.D.N.Y. 1989); *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115808, at *9 (S.D.N.Y. Nov. 7, 2007); *Missouri v. Jenkins*, 491 U.S. 274, 284 (1989).

797700_1

Additionally, "[u]nder the lodestar method of fee computation, a multiplier is typically applied to the lodestar." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004). "The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *Id.* (citing *Goldberger*, 209 F.3d at 47; *Savoie*, 166 F.3d at 460).

In this entirely contingent action, Lead Plaintiff's counsel have collectively spent 6,838.45 hours, representing a lodestar of $3,909,020.75, in investigating, prosecuting, and ultimately settling these claims.[7] All time spent litigating this matter was reasonably necessary and appropriate, and, Lead Counsel respectfully submit, the results achieved further confirm that the time spent on the case was entirely proportionate to the amounts at stake.

Based on a 24.5% fee, Lead Plaintiff's counsel's aggregate lodestar of $3,909,020.75 would yield a "crosscheck" multiplier of 4.2. Like the requested 24.5% fee award, the inferred lodestar multiplier here also falls well within the range of multipliers awarded in other complex cases, including other securities class actions that were certainly no more exceptional than this one.

In complex contingent litigation, lodestar multiples of four or more are commonly awarded in this Circuit and throughout the nation. *See Maley*, 186 F. Supp. 2d at 369 (awarding fee equal to a 4.65 multiplier as "well within the range awarded by courts in this Circuit and courts throughout the country"); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 736 n.44 (E.D. Pa. 2001) and *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589-91 (E.D. Pa. 2005) (awarding fees in case involving combined recoveries of $319.6 million with multiplier of 4.5 to 8.5 with respect to one

---

[7]    The time expended by each legal professional and paraprofessional who worked on this matter (including their hourly rates and the resulting lodestar for each individual) is set forth in the Largent Declaration and the Declaration of Matthew P. Montgomery Filed in Support of Application for Award of Attorneys' Fees and Expenses, submitted herewith.

- 17 -

recovery and 6.96 multiplier for the other, for an aggregate multiplier of roughly 6.7).[8]  Case law involving fee awards in other complex types of class actions stand for the same proposition.  *See, e.g.*, *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding 3.97 multiplier, and finding multipliers of 3 to 4.5 to be "common"); *Sumitomo Copper*, 74 F. Supp. 2d at 399 (similarly finding 3 to 4.5 multipliers to be common).

Moreover, the lodestar "crosscheck" is exactly that – a rough crosscheck that is not intended to supplement the primacy of the percentage-based method.  For example, as the court expressly noted in *Rite Aid*, 146 F. Supp. 2d at 736 n.44, if high multipliers are not allowed in cases involving large dollar recoveries, then the lodestar approach "begins to dominate and supersede the percentage of the recovery formula," particularly in those exemplary cases where the recovery greatly exceeds the norm for such litigation.  *See also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 307 (3d Cir. 2005) ("the lodestar cross-check does not trump the primary reliance on the percentage of common fund method").  Courts in this District have similarly emphasized that the lodestar crosscheck should not override the percentage approach where class counsel's efforts have produced exceptional results.  For example, in *In re Buspirone Antitrust Litig.*, No. MDL 1413 (JGK), 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 17, 2003), Judge Koeltl awarded a 33% fee with an 8.46 multiplier.  Similarly, in *Newman v. Caribiner Int'l, Inc.*, No. 99 Civ. 2271(GEL) (S.D.N.Y. Oct. 19, 2001), Judge Lynch observed that: "I wanted to note that, in my view, there is no difficulty with the fact candidly acknowledged in the papers that, in terms of the time expended, this is a profitable case for the plaintiffs' lawyers who worked on it.  Contingency type percentage settlements serve an

---

[8]      *See also In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 130-35 (D.N.J. 2002) (awarding fee equal to 4.3 multiplier in case involving $194 million recovery); *In re Doral Fin. Corp. Sec. Litig.*, No. 1:05-md-01706-RO, slip op. at 5 (S.D.N.Y. July 17, 2007) ($129 million recovery for the class; awarding fee equal to a "reasonable multiplier of 10.26").

- 18 -

important purpose . . . so it is important in awarding or approving a fee settlement in a case of this kind not to be [blinded] that in this particular case, calculated on an hourly basis, [that] this is a very large, high proportion to what hourly charges would have been." *Id.* at 6. Judge Lynch proceeded to approve a percentage-based fee that equated to a 7.7 multiplier. *Id.*

For the same reasons as discussed above, and given the outstanding results achieved solely due to Lead Counsel's efforts in the face of substantial litigation risk, the requested multiplier of 4.2 falls within the range of "lodestar crosschecks" that are regularly approved in complex class actions, and should be approved.

### 6.      Important Public Policy Considerations Further Support the Requested Fee

Although it is a factor that is too often given only cursory attention, public policy considerations constitute a final but nonetheless very significant factor to consider in evaluating a fee request. *See Goldberger*, 209 F.3d at 50; *Flag Telecom*, 2010 WL 4537550, at *29; *see also WorldCom*, 388 F. Supp. 2d at 359 ("to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives"); *In re Priceline.com, Inc. Sec. Litig.*, No. 3:00-CV-1884 (AVC), 2007 WL 2115592, at *5 (D. Conn. July 20, 2007) (fee awards in complex securities cases "help[] to perpetuate the availability of skilled counsel for future cases of this nature"); *Hicks*, 2005 WL 2757792, at *9 ("'To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding.'") (citation omitted); *Maley*, 186 F. Supp. 2d at 369 ("courts recognize that such awards serve the dual purposes of encouraging representatives to seek redress for injuries caused to public investors and discouraging future misconduct of a similar nature").

- 19 -

Similarly, for decades the Supreme Court has consistently recognized that the public has a particularly strong interest in incentivizing top-quality plaintiffs' counsel to pursue private actions under the federal securities laws to protect investors, deter violations, and help maintain the integrity of the nation's securities markets. Justice Ginsburg delivered the opinion of the Supreme Court: "This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC)." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).[9] Indeed, as Congress recognized in passing the PSLRA in 1995:

> Private securities litigation is an indispensable tool with which defrauded investors can recover their losses without having to rely upon government action. Such private lawsuits promote public and global confidence in our capital markets and help to deter wrongdoing and to guarantee that corporate officers, auditors, directors, lawyers and others properly perform their jobs. This legislation seeks to return the securities litigation system to that high standard.

*See* H.R. Conf. Rep. No. 104-369, at 31, 1995 WL 709276, at *31 (1995) ("H.R. Conf. Rep."). Simply stated, the SEC, a vital but understaffed agency whose inadequate funding has been the subject of numerous news stories and other accounts in recent years, does not have anywhere near the budget or personnel to ensure enforcement of the securities laws. If the vitally important public policy of supplementing SEC enforcement through effective private litigation is to be carried out, the courts should award fees that appropriately reward plaintiffs' counsel for obtaining outstanding results for the many risks that they assume in prosecuting securities class actions.

---

[9]     *See also J.I. Case*, 377 U.S. at 432 (private securities actions provide "a most effective weapon in the enforcement" of the securities laws and are "a necessary supplement to [SEC] action"); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) ("The securities statutes seek to maintain public confidence in the marketplace" and "[t]hey do so by deterring fraud, in part, through the availability of private securities fraud actions.").

- 20 -

For the foregoing reasons, public policy considerations provide further support for the requested attorneys' fees – a fee that is well within the established measures of reasonableness.[10]

### E.   Lead Plaintiff's Endorsement Should Also Be Considered in Determining Reasonableness of the Requested Fee

In enacting the PSLRA, Congress sought to encourage institutional investors to play an active role in prosecuting cases under the securities laws, and indicated its belief that increasing the role of such sophisticated investors would "ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions." H.R. Conf. Rep. at 34; *see also In re Lernout & Hauspie Sec. Litig.*, 138 F. Supp. 2d 39, 43 (D. Mass. 2001). Because institutional investors with large financial stakes in an action have a particular interest in ensuring that class counsel receive appropriate, but not excessive, fees upon final resolution of a case, courts can have more confidence in the fairness of fee requests in cases subject to the supervision of such institutional plaintiffs. *See* Elliott J. Weiss and John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J. 2053, 2105 (1995), cited with approval by H.R. Conf. Rep. at 34; *see also In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG)(RER), 2010 WL 2653354, at *3 (E.D.N.Y. June 24, 2010) (the fact that "'PSLRA lead plaintiffs often have a significant financial stake in the settlement'" provides them with "'a powerful incentive to ensure that any fees resulting from that settlement are reasonable'") (citation omitted).

---

[10]   The reaction of the Class may also be considered in assessing the reasonableness of a requested fee. *See Veeco*, 2007 WL 4115808, at *10; *Maley*, 186 F. Supp. 2d at 374. Although the deadline for objections to the requested fees and expenses has not yet passed, no objections have been received to date. Lead Counsel will address objections to the request for fees and expenses, if any arise, in a supplemental submission to be filed on February 14, 2013.

- 21 -

The Lead Plaintiff here is precisely the kind of large and sophisticated institutional investor that Congress wanted to supervise this type of litigation, especially since it has a substantial financial interest at stake and has had direct involvement in the Litigation from its early days through settlement. Based on its knowledge of the case and its review of the relevant facts, including the results achieved in the face of significant litigation risks, Lead Plaintiff has approved and fully supports the requested fee. *See* paragraph 5 to the Declaration of Charles T. Hannaford in Support of Motion for Final Approval of Settlement, Plan of Allocation of Settlement Proceeds, and Award of Attorneys' Fees and Expenses ("Hannaford Decl."), filed herewith.

The endorsement of Lead Counsel's fee request by the institutional Lead Plaintiff strongly supports approval of the requested fee. *See, e.g., In re Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 262 (E.D. Va. 2009) (the fact that "Lead Plaintiffs, IPERS and MPERS – sophisticated institutional investors – clearly approve of the percentage sought" supported approval of the requested fee); *In re Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 442 (D.N.J. 2004) ("Significantly, the Lead Plaintiffs, both of whom are institutional investors with great financial stakes in the outcome of the litigation, have reviewed and approved Lead Counsel's fees and expenses request.").

## III.   LEAD COUNSEL'S REQUEST FOR PAYMENT OF LITIGATION EXPENSES SHOULD BE APPROVED

It is well established that counsel who create a common fund are entitled to the reimbursement of expenses that they advance to a class. *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998); *In re China Sunergy Sec. Litig.*, No. 07 Civ. 7895 (DAB), 2011 WL 1899715, at *6 (S.D.N.Y. May 13, 2011); *Veeco*, 2007 WL 4115808, at *10.

Here, the litigation expenses include the costs of experts and consultants, online legal and factual research, developing and maintaining the electronic discovery platform that counsel used to search, review, and analyze Defendants' and third party document productions, court fees, travel

- 22 -

expenses, copying costs, facsimile charges, court reporting services, postage and delivery expenses, and Lead Plaintiff's share of Judge Phillip's mediation fees. All expenses are detailed in the Largent Declaration. Lead Counsel respectfully submit that the expenses sought were all reasonably and necessarily incurred, and are of the type that are customarily reimbursed in securities cases. *See, e.g., Global Crossing*, 225 F.R.D. at 468 (court approved expenses incurred, which included investigative and expert witness fees, filing fees, service of process, travel, legal research, and document production).

## IV.   CLASS REPRESENTATIVE SHOULD RECEIVE REIMBURSEMENT FOR ITS EXPENSES

The PSLRA specifically provides for reimbursement to representative plaintiffs in securities actions:

> Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class.

15 U.S.C. §78u-4(a)(4). With the discretion provided by the PSLRA, courts routinely grant remuneration to class representatives reflecting the services undertaken for the benefit of the class. *See In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (granting awards to lead plaintiffs where they reviewed pleadings, communicated with counsel, indicated willingness to appear at trial, kept informed of settlement negotiations, and effectuated policies of federal securities laws); *Hicks*, 2005 WL 2757792, at *10 ("Courts in this Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place.").

Lead Plaintiff seeks a total of $4,526.25 for its unreimbursed time spent in pursuing the claims of the Class against the Defendants. *See* Hannaford Decl., ¶6. Lead Plaintiff's efforts are

- 23 -

precisely the types of activities found to support reimbursement to class representatives. Accordingly, Lead Counsel respectfully request that the Court approve an award of $4,526.25, as reimbursement for the efforts of the Lead Plaintiff on behalf of the Class.

## V.   CONCLUSION

The total recovery of $67,500,000 under the proposed settlement represents an excellent result achieved in a high risk case in the face of determined adverse parties and counsel. Lead Counsel respectfully submit that the requested 24.5% fee is fair and reasonable, well within the range of fees awarded in similar cases, and is fully supported by each of the *Goldberger* factors, and that the requested reimbursement of Lead Counsel's expenses and Lead Plaintiff's time is also fair and reasonable.

DATED: January 10, 2013                 Respectfully submitted,

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        TOR GRONBORG
                                        TRIG R. SMITH
                                        LAURIE L. LARGENT
                                        CHRISTOPHER D. STEWART
                                        SUSANNAH R. CONN


                                                    s/ Tor Gronborg
                                        TOR GRONBORG

                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)
                                        torg@rgrdlaw.com
                                        trigs@rgrdlaw.com
                                        llargent@rgrdlaw.com
                                        cstewart@rgrdlaw.com
                                        sconn@rgrdlaw.com

- 24 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

Lead Counsel for Lead Plaintiff

797700_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 10, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 10, 2013.

s/ Tor Gronborg
TOR GRONBORG

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:TorG@rgrdlaw.com

797700_1

# Mailing Information for a Case 1:07-cv-10329-RJS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Rae Caroline Adams**
  radams@stblaw.com,mwasserman@stblaw.com

- **Susannah R Conn**
  sconn@rgrdlaw.com

- **Tor Gronborg**
  torg@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Laurie L. Largent**
  llargent@rgrdlaw.com

- **Lynn Katherine Neuner**
  lneuner@stblaw.com,managingclerk@stblaw.com

- **Bryce Allan Pashler**
  bpashler@stblaw.com,managingclerk@stblaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christopher D. Stewart**
  cstewart@rgrdlaw.com,karenc@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **George S Wang**
  gwang@stblaw.com,managingclerk@stblaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)