UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

CITY OF LIVONIA EMPLOYEES'            :
RETIREMENT SYSTEM, On Behalf of Itself :
and All Others Similarly Situated,         :
                                          :
                        Plaintiff,        :
                                          :
            vs.                           :
                                          :
WYETH, et al.,                            :
                                          :
                        Defendants.       :

——————————————————————— x

Civil Action No. 1:07-cv-10329-RJS

CLASS ACTION

**ECF CASE**

DECLARATION OF TOR GRONBORG IN
SUPPORT OF LEAD PLAINTIFF'S
MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT AND
PLAN OF ALLOCATION OF
SETTLEMENT PROCEEDS AND AWARD
OF ATTORNEYS' FEES AND EXPENSES
AND LEAD PLAINTIFF'S EXPENSES
PURSUANT TO 15 U.S.C. §78u-4(a)(4)

796390_1

## TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ............................................................................ 1

II.     THE LITIGATION ........................................................................................... 8

    A.      The Commencement of the Action ................................................... 8

    B.      Defendants' Motion to Dismiss the Consolidated Complaint ................................ 9

    C.      Defendants' Motion for Reconsideration ............................................. 11

    D.      Defendants' Efforts to Limit Fact Discovery to the Issue of Statistical Significance ........................................................................... 12

    E.      Lead Plaintiff's Motion for Class Certification ....................................... 14

    F.      Investigators ................................................................................ 17

    G.      Fact Discovery ............................................................................. 18

        1.      Document Discovery to Defendants ............................................ 18

        2.      Depositions ........................................................................ 21

        3.      Third Party Discovery ........................................................... 23

    H.      Experts and Consultants ................................................................ 25

III.    THE STRENGTHS AND WEAKNESSES OF THE CASE ........................................... 27

IV.     SETTLEMENT NEGOTIATIONS AND TERMS ..................................................... 30

V.      THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS AND WARRANTS APPROVAL ................................................................................ 31

VI.     THE PLAN OF ALLOCATION ........................................................................... 31

VII.    CONCLUSION .............................................................................................. 35

I, TOR GRONBORG, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of California, and I have been admitted in this case *pro hac vice*. I am a member of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), counsel for Lead Plaintiff Pipefitters Union Local 537 Pension Fund ("Lead Plaintiff" or "Pipefitters") and the Class. I have been actively involved in the prosecution and resolution of this action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my active supervision and participation in all material aspects of the Litigation.

2.      I submit this Declaration in support of Lead Plaintiff's motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of: (a) the Settlement Agreement, dated as of November 7, 2012 (the "Stipulation"),[1] which provides for a cash settlement of $67,500,000; (b) the proposed Plan of Allocation of settlement proceeds; (c) Lead Counsel's application for attorneys' fees and expenses; and (d) reimbursement of Lead Plaintiff's time and expenses incurred in its representation of the Class.

## I.      PRELIMINARY STATEMENT

3.      This case has been vigorously litigated from its commencement in November 2007 through settlement, the basic terms of which were not finalized until shortly before the fact discovery deadline of December 28, 2012. As the Court is aware, this case settled after extensive motion practice and discovery. At every stage of the Litigation, Defendants aggressively litigated the matter and asserted that they had comprehensive defenses. The settlement was achieved only after Lead Counsel, *inter alia*: (a) conducted or oversaw detailed investigative interviews of numerous

---

[1]      Capitalized terms not otherwise defined in this Declaration have the same meanings set forth in the Stipulation.

- 1 -

witnesses, including former Wyeth employees ("Wyeth" or the "Company"); (b) prepared a detailed consolidated complaint with the assistance of medical and economics consultants; (c) successfully opposed Defendants' comprehensive motion to dismiss, motion for reconsideration, and efforts to bring early summary judgment on the issue of materiality; (d) reviewed and analyzed over 1.3 million pages of documents produced by Defendants, and over 52,000 pages of documents produced by financial analysts, the European Medicines Agency ("EMA"), and other third-party fact witnesses; (e) deposed multiple witnesses, including two Wyeth corporate representatives pursuant to Fed. R. Civ. P. 30(b)(6); (f) fully briefed and successfully obtained class certification; (g) defended depositions of the class representative for Pipefitters; (h) extensively prepared for 14 noticed/subpoenaed fact depositions of former and current Wyeth employees, including the Individual Defendants, and other third parties; (i) extensively prepared for an additional six depositions of former Wyeth employees and other third parties whose depositions had not yet been set at the time of the settlement; (j) deposed Defendants' market efficiency and loss causation expert in connection with Defendants' opposition to Lead Plaintiff's motion for class certification; and (k) met extensively with experts and consultants with experience in the fields of medicine, pharmaceuticals, economics, loss causation, and biostatistics.

4.     This settlement is the product of hard-fought litigation and takes into consideration the significant risks specific to the case.  The settlement is the result of extensive arm's-length negotiations between the parties, facilitated by a respected and experienced mediator, the Honorable Layn R. Phillips (Ret.).  These negotiations were conducted by experienced counsel with a full understanding of both the strengths and weaknesses of their respective cases.  The settlement for $67,500,000 represents an extraordinary recovery in light of the significant risks Lead Plaintiff faced in bringing the action to trial.

5.     Lead Counsel believe that this settlement represents an excellent result for the Class, especially considering the circumstances of this case as discussed herein.  Investigation, discovery, motion practice, and legal research informed Lead Counsel that, while they believed the case was meritorious, there were also weaknesses that had to be carefully evaluated in determining what course (*i.e.*, whether to settle and on what terms, or to continue to litigate through, potentially, summary judgment and a trial on the merits) was in the best interests of the Class.  As set forth in further detail below, despite the fact that Lead Plaintiff's allegations and claims were arguably supported by legal authority, expert opinion, and evidence discovered during extensive pre-trial investigation and discovery, the specific circumstances involved here presented uncertainties with respect to Lead Plaintiff's ability to prevail through summary judgment and trial.

6.     The gravamen of this case concerns Defendants' alleged misleading statements and omissions during the Class Period (June 26, 2006 through July 24, 2007) regarding the safety and approvability of the drug Pristiq for the treatment of vasomotor symptoms ("VMS").  Lead Plaintiff's Consolidated Complaint for Violations of the Federal Securities Laws ("Consolidated Complaint") alleges Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") by withholding material information from investors during the Class Period about Pristiq's safety profile and serious adverse effects ("SAEs") observed during the drug's clinical trials for the treatment of VMS.

7.     The Consolidated Complaint alleges that, as a result of Defendants' conduct, Wyeth's stock traded at artificially inflated prices during the Class Period.  This artificial inflation allegedly enabled Defendants to collect $83.8 million in insider trading proceeds during the Class Period.  When the truth about Defendants' misleading statements and omissions is alleged to have been revealed, Wyeth's shareholders were damaged and the Company's common stock price eventually

- 3 -

closed at $50.30 per share on July 24, 2007 – an approximate 10% decline from its closing price of $56.00 per share on the previous trading day.

8.      In opting to settle the Litigation, Lead Plaintiff and Lead Counsel took into consideration the significant risks associated with advancing the claims alleged in the Consolidated Complaint.  Defendants repeatedly argued in their motion to dismiss and motion for reconsideration, that Lead Plaintiff's claims failed for various reasons.  Defendants made similar arguments in opposing Lead Plaintiff's efforts to certify the Class.  For example, in their brief opposing class certification, Defendants (in part via expert analysis) extensively argued that, based on stock price reactions during the Class Period, the alleged misrepresentations and omissions had no statistically significant impact on the price of Wyeth stock.  Defendants also argued that Wyeth had disclosed the allegedly adverse information about the hypertensive and cardiac risks associated with Pristiq well before the end of the Class Period.  As a result, Defendants contended Lead Plaintiff and the Class could not invoke the fraud-on-the-market presumption of reliance and therefore common issues of fact did not predominate as required by Rule 23(b)(3).

9.      If this Litigation proceeded to summary judgment and/or trial, Defendants almost certainly would have made similar arguments, contending liability could not be demonstrated because, during the Class Period, Wyeth disclosed all medical information regarding Pristiq's safety that Lead Plaintiff asserted was withheld.  Additionally, at summary judgment and (potentially) trial, Defendants were expected to contend that they made no false and/or misleading statements or omissions regarding Pristiq's safety, and that, even if not technically accurate, any such misrepresentations were legally immaterial based on share price reactions to the alleged statements and omissions.  Although Lead Plaintiff was confident it could support its claims with qualified and persuasive expert testimony, jury reactions to competing experts are inherently difficult to predict,

- 4 -

and Defendants would have almost certainly utilized highly experienced experts to argue their defenses to liability, including arguments that they made sufficiently accurate statements in publicly filed documents concerning Pristiq's safety profile.

10.   Lead Plaintiff also faced unknown risks in establishing loss causation and damages had the Litigation proceeded.  Defendants had previously argued that Wyeth's stock declined not because of the Company's disclosures regarding the safety profile of Pristiq, but rather because of non-fraudulent factors, such as the announcement that the FDA was not approving Pristiq for the VMS indication.  Lead Plaintiff believed it had convincing arguments that the facts demonstrated Defendants' misleading statements and omissions during the Class Period regarding the safety and approvability of the drug, including the adverse cardiovascular and hepatic effects associated with Pristiq and the combination thereof, artificially inflated Wyeth's stock price during the Class Period and the stock price decline on July 24, 2007 was due to the disclosure of the alleged fraud.  Lead Plaintiff was, however, aware that Defendants had retained a nationally known expert, Dr. Kenneth Lehn, who would opine otherwise.

11.   As mentioned above, Defendants would have argued that any losses suffered by Class Members on their investments in Wyeth securities were attributable to various factors other than Defendants' alleged public misstatements, such as the announcement that the FDA was not approving Pristiq for the VMS indication.  As with contested liability issues, issues relating to loss causation and damages would have likely come down to an inherently unpredictable and hotly disputed "battle of the experts."  Accordingly, in the absence of a settlement, there was a very real risk that the Class could have recovered an amount significantly less than the settlement – or even nothing at all.

- 5 -

12.    On balance, considering all the circumstances and risks both sides faced were the parties to continue to trial, both Lead Plaintiff, for itself and the Class, and Defendants concluded that settlement on the terms agreed upon was in their respective best interests.

13.    Lead Counsel prosecuted this action on a wholly contingent basis and advanced or incurred significant litigation expenses.  By doing so, Lead Counsel shouldered the risk of an unfavorable result.  Lead Counsel have not received any compensation for their effort; nor have they been reimbursed for the substantial expenses they incurred.  The complex nature and broad scope of the facts and law underlying the securities violations alleged, and the intense litigation proceedings, have added substantial expenditures to this otherwise costly prosecution, resulting in expenses of $461,050.19, as well as the investment of over 6,800 hours of attorney and other professional and paraprofessional time.

14.    The fee application for 24.5% of the Settlement Fund is fair both to the Class and Lead Counsel, and warrants the Court's approval.  This fee request is within the range of fee percentages frequently awarded in this type of action and, under the particular facts of this case, is fully justified in light of the substantial benefits conferred on the Class, the risks undertaken, the quality of representation, the nature and extent of legal services performed, and the fact that the considerable cash settlement was far from guaranteed at the outset of the case.  Both the settlement and the fee request have been independently approved by Lead Plaintiff.  *See* paragraphs 4 through 5 to the Declaration of Charles T. Hannaford in Support of Motion for Final Approval of Settlement, Plan of Allocation of Settlement Proceeds, and Award of Attorneys' Fees and Expenses, submitted herewith.  This is the kind of result envisioned by Congress in enacting the Private Securities Litigation Reform Act of 1995 ("PSLRA") and is entitled to significant weight by the Court in awarding fees to counsel.

15.     Lead Counsel also seek an award of $461,050.19 for expenses reasonably and necessarily committed to the nearly five-year long prosecution of the Litigation.  These expenses include: (a) the costs of meals, hotels, and transportation incurred in prosecuting the case; (b) the fees and expenses of consultants and experts whose services Lead Counsel required in order to successfully prosecute and resolve this case; (c) the fees and expenses of investigators who located and interviewed dozens of former Wyeth employees and thus developed information that was essential in the prosecution and resolution of the case; (d) the costs associated with conducting or defending fact and expert witness depositions, which included court reporter and videographer fees; (e) photocopying, imaging, shipping, and managing a database of over 1.3 million pages of documents; (f) mediation fees; (g) Court filing fees; and (h) online legal and media research fees. *See* accompanying Declaration of Laurie L. Largent Filed on Behalf of Lead Counsel in Support of Application for Award of Attorneys' Fees and Expenses ("Largent Decl.") for a detailed history of expenses incurred by Lead Counsel.  As will be seen from the discussion of the efforts required by Lead Counsel to achieve this settlement, these expenses were reasonable and necessary to obtain the successful result reached in this case.

16.     Also, as allowed under the PSLRA, Lead Plaintiff seeks reimbursement for its time and expenses in the amount of $4,526.25.  Lead Plaintiff's investment of time, effort, and expense greatly contributed to the successful result of the Litigation.

17.     The following is a summary of the principal events which occurred during the course of the Litigation and the legal services provided by Lead Counsel.  For a summary of Lead Plaintiff's allegations, *see* the Consolidated Complaint (Dkt. No. 17) and this Court's September 29, 2010 Memorandum and Order on Defendants' motion to dismiss.  Dkt. No. 46.

- 7 -

## II.    THE LITIGATION

### A.    The Commencement of the Action

18.    On November 14, 2007, City of Livonia Employees' Retirement System ("City of Livonia") filed the original Complaint for Violation of the Federal Securities Laws with this Court. Dkt. No. 1.  The complaint asserted claims under §§10(b) and 20(a) of the Exchange Act against Wyeth and Robert Essner, the Company's Chief Executive Officer and Chairman of the Board.  Dkt. No. 1.

19.    On January 14, 2008, Pipefitters filed a motion for appointment as lead plaintiff and for approval of its selection of lead counsel.  Dkt. No. 7.  No other Wyeth investor moved to be lead plaintiff and no other counsel moved to be appointed lead counsel.  On February 25, 2008, the Court granted Lead Plaintiff's motion, appointing Pipefitters as the Lead Plaintiff and approving Pipefitters' choice of Robbins Geller as Lead Counsel.  Dkt. No. 13.

20.    On April 11, 2008, after further extensive factual investigation by Lead Counsel, which included locating and interviewing former Wyeth employees and consulting with medical and economics experts, Lead Plaintiff filed the Consolidated Complaint on behalf of all purchasers of Wyeth securities during the period June 26, 2006 through July 24, 2007.  Dkt. No. 17.  In comparison to the original complaint, the Consolidated Complaint included five additional individual Defendants, each of whom was alleged to have made false statements during the Class Period. The Consolidated Complaint also significantly expanded the allegations of securities fraud, and included allegations of Defendants' insider trading and other motives during the Class Period. Based on Lead Counsel's investigation, the Class Period was also shortened by five months.  As demonstrated by the Court's subsequent orders on Defendants' motion to dismiss and motion for reconsideration, the Consolidated Complaint was the end result of a tremendous amount of time and

- 8 -

effort expended by Lead Counsel in drafting a detailed, factually supported pleading capable of passing muster under the PSLRA.

**B.      Defendants' Motion to Dismiss the Consolidated Complaint**

21.     On June 10, 2008, Defendants filed a motion to dismiss the Consolidated Complaint. Dkt. Nos. 23-25. Defendants' complex memorandum of law ran nearly 40 pages, citing more than 60 cases and raising numerous legal issues and sub-issues aimed at undermining Lead Plaintiff's allegations. Defendants' memorandum of law in support of the motion to dismiss contended that the alleged false statements and/or omissions at issue were not actionable under the securities laws for various reasons. Defendants vigorously argued that Lead Plaintiff: (a) failed to specify any false or misleading statements or the reasons why any such statements were false or misleading; (b) improperly sought to establish liability for statements constituting opinions and beliefs as well as forward-looking statements and statements that constituted non-material "puffery" or corporate optimism; (c) improperly alleged that certain statements were false when in fact they contained no material misrepresentations; (d) failed to plead scienter as to any Defendant; and (e) failed to allege loss causation. Defendants also argued that Lead Plaintiff failed to meet the pleading requirements required for a §20(a) control person claim.

22.     On July 25, 2008, Lead Plaintiff filed a comprehensive opposition to Defendants' motion to dismiss. Dkt. No. 28. In its 40-page opposition, Lead Plaintiff argued that each of Defendants' reasons to dismiss the Consolidated Complaint should be rejected. Based on the detailed allegations of the Consolidated Complaint, Lead Plaintiff argued, *inter alia*, that: (a) it had adequately alleged Defendants' false and misleading statements; (b) those statements were made with the requisite scienter; (c) it had adequately alleged loss causation; and (d) it had properly alleged a §20(a) control person claim. Lead Plaintiff explained the reasons why the misstatements

- 9 -

and omissions concerning the adverse events associated with Pristiq for VMS were materially misleading. For example, Lead Plaintiff explained that Wyeth had projected the revenue from Pristiq for VMS would replace the billions of dollars in revenue that would be lost once the patents on other specific Wyeth drugs expired. Lead Plaintiff also described the materiality of these adverse events in light of the fact that news of them could negatively impact future revenue streams from Pristiq's other indication for the treatment of Major Depressive Disorder ("MDD"). Lead Plaintiff's opposition highlighted key indicia of Defendants' scienter, including Defendants' knowledge of the adverse effects associated with Pristiq, Defendants' motive and opportunity to commit the fraud, and Defendants' Class Period sales of over 1.55 million shares of Wyeth stock. Lead Plaintiff cited approximately 70 cases in opposing Defendants' motion and made forceful arguments in opposition to Defendants' motion, spending significant time and resources performing the legal research and factual analysis necessary to draft an effective opposition and satisfy the strict pleading burden imposed by the PSLRA.

23. On August 25, 2008, Defendants filed their reply in support of their motion to dismiss. Dkt. No. 31. In all, Defendants submitted approximately 1,300 pages of exhibits in support of their motion to dismiss, which Lead Counsel was tasked with reviewing and analyzing in order to sufficiently respond to Defendants' arguments.

24. At the time the parties were briefing the issues on Defendants' motion to dismiss, in September 2008, the parties also engaged in a full round of briefing on Lead Plaintiff's motion to strike certain exhibits filed by Defendants in connection with the motion to dismiss briefing. Dkt. Nos. 33-37. This separate briefing on certain exhibits relied upon by Defendants also involved significant legal and factual research. On June 25, 2009, the Court granted in part and denied in part Lead Plaintiff's motion to strike certain of Defendants' exhibits. Dkt. No. 40.

796390_1

25.     Prior to and following Defendants' submission of their reply brief in support of their motion to dismiss, Lead Plaintiff continued its factual investigation of the allegations in preparation for discovery.  As a result, Lead Counsel were prepared to file an amended complaint with even more detailed allegations, if the Court determined that the Consolidated Complaint did not sufficiently allege securities fraud.

26.     On September 29, 2010, this Court issued a Memorandum and Order denying in part and granting in part Defendants' motion to dismiss. Dkt. No. 46.  The Court held Lead Plaintiff had properly alleged claims under §§10(b) and 20(a) of the Exchange Act, and permitted discovery to go forward.

**C.     Defendants' Motion for Reconsideration**

27.     On October 14, 2010, Defendants moved for reconsideration on the portion of this Court's Order denying the motion to dismiss. Dkt. No. 47. Defendants argued reconsideration was warranted because Study 315 of the Pristiq VMS clinical trials allegedly failed to demonstrate statistical significance between the adverse events at issue and the drug and, therefore, there was no duty to publicly disclose the adverse events.  Defendants also contended that because Study 315 purportedly did not demonstrate a statistically significant relationship between Pristiq and the cardiovascular and hepatic adverse events, any misstatements and omissions of fact about Pristiq could not have involved conscious misbehavior or recklessness.  Defendants' arguments were largely premised on the Second Circuit decisions in *Carter-Wallace I* and *Carter-Wallace II*.

28.     On October 27, 2010, Lead Plaintiff filed an opposition to Defendants' motion for reconsideration, arguing that Defendants had failed to point to any controlling authority or relevant factual matters the Court had overlooked when ruling on the motion to dismiss, as required by the legal standard for motions for reconsideration. Dkt. No. 50.  For example, Lead Plaintiff pointed out

- 11 -

that the Court had already considered the Second Circuit's *Carter-Wallace* decisions and their progeny, as well as Study 315 that Defendants had previously submitted to the Court in support of their motion to dismiss. Lead Plaintiff further argued that Study 315 did not support reconsideration or dismissal of the Consolidated Complaint and actually demonstrated the statistically significant relationship between Pristiq and the adverse cardiovascular and hepatic events at issue. Lead Plaintiff's response to Defendants' motion required Lead Counsel to meticulously and thoroughly analyze both the legal opinions on which Defendants relied, as well as the results of Study 315 and the adverse events associated with Pristiq.

29.     On November 4, 2010, Defendants filed their reply in support of their motion for reconsideration. Dkt. No. 53. On November 23, 2010, the Court issued an Order denying Defendants' motion for reconsideration. Dkt. No. 56.

**D.     Defendants' Efforts to Limit Fact Discovery to the Issue of Statistical Significance**

30.     In the Court's Order denying Defendants' motion for reconsideration, and in response to requests by Defendants to engage in bifurcated discovery, the Court ordered the parties to provide a joint submission to the Court, stating whether the parties wished to set a bifurcated discovery schedule that focused first on the issues concerning the statistical significance of the cardiovascular and hepatic adverse events in Study 315, followed by a possible motion for summary judgment on this issue alone. Dkt. No. 56.

31.     On December 10, 2010, the parties made their submission to the Court setting forth the parties' respective positions and arguments on whether to bifurcate discovery on the issue of statistical significance. In drafting this joint letter and responding to Defendants' arguments contained therein, Lead Counsel spent considerable time searching for and analyzing relevant case law that addressed this specific issue. Together with their consultants, Lead Counsel also further

- 12 -

analyzed the 1,000-plus page Study 315 Report on which Defendants relied in seeking to bifurcate discovery on the issue of statistical significance.

32.     Lead Plaintiff argued that a bifurcated discovery schedule would not be efficient and should not be conducted, because, *inter alia*, the presence or absence of statistical significance could not be dispositive of the elements of materiality and scienter, and because any evaluation of the statistical significance of the hepatic and cardiovascular adverse events linked to Pristiq would also be broader than just the results of Study 315. Accordingly, because of the inextricable relationships between statistical significance and the elements of materiality, scienter, and loss causation, Lead Plaintiff argued that Defendants' proposed "phased" approach to discovery would not be efficient. In contrast, Defendants argued in favor of a bifurcated discovery approach, contending the approach would allow for a more efficient discovery process by focusing solely on the issue of statistical significance.

33.     On January 20, 2011, this Court issued an Order stating that discovery was to initially focus on the issue of statistical significance and the parties were to submit a joint letter to the Court proposing a schedule for this initial discovery period. Dkt. No. 64. On January 26, 2011, following the parties' submission of a joint letter to the Court, the Court set a schedule by which bifurcated discovery was to proceed on the issue of statistical significance. Dkt. No. 69.

34.     The parties proceeded accordingly, and on February 7, 2011, Defendants began producing documents relevant to the issue of statistical significance. Between February and June 2011, Defendants produced close to 600,000 pages of documents, primarily consisting of detailed records regarding the Pristiq clinical trials and Wyeth's submissions to the FDA for marketing approval of Pristiq for VMS. On June 30, 2011, counsel for the parties engaged in a full-day, face-to-face settlement meeting, which included presentations of the issue of statistical significance. Both

- 13 -

parties brought biostatisticians to the June 30, 2011 meeting, and those experts made presentations and were questioned by opposing counsel. Based on the meeting, it was apparent that the parties had very different views regarding the results of the Pristiq clinical trials and the materiality of the cardiovascular and hepatic adverse events. Accordingly, on July 29, 2011, Defendants submitted a pre-motion letter setting forth the basis for moving for summary judgment on the issue of statistical significance.

35.     On August 9, 2011, Lead Plaintiff submitted its response to Defendants' pre-motion letter, relying on the Supreme Court's recent opinion in *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011). In *Matrixx*, the Supreme Court expressly rejected the bright-line standard for statistical significance and materiality espoused in the *Carter-Wallace* decisions on which Defendants had relied. As a result, Lead Plaintiff argued, Defendants' proposed initial summary judgment motion would be premature and improper, and advocated the parties engage in full merits discovery.

36.     Following further discussions between counsel, on August 31, 2011 at the pre-motion conference, Defendants' counsel informed the Court that they no longer intended to move for summary judgment on the limited issue of statistical significance. Accordingly, the Court ordered the parties to promptly submit a proposed revised case management plan and scheduling order and engage in full merits discovery. Dkt. No. 78.

### E.     Lead Plaintiff's Motion for Class Certification

37.     On January 21, 2011, Lead Plaintiff filed its initial motion for class certification, supported by a memorandum of law and two declarations. Dkt. Nos. 65-68. Shortly after this filing, however, the Court bifurcated discovery as discussed above and issued an order staying all discovery related to Lead Plaintiff's motion for class certification pending the parties' completion of the initial

- 14 -

phase of discovery focused on the issue of statistical significance.   Accordingly, the Court administratively denied, without prejudice, Lead Plaintiff's initial class certification motion   Dkt. No. 69 at 1-2.

38.     Following the August 31, 2011 pre-motion conference discussed above, the Court issued a revised scheduling order on September 19, 2011, which set new deadlines for the filing of Lead Plaintiff's renewed class certification motion.  Dkt. No. 79.  Pursuant to the revised scheduling order, on October 21, 2011, Lead Plaintiff filed a renewed motion for class certification.   Dkt. Nos. 80-83.   Lead Plaintiff sought certification of a class of all purchasers and/or acquirers of Wyeth's publicly traded securities during the period June 26, 2006 through July 24, 2007.  Dkt. No. 81.  Lead Plaintiff's motion set forth the relevant facts in the case, detailed the reasons why Pipefitters was an appropriate class representative, and explained how the requirements of Fed. R. Civ. P. 23(a) – numerosity, commonality, typicality and adequacy – were met, as were the requirements of Fed. R. Civ. P. 23(b)(3).  With respect to the Rule 23(a) requirements, Lead Plaintiff's motion explained, *inter alia*, that Pipefitters' injury was typical of the other members of the Class, Pipefitters had been harmed by the same alleged course of conduct as had the other Class members, and would fairly and adequately protect the interests of the Class.  Lead Plaintiff's motion also explained that the market for Wyeth shares was efficient and that the Class was entitled to the fraud-on-the-market presumption of reliance.

39.     As part of the discovery on Lead Plaintiff's motion, Defendants noticed the deposition of the Rule 30(b)(6) designee for Pipefitters.   On January 11, 2012, Lead Counsel defended an all-day deposition of the Rule 30(b)(6) designee for Pipefitters, Charles Hannaford.

40.     Prior to the deposition, Lead Counsel met with and thoroughly prepared the designated Rule 30(b)(6) witness for Pipefitters, including reviewing and analyzing hundreds of pages of documents Pipefitters and its respective investment advisors had produced to Defendants.

41.     On January 31, 2012, Defendants filed their opposition to Lead Plaintiff's motion for class certification. Dkt. No. 88. Defendants submitted two declarations and approximately 20 exhibits in support of their opposition. Dkt. No. 88. In opposing Lead Plaintiff's motion for class certification, Defendants retained Dr. Kenneth M. Lehn to study and opine on the reaction of Wyeth's stock price to the alleged misstatements and omissions. Defendants argued in their opposition papers (in part via expert analysis) that, according to stock price reactions during the Class Period, the alleged misrepresentations and omissions had no statistically significant impact on the price of Wyeth shares during the Class Period. Defendants also argued that Wyeth had disclosed information during the Class Period about the alleged hypertensive and cardiac events in Study 315. Defendants further contended Lead Plaintiff could not invoke the fraud-on-the-market presumption of reliance and therefore common issues of fact did not predominate as required by Rule 23(b)(3). Defendants also challenged Pipefitters' ability to represent the Class based on Pipefitters' monitoring agreement with Lead Counsel and the timing of Pipefitters' purchases of Wyeth shares.

42.     In preparing to respond to Defendants' opposition brief, Lead Counsel meticulously reviewed and researched the briefing and evidentiary material Defendants submitted in support of their opposition. Lead Counsel also prepared extensively for and, on February 27, 2012, took the deposition of Defendants' expert, Dr. Lehn, which allowed Lead Counsel to question Dr. Lehn on the bases for his expert conclusions and report. In preparing for the deposition of Dr. Lehn, as well as the reply brief in support of class certification, Lead Counsel consulted with their economics and

loss causation experts.  On March 13, 2012, Lead Plaintiff filed the reply brief in support of its motion for class certification.  Dkt. Nos. 94-95.

43.     On March 27, 2012, Defendants submitted to the Court a sur-reply in opposition to class certification and a letter seeking leave to file the sur-reply.  Two days later, on March 29, 2012, Lead Plaintiff submitted a written response to the Court, challenging Defendants' submission of a sur-reply, without first obtaining leave to file the sur-reply, as procedurally improper.  On April 6, 2012, the Court denied Defendants' request to file a sur-reply.

44.     On May 10, 2012, the Court heard oral argument on Lead Plaintiff's class certification motion.  On September 18, 2012, the Court issued a Memorandum and Order granting Lead Plaintiff's motion. Dkt. No. 106.  On October 2, 2012, Defendants filed a petition to the United States Court of Appeals for the Second Circuit seeking leave to appeal the Court's class certification order, and Lead Plaintiff filed its opposition to the petition on October 15, 2012.

**F.     Investigators**

45.     In the post-PSLRA passage era, the use of investigators to gather detailed, fact-specific information from knowledgeable witnesses is often necessary in drafting the type of highly particularized complaints mandated by the current pleading standards.  Here, Lead Counsel utilized in-house and external investigators to perform investigative services relating to the Litigation.

46.     In connection with Lead Plaintiff's factual investigation and preparation of the case, in January 2008, Lead Counsel retained experienced private investigators from L.R. Hodges & Associates, Ltd. ("LRH&A") who assisted with the investigation by providing investigative services to Lead Counsel.  LRH&A's research staff expended considerable hours researching, identifying, and confirming the employment status of prospective witnesses, locating key targets, as well as maintaining and updating witness lists.  Their efforts also involved researching, retrieving, and

- 17 -

analyzing relevant documents, including news articles, court filings, and other materials related to the case.  LRH&A identified, gathered, and recorded contact information of over 50 individuals that were currently or formerly affiliated with Wyeth and had potentially relevant information regarding the allegations.  LRH&A contacted and conducted interviews with these witnesses; and thereafter, prepared detailed interview summaries and other case reports for Lead Counsel's review.  LRH&A further analyzed key case issues during the process, and participated in numerous strategy sessions and investigation briefings with Lead Counsel.  As a result of these efforts, Lead Counsel was provided with key information that could be used to strengthen Lead Plaintiff's allegations, navigate documents produced during discovery, and intelligently discern which individuals possessed potentially relevant information and could be potential candidates from which deposition or trial testimony could be elicited.

47.     LRH&A billed a total of $104,375.62 for the 534.8 hours of billed work over a four-month period.

### G.     Fact Discovery

#### 1.     Document Discovery to Defendants

48.     On November 11, 2010, Lead Plaintiff propounded its first request for the production of documents to the Individual Defendants.  Also on November 11, 2010, Lead Plaintiff propounded its first request for the production of documents to Wyeth.  Each request included 69 discrete requests seeking documents on a variety of relevant topics and spanning a five-year relevant time period.  Defendants submitted their responses and objections to the document requests to Lead Plaintiff on December 14, 2010.  Lead Counsel engaged in numerous meet-and-confer discussions with Defendants' counsel to address their responses and objections to the document requests, to negotiate the scope and manner of the discovery, and to arrange for the production of responsive

documents. Given the scope of the issue on which discovery was sought, as well as the disputes that arose regarding relevancy, burden, and privilege, from the outset the discovery process required extensive coordinated efforts and expenditures of substantial time and money on Lead Counsel's part.

49.     During fact discovery, Lead Counsel also spent a significant amount of time discussing and negotiating with Defendants the discovery and production of Wyeth's relevant electronically stored information ("ESI"). The parties discussed the relevant data sources that could be searched and retrieval methodologies for obtaining relevant ESI. The parties conducted numerous meet and confers to identify the custodians whose files would be searched, the relevant time frames and search terms to be used and the protocol for the format of the production, including the production of metadata. The negotiations and discussions led to the production of ESI from numerous Wyeth data bases.

50.     Prior to producing the requested discovery, Defendants insisted that Lead Plaintiff stipulate to a confidentiality agreement. The parties engaged in substantial conferrals and negotiations over the terms of the agreement and the confidential treatment of documents. On February 7, 2011, the Court approved the stipulated confidentiality order. Dkt. No. 71.

51.     On April 5, 2012, Lead Plaintiff propounded its second request for the production of documents to Defendants and first request to Defendants for the inspection of tangible things. This second document request targeted events following the Class Period concerning the drug Pristiq, including the reasons for Wyeth's withdrawal of its new drug application for Pristiq for VMS. These post-Class Period events indicated the existence of additional documents and information that were likely relevant to the Litigation. Lead Plaintiff's request for inspection was precipitated by Defendants' assertion, raised in prior briefing on the parties' motions, that certain facts regarding

- 19 -

Pristiq had purportedly been disclosed on a poster board during an industry event. Accordingly, Lead Plaintiff also sought to inspect this poster board and related materials.

52.     On May 7, 2012, Defendants submitted their responses and objections to Lead Plaintiff's second document request and first request for inspection. As it had with respect to the first documents requests, Lead Counsel engaged in a series of meet-and-confer discussions with Defendants' counsel to discuss their objections to the second document request and to negotiate the scope of the discovery. Following this series of conferrals, Defendants agreed to produce additional documents in response to the second set of document requests.

53.     The result of the discovery requests, in addition to numerous subsequent written and telephonic correspondence regarding the sufficiency of Defendants' discovery responses, culminated in the production of over 1.3 million pages of documents from Defendants. The careful examination and analysis of hundreds of thousands of pages of documents required an effort by various attorneys who analyzed, coded, and organized the documents, selected the documents that proved or could undermine Lead Plaintiff's allegations, identified relevant witnesses, and established procedures to identify additional documents and information that had not been produced. Attorneys for Lead Plaintiff also spent considerable time discussing specific documents produced during discovery, including which documents could potentially be utilized during motion practice or in connection with depositions.

54.     It must be stressed that virtually all of the materials produced by Defendants, as well as those by third parties, were highly scientific in nature and required Lead Counsel to become familiar with various terms, acronyms, concepts, and processes associated with the fields of pharmacology, biostatistics, and statistics. Lead Counsel thus spent significant time reviewing communications, minutes, reports, voluminous Excel spreadsheets, and PowerPoint presentations

- 20 -

that were technical in nature.  Throughout the document review process, Lead Counsel was tasked with comprehending what information the documents conveyed, determining how they were relevant to the alleged fraud, and then applying that understanding to other documents that had been produced.  Lead Counsel also continually assessed the areas in which Defendants' document production appeared insufficient in light of Lead Plaintiff's document requests and the parties agreed upon production protocol.  In total, the review, analysis, and organization of the document productions in this case was conducted over the course of nearly 18 months.

55.    In addition to propounding and conferring over the three sets of document requests to Defendants, Lead Plaintiff also responded to discovery requests propounded by Defendants. Defendants submitted their first request for production on November 9, 2010, which consisted of over 40 separate document requests.  Lead Plaintiff submitted its responses and objections to these document requests on December 9, 2010.  Lead Plaintiff also met and conferred with Defendants in order to negotiate the scope and breadth of the document requests, as well as how the parties would proceed following the submission of Defendants' notice of deposition of Lead Plaintiff and the original named plaintiff City of Livonia Employees' Retirement System.[2]  Lead Plaintiff also gathered documents in responses to the requests, and Lead Counsel reviewed the documents for responsiveness and privilege, ultimately producing just under 3,000 pages to Defendants.

### 2.    Depositions

56.    In preparation for trial and an anticipated motion for summary judgment, as of the time of the settlement Lead Counsel had taken depositions of three Wyeth employees, including two in their capacity as Fed. R. Civ. P. 30(b)(6) designations.  Defendants served written objections in

---

[2]    Based on a negotiated agreement between the parties, discovery directed at the City of Livonia Employees' Retirement System was largely stayed.

connection with Lead Plaintiff's efforts to conduct the Fed. R. Civ. P. 30(b)(6) depositions, which

the parties addressed during conferrals. Those depositions are set forth as follows:

| DEPONENT | DATE | LOCATION |
|---|---|---|
| Ru Fong Cheng – Fed. R. Civ. P. 30(b)(6) | July 31, 2012 | New York, NY |
| Justin Victoria – Fed. R. Civ. P. 30(b)(6) | Aug. 30, 2012 | New York, NY |
| Susan Mather, M.D. | Oct. 12, 2012 | Philadelphia, PA |

57.    Lead Counsel also noticed/subpoenaed and extensively prepared for the depositions

of the following witnesses, who included former and current employees of Wyeth, as well as non-

party analysts that covered Wyeth during the relevant time period:

| DEPONENT | NOTICED/SUBPOENAED DEPOSITION DATE |
|---|---|
| Maria Palma Seljan (former Wyeth employee) | Oct. 29, 2012 |
| Justin Victoria (former Wyeth employee) | Nov. 2, 2012 |
| Randall Brenner (former Wyeth employee) | Nov. 8, 2012 |
| Dr. Gary Stiles (former Wyeth employee) | Nov. 15, 2012 |
| Bernard Poussot (Defendant) | Nov. 27, 2012 |
| Ginger Constantine (Defendant) | Nov. 29, 2012 |
| Margery Gass, M.D. (Wyeth consultant on Pristiq) | Dec. 4, 2012 |
| Stephen Scala (Cowen analyst) | Dec. 6, 2012 |
| Robert Ruffolo (Defendant) | Dec. 11, 2012 |
| John Boris (Citigroup analyst) | Dec. 12, 2012 |
| Joseph Mahady (Defendant) | Dec. 13, 2012 |
| Henrietta Ukwu (former Wyeth employee) | Dec. 14, 2012 |
| Kenneth Martin (Defendant) | Dec. 18, 2012 |
| Robert Essner (Defendant) | Dec. 18, 2012 |

58.    In addition to these noticed/subpoenaed depositions, Lead Counsel was also

extensively preparing to take the depositions of other former Wyeth employees and third parties,

whose depositions had not yet been scheduled at the time of the settlement.  They include:

| DEPONENT |
|---|
| Barbara Ryan (Deutsche analyst) |
| James Kelly (Credit Suisse analyst) |
| John Boris (Bear Stearns analyst) |
| Tim Anderson (Prudential analyst) |
| Karen Tourain (former Wyeth employee) |
| Sophie Olivier (former Wyeth employee) |

- 22 -

59.     In preparation for the depositions outlined in ¶¶56-57, Lead Counsel analyzed tens of thousands of pages of documents produced by Defendants and third parties. Lead Counsel also reviewed analyst reports and conference call transcripts from the relevant time period in order to determine which analysts were likely to possess responsive information, and through Lead Counsel's internal investigation, Lead Counsel located, contacted, and negotiated with the analysts (or their respective counsel) regarding Lead Counsel's efforts to obtain the analysts' deposition testimony.

60.     Lead Plaintiff faced unique challenges in seeking to depose Sophie Olivier, M.D., a central witness who possessed key information regarding Pristiq and the events at issue but resided abroad in England and outside the jurisdictional reach of the United States District Courts. Dr. Olivier served as a Senior Director at Wyeth, was deeply involved in Wyeth's clinical trials of the drug Pristiq, sat on the Safety Review Team overseeing Pristiq for VMS, and had firsthand knowledge of the cardiovascular and hepatic side effects that were associated with Pristiq for the treatment of VMS. As part of the process of obtaining discovery from a person within the English court system's jurisdiction, Lead Plaintiff drafted and filed an application for the issuance of a Letter of Request from the Court. Lead Counsel worked with local counsel in England who was very knowledgeable in the area of English law, and in particular, the processes and intricacies involved in instances in which American litigants seek discovery from persons located in England.

### 3.     Third Party Discovery

61.     Starting in October 2010, Lead Plaintiff began issuing subpoenas seeking the production of documents from more than two dozen relevant third parties, including the FDA, companies Wyeth retained in order to market and develop publications regarding Pristiq, and more than a dozen securities financial analysts who covered Wyeth during the Class Period. Additionally, Lead Plaintiff, through public access procedures, retained thousands of pages of documents from the

- 23 -

EMA related to the registration of Pristiq for VMS in the European Union.  *See* paragraph 3 to the Declaration of Matthew P. Montgomery Filed in Support of Application for Award of Attorneys' Fees and Expenses, submitted herewith.  Lead Plaintiff issued additional document subpoenas throughout the litigation as other relevant third parties emerged as a result of Lead Plaintiff's continued review of documents and information produced during discovery, including various medical professionals and institutions who were involved with, and possessed relevant information concerning, the safety issues associated with Pristiq for the treatment of VMS.

62.    Lead Counsel expended considerable time locating and serving these third parties which were located in various regions across the United States, and obtaining EMA documents through its public access process.  Following service of the subpoenaed third parties, Lead Counsel engaged in numerous meet-and-confers with the third parties to discuss written objections to the subpoenas, negotiate the scope of production, and arrange for the production of responsive documents.  This required extensive coordinated efforts and expenditures of time and resources on Lead Counsel's part.  In all, Lead Plaintiff subpoenaed documents from the third parties identified below, and the document productions from the third parties exceeded 52,000 pages.

| NAME | SUBPOENAED/REQUEST DUE |
|------|------------------------|
| U.S. Food and Drug Administration | Nov. 19, 2010 |
| Arbor Scientia | Dec. 20, 2010 |
| Citigroup, Inc. | Dec. 20, 2010 |
| Cowen and Company, LLC | Dec. 20, 2010 |
| Credit Suisse Group AG | Dec. 20, 2010 |
| Deutsche Bank AG | Dec. 20, 2010 |
| Edward D. Jones & Co., L.P. | Dec. 20, 2010 |
| Goldman, Sachs & Co. | Dec. 20, 2010 |
| HSBC Global Asset | Dec. 20, 2010 |
| JPMorgan Chase & Co. | Dec. 20, 2010 |
| Leerink Swann, LLC | Dec. 20, 2010 |
| Merrill Lynch & Co., Inc. | Dec. 20, 2010 |
| Morgan Stanley & Co., Inc. | Dec. 20, 2010 |
| Natixis Bleichroeder LLC | Dec. 20, 2010 |

- 24 -

| NAME | SUBPOENAED/REQUEST DUE |
|------|------------------------|
| Oppenheimer & Co., Inc. | Dec. 20, 2010 |
| Prudential Financial Inc. | Dec. 20, 2010 |
| Standard & Poor's Financial Services, LLC | Dec. 20, 2010 |
| UBS Financial Services, Inc. | Dec. 20, 2010 |
| Cornerstone Research | Feb. 15, 2012 |
| Kenneth Lehn, Ph.D. | Feb. 15, 2012 |
| Margery Gass, M.D. | June 1, 2012 |
| Leon Speroff, M.D. | June 25, 2012 |
| University of Cincinnati | Aug. 6, 2012 |
| Cardinal Health | Oct. 10, 2012 |
| Michael Sketch, Jr., M.D. | Oct. 30, 2012 |
| John Warner, M.D. | Nov. 2, 2012 |
| Gregory Burkhart, M.D. | Nov. 7, 2012 |
| Margery Gass, M.D. | Dec. 4, 2012 |
| Stephen Scala (Cowan analyst) | Dec. 6, 2012 |

## H.     Experts and Consultants

63.     To assist Lead Counsel in investigating and proving up the complex issues involved in this matter, including matters concerning pharmacology, biostatistics, and statistical analysis, as well as loss causation and the Class's damages, the services of certain experts and consultants were required.  These experts and consultants included:

- Nicholas P. Jewell, Ph.D., a well-respected and published professor of Biostatistics and Statistics at the University of California, Berkeley, was retained by Lead Counsel to opine on Defendants' claims that the hepatic and cardiovascular serious adverse events in Study 315 were not statistically significant.  Dr. Jewell reviewed the clinical study report for Study 315, as well as thousands of pages of other Pristiq clinical trial reports and FDA related documents in preparing his opinions. Dr. Jewell also attended the parties' June 2011 face-to-face settlement meeting where the parties discussed their respective positions in the case.  Dr. Jewell made an informal presentation of his opinions at the face-to-face meeting and was instrumental in preparing Lead Counsel for the meeting.  Dr. Jewell also assisted with deposition preparation of the former Wyeth employees who were knowledgeable about the biostatistical data from Study 315.

- Ralph D. Harkins, Ph.D. (Innovation Clinical Research LLC), a statistical and management consultant and expert in the field of statistics and a former FDA employee, was retained by Lead Counsel to opine on the materiality of the hepatic and cardiovascular adverse events in Study 315, including whether Defendants had warning signs from the Pristiq clinical trials that the drug had alleged safety issues during the Class Period.  Dr. Harkins reviewed the results from each of the Pristiq

clinical trials and performed his own statistical analysis of those results. Dr. Harkins also provided significant insight to Lead Counsel regarding the FDA's statistical methodology and consulted with Lead Counsel on document and deposition discovery issues.

- Dr. Daniel Shames, an expert in the medical and pharmaceutical fields, and a former FDA director who presided over the review of drug products regulated by the FDA, was retained by Lead Counsel to opine on the nature of the communications between Wyeth and the FDA concerning Pristiq for VMS and the significance of the alleged adverse events to the marketing approval for Pristiq. Dr. Shames had been personally involved in the FDA review process for Pristiq for VMS, and reviewed thousands of pages of materials associated with the Pristiq clinical trials and FDA approval process. In addition to preparing his opinions, Dr. Shames regularly consulted with Lead Counsel regarding potential areas for discovery and relevant depositions.

- Financial Markets Analysis, LLC ("FMA") was retained by Lead Counsel to assist with the analysis of the movement of the price of Wyeth's common stock during the Class Period. FMA prepared an event study by locating, reviewing and chronologically aggregating various media articles and analyst reports, and analyzing the price movement of Wyeth's common stock in relation to the information disclosed in these public materials. FMA discussed its findings with Lead Counsel and presented its findings to Lead Counsel in a comprehensive report. Lead Counsel referred to and relied on this event study in moving for class certification, arguing that the event study demonstrated that Wyeth's stock price reacted quickly to new, material information during the Class Period, and that its common stock traded in an efficient market.

- Dr. Benny Chien, a well respected medical doctor and litigation consultant in San Diego, California, performed initial research on the chemical aspects of Pristiq, Wyeth's medical trials for Pristiq, and the available literature concerning desvenlaxafine and the drug class of serotonin-norepinephrine reuptake inhibitors ("SNRI"), which included Pristiq. Dr. Chien also reviewed Wyeth's press releases and filings with the SEC, and assisted Lead Counsel with the drafting and finalization of Lead Plaintiff's allegations, as well as Lead Counsel's investigation of those allegations.

- Forensic Economics, Inc. and its staff were retained by Lead Counsel to evaluate loss causation and assist in preparing the plan of allocation. During the class certification briefing, Defendants argued that the price reaction of Wyeth stock following the end of the Class Period was not related to the alleged misrepresentations and omissions, and Forensic Economics, Inc. was retained to respond to Defendants' defense and provide expert analysis and testimony, if necessary, to meet Lead Plaintiff's burden of proof on loss causation at summary judgment and trial. Additionally, Forensic Economics, Inc. spent numerous hours working with Lead Counsel in drafting a plan of allocation for disbursement of the Settlement Fund.

- 26 -

64.     These experts provided crucial assistance and guidance to Lead Counsel.  Lead Counsel met and corresponded with these experts often to discuss the complex issues in this case, including issues concerning the statistical significance of adverse events in Study 315, materiality, market efficiency, loss causation, and damages.  These experts' experience proved critical in this case, especially considering the degree to which statistical significance and materiality played a role in the action.  Had the case proceeded to summary judgment and/or trial, the employment of these experts' knowledge and testimony would have been equally indispensible.

## III.    THE STRENGTHS AND WEAKNESSES OF THE CASE

65.     Based on available documents, deposition testimony, and Lead Counsel's consultation with investigators, consultants, and experts, Lead Plaintiff believes that it had adduced and would continue to adduce substantial evidence to support its claims.  It also realized, however, that it faced considerable risks as the case proceeded.  Lead Plaintiff carefully considered these risks in evaluating whether a settlement was in the Class's best interests.

66.     As an initial matter, proceeding to summary judgment or trial posed a number of risks.  In order for the Class to ultimately prevail on its claims, it would first have to survive Defendants' motion or motions for summary judgment.  Summary judgment would pose a number of risks for the Class.  Lead Plaintiff would have to demonstrate to the Court that a genuine issue of material fact exists with regard to each element of its securities claims.  Summary judgment allows both Lead Plaintiff and Defendants to present their strongest evidence before the Court.  Defendants would undoubtedly bolster their motion for summary judgment with exculpatory evidence that arose during merits discovery.

- 27 -

67.     If Lead Plaintiff was to proceed to trial, notwithstanding its belief in the merits of the claims asserted, there would be a risk that documentary and expert evidence in support of the Consolidated Complaint's allegations would fail to convince a jury to find in favor of the Class.

68.     Assuming the Litigation had proceeded on to summary judgment and/or trial, Defendants almost certainly would have contended (as they had in connection with prior motions) liability could not be demonstrated because Lead Plaintiff could not demonstrate all of the elements of its §10(b) claim, including materiality, scienter, and loss causation. For instance, Defendants would have been expected to argue at summary judgment and/or trial that, prior to the end of the Class Period, Wyeth disclosed all material information about the alleged hypertensive and cardiac events in Study 315. Additionally, at summary judgment and/or trial, Defendants were expected to contend that they made no false and/or misleading statements or omissions regarding Pristiq's safety, and that, even if not technically accurate, any such misrepresentations were legally immaterial when one considered the degree of stock share price reactions to the alleged misstatements and omissions. Moreover, the Court would have been permitted to weigh evidence at these later stages of litigation, which potentially would have benefitted Defendants had these or other arguments been presented at later stages in the litigation.

69.     As discussed above, there was a risk that Lead Plaintiff might not be able to prove loss causation at trial. A private plaintiff alleging securities fraud must prove that the defendants' fraud caused an economic loss. Lead Plaintiff believes that at trial, and with the support of expert testimony, it would be able to demonstrate loss causation as to Defendants' challenged statements and corrective disclosures. However, Lead Plaintiff recognizes that Defendants would present expert testimony purportedly demonstrating the absence of a causal link between the various stock price declines and those disclosures. Defendants had contended in the past, and would undoubtedly

- 28 -

argue at summary judgment and/or trial, that the stock price drop on July 24, 2007, was the result of non-fraudulent factors such as the FDA's decision to issue an approvable letter for the VMS new drug application, as opposed to a disclosure of any allegedly withheld facts. As a result, Defendants would no doubt argue that Lead Plaintiff could not prove the loss causation and damage elements of the case.

70.    Moreover, there was a risk that at trial Lead Plaintiff would not be able to prove scienter; *i.e.*, that Defendants acted with knowledge of or with recklessness as to the alleged falsity of their statements and omissions. A defendant's state of mind in a securities case is often the most difficult element of proof and one which is rarely supported by direct evidence such as an admission. Thus, it was quite possible that Lead Plaintiff would depose all Defendants and others with knowledge about the facts, and yet adduce insufficient evidence to satisfy its burden of proof on this issue at trial. Defendants had previously argued, and would be expected to argue again at summary judgment and/or trial, that Lead Plaintiff could not demonstrate scienter because it could not show Defendants acted with conscious misbehavior or recklessness.

71.    Lead Plaintiff also faced a risk that a jury could ultimately find that Defendants' alleged false statements were either non-actionable projections, immaterial expressions of corporate optimism, or both. Defendants made these arguments in their motion to dismiss and almost assuredly would have revived them had this case proceeded to summary judgment and/or trial. Lead Plaintiff would have vigorously argued that, based on documentary evidence, deposition testimony, and expert analysis, Defendants' misstatements were about present and/or historical fact and would have been important information for a reasonable investor to consider in making an investment decision about Wyeth. However, there was the possibility the jury could disagree. For instance, Defendants would assuredly have contended (with the assistance of expert testimony) the adverse

- 29 -

events in Study 315 were not statistically significant and therefore any statements regarding, or non-disclosure of, the adverse events was immaterial. In a battle of pharmacology and biostatistics experts, a jury could easily have concluded that the undisclosed information was immaterial.

72.     Even if Lead Plaintiff prevailed on liability on any or all of its claims and was awarded some or all of its damages, there was the high likelihood that Defendants would appeal the verdict and award. The appeals process could span several years, during which time the Class would receive no distribution on any damage award. In addition, an appeal of any verdict would carry with it the risk of reversal, in which case the Class would receive no distribution despite having prevailed on the claims at trial.

73.     Furthermore, on October 2, 2012, Defendants filed a petition to the United States Court of Appeals for the Second Circuit seeking leave to appeal the Court's class certification order, which provided an additional risk to the Class.

74.     In summary, there are multiple procedural hurdles as well as significant merit-based risks involved in proceeding with the Litigation, each of which was carefully considered by Lead Counsel and Lead Plaintiff in making the determination to settle with Defendants on the agreed terms.

## IV.     SETTLEMENT NEGOTIATIONS AND TERMS

75.     On June 30, 2011, the parties engaged in a face-to-face meeting in New York City. During this all-day meeting, the parties' biostatistics experts each made presentations and were questioned by opposing counsel. Counsel also made presentations that focused on materiality and damages issues and addressed the merits of settlement. Thereafter, counsel engaged in numerous telephonic conferences on the issue of settlement. Ultimately, the parties agreed on a mediator and, on May 16, 2012, the parties participated in an all-day mediation with Judge Phillips in New York

City. In advance of the mediation, Lead Counsel prepared a detailed Mediation Statement, including significant evidentiary support, as well as a written response to questions raised by Judge Phillips. While the parties were unable to reach an agreement on May 16, 2012, they continued to negotiate with Judge Phillips' assistance. Over the course of the next five months, the parties made more than 18 formal demands and counter-offers, and finally reached this settlement on November 7, 2012.

## V.    THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS AND WARRANTS APPROVAL

76.    Lead Plaintiff believes it would have prevailed at summary judgment and eventually on the merits at trial. Defendants were just as adamant that Lead Plaintiff would not have prevailed. There was a very real risk that Lead Plaintiff would not have convinced a jury that Defendants acted with scienter, that the alleged misrepresentations and omissions were materially false or misleading when made, or that the alleged misrepresentations and omissions caused the Class's losses incurred at the end of the Class Period.

77.    Having considered the foregoing, and evaluating Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed settlement of this matter before this Court is fair, reasonable, and adequate, and in the best interest of the Class.

## VI.    THE PLAN OF ALLOCATION

78.    Class Members' claims will be calculated under the Plan of Allocation set forth below and in the Notice mailed to Class Members, if the plan is approved by the Court. The Plan of Allocation is based on Lead Plaintiff's damage theory and was developed in conjunction with Forensic Economics, Inc., Lead Plaintiff's economics and damages experts. The proposed Plan of Allocation provides as follows:

A claim will be calculated as follows:

- 31 -

The allocation below is based on the following per share decline in the alleged artificial inflation that Plaintiff contends was in the Wyeth stock price, as well as the statutory Private Securities Litigation Reform Act of 1995 ("PSLRA") "90-day look-back":

July 24, 2007 Price Decline:          $4.98

For shares of Wyeth common stock purchased or otherwise acquired on or between June 26, 2006 and July 24, 2007, the claim per share shall be as follows:

(a)      If sold on or before July 23, 2007, the claim per share is zero;

(b)      If sold between July 24, 2007 and October 19, 2007, the claim per share shall be the least of: (i) $4.98 (July 24, 2007 Price Decline), or (ii) the difference between the purchase price and the selling price, or (iii) the difference between the purchase price per share and the average closing price per share up to the date of the sale as set forth in the table below; and

(c)      If sold after October 19, 2007 or still retained, the claim per share shall be the lesser of: (i) $4.98 (July 24, 2007 Price Decline), or (ii) the difference between the purchase price per share and $46.73 per share.

PSLRA 90-DAY LOOK-BACK TABLE

| Date | Daily Closing Prices | Average Closing Prices |
|---|---|---|
| 7/24/2007 | $50.30 | $50.30 |
| 7/25/2007 | $49.61 | $49.96 |
| 7/26/2007 | $48.82 | $49.58 |
| 7/27/2007 | $48.41 | $49.29 |
| 7/30/2007 | $48.56 | $49.14 |
| 7/31/2007 | $48.52 | $49.04 |
| 8/1/2007 | $49.28 | $49.07 |
| 8/2/2007 | $49.07 | $49.07 |
| 8/3/2007 | $48.45 | $49.00 |

- 32 -

| Date | Daily Closing Prices | Average Closing Prices |
|---|---|---|
| 8/6/2007 | $49.33 | $49.04 |
| 8/7/2007 | $49.34 | $49.06 |
| 8/8/2007 | $50.55 | $49.19 |
| 8/9/2007 | $49.58 | $49.22 |
| 8/10/2007 | $46.59 | $49.03 |
| 8/13/2007 | $46.45 | $48.86 |
| 8/14/2007 | $44.96 | $48.61 |
| 8/15/2007 | $45.54 | $48.43 |
| 8/16/2007 | $45.78 | $48.29 |
| 8/17/2007 | $45.33 | $48.13 |
| 8/20/2007 | $45.18 | $47.98 |
| 8/21/2007 | $45.57 | $47.87 |
| 8/22/2007 | $46.49 | $47.81 |
| 8/23/2007 | $46.61 | $47.75 |
| 8/24/2007 | $46.97 | $47.72 |
| 8/27/2007 | $47.03 | $47.69 |
| 8/28/2007 | $46.56 | $47.65 |
| 8/29/2007 | $47.08 | $47.63 |
| 8/30/2007 | $46.54 | $47.59 |
| 8/31/2007 | $46.30 | $47.54 |
| 9/4/2007 | $46.95 | $47.53 |
| 9/5/2007 | $46.94 | $47.51 |
| 9/6/2007 | $47.54 | $47.51 |
| 9/7/2007 | $45.72 | $47.45 |
| 9/10/2007 | $46.30 | $47.42 |
| 9/11/2007 | $46.29 | $47.39 |
| 9/12/2007 | $45.90 | $47.35 |
| 9/13/2007 | $46.68 | $47.33 |
| 9/14/2007 | $46.34 | $47.30 |
| 9/17/2007 | $45.65 | $47.26 |
| 9/18/2007 | $45.70 | $47.22 |
| 9/19/2007 | $45.82 | $47.19 |
| 9/20/2007 | $44.92 | $47.13 |
| 9/21/2007 | $45.21 | $47.09 |
| 9/24/2007 | $44.68 | $47.03 |
| 9/25/2007 | $44.53 | $46.98 |
| 9/26/2007 | $44.70 | $46.93 |
| 9/27/2007 | $44.79 | $46.88 |
| 9/28/2007 | $44.55 | $46.83 |
| 10/1/2007 | $45.43 | $46.80 |
| 10/2/2007 | $45.26 | $46.77 |
| 10/3/2007 | $46.23 | $46.76 |
| 10/4/2007 | $46.59 | $46.76 |

- 33 -

| Date | Daily Closing Prices | Average Closing Prices |
|------|------|------|
| 10/5/2007 | $47.69 | $46.78 |
| 10/8/2007 | $46.93 | $46.78 |
| 10/9/2007 | $47.10 | $46.79 |
| 10/10/2007 | $46.16 | $46.78 |
| 10/11/2007 | $45.78 | $46.76 |
| 10/12/2007 | $45.90 | $46.74 |
| 10/15/2007 | $45.99 | $46.73 |
| 10/16/2007 | $45.96 | $46.72 |
| 10/17/2007 | $46.35 | $46.71 |
| 10/18/2007 | $47.76 | $46.73 |
| 10/19/2007 | $47.16 | $46.73 |

The date of purchase or acquisition or sale is the "contract" or "trade" date as distinguished from the "settlement" date.

For Class Members who held Wyeth common stock at the beginning of the Class Period or made multiple purchases or sales during the Class Period, the First-In, First-Out ("FIFO") method will be applied to such holdings, purchases, acquisitions, and sales for purposes of calculating a claim. Under the FIFO method, sales of Wyeth common stock during the Class Period will be matched, in chronological order, first against Wyeth common stock held at the beginning of the Class Period. The remaining sales of Wyeth common stock during the Class Period will then be matched, in chronological order, against Wyeth common stock purchased or acquired during the Class Period.

A Class Member will be eligible to receive a distribution from the Net Settlement Fund only if a Class Member had a net overall loss, after all profits from transactions in all Wyeth common stock described above during the Class Period are subtracted from all losses. However, the proceeds from sales of a security that have been matched against the same type security held at the beginning of the Class Period

- 34 -

will not be used in the calculation of such net loss.  No distributions will be made to Authorized Claimants who would otherwise receive a distribution of less than $10.00.

The Court has reserved jurisdiction to allow, disallow, or adjust the claim of any Class Member on equitable grounds.

Payment pursuant to the Plan of Allocation set forth above shall be conclusive against all Authorized Claimants.  No Person shall have any claim against the Plaintiff, Plaintiff's counsel, any claims administrator, or other Person designated by Plaintiff's counsel, or Defendants or Defendants' counsel based on distributions made substantially in accordance with the Stipulation and the settlement contained therein, the Plan of Allocation, or further orders of the Court.  All Class Members who fail to complete and file a valid and timely Proof of Claim form shall be barred from participating in distributions from the Net Settlement Fund (unless otherwise ordered by the Court), but otherwise shall be bound by all of the terms of the Stipulation, including the terms of any judgment entered and the releases given.

## VII.   CONCLUSION

For all the foregoing reasons, Lead Counsel respectfully request the Court to approve the settlement and Plan of Allocation, award attorneys' fees of 24.5% of the Settlement Fund plus $461,050.19 in expenses, and award Lead Plaintiff expenses of $4,526.25.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 10th day of January, 2013, at San Diego, California.

s/ Tor Gronborg
_____
TOR GRONBORG

- 35 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 10, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 10, 2013.

s/ Tor Gronborg
TOR GRONBORG

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:TorG@rgrdlaw.com

# Mailing Information for a Case 1:07-cv-10329-RJS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Rae Caroline Adams**
  radams@stblaw.com,mwasserman@stblaw.com

- **Susannah R Conn**
  sconn@rgrdlaw.com

- **Tor Gronborg**
  torg@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Laurie L. Largent**
  llargent@rgrdlaw.com

- **Lynn Katherine Neuner**
  lneuner@stblaw.com,managingclerk@stblaw.com

- **Bryce Allan Pashler**
  bpashler@stblaw.com,managingclerk@stblaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christopher D. Stewart**
  cstewart@rgrdlaw.com,karenc@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **George S Wang**
  gwang@stblaw.com,managingclerk@stblaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)